RYAN B. HANCEY (9101)
ADAM L. GRUNDVIG (12106)
KESLER & RUST
68 South Main Street, 2nd Floor
Salt Lake City, UT 84101
Telephone: (801) 532-8000
rhancey@keslerrust.com
agrundvig@keslerrust.com
*Attorneys for plaintiff Christina Rossi*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CHRISTINA ROSSI,<br><br>           Plaintiff,<br><br>v.<br><br>UNIVERSITY OF UTAH, a Utah state educational institution; F. EDWARD DUDEK, an individual, in his official and individual capacities; KRISTIN A. KEEFE, an individual, in her official and individual capacities; JOHN A. WHITE, an individual, in his official and individual capacities; JEFFREY J. EKSTRAND, an individual, in his official and individual capacities; BRADLEY GREGER, an individual, in his official and individual capacities; JEFFERY R. BOTKIN, an individual, in his official and individual capacities; and DOES 1 through 25, inclusive,<br><br>           Defendants. | **AMENDED COMPLAINT**<br><br><br>Civil No. 2:15-cv-00767-BCW<br><br>Magistrate Judge Brooke C. Wells<br><br>(**JURY DEMANDED**) |

Christina Rossi, through her undersigned counsel, complains of defendants the University of Utah, F. Edward Dudek, Kristin A. Keefe, John A. White, Jeffrey J. Ekstrand, Bradley Greger, Jeffery R. Botkin, and DOES 1 through 25, and for cause of action alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Christina A. Rossi is an individual currently residing in Massachusetts and a former Ph.D. student in the University's Interdepartmental Program in Neuroscience ("the Program").

2.      The University of Utah is a public educational institution and is (or was) the employer of all named defendants during all relevant times herein.

3.      F. Edward Dudek is an individual believed to be residing in Salt Lake County, Utah; a University faculty member; a Program faculty member; a member of Christina's dissertation committee, and Christina's mentor during most of her affiliation with the Program.

4.      Kristin A. Keefe is an individual believed to be residing in Salt Lake County, Utah; a University faculty member; a Program faculty member; formerly a member of Christina's dissertation committee, and formerly the Program director, including during some of Christina's affiliation with the Program.

5.      John A. White is an individual believed to be residing in Salt Lake County, Utah; a University faculty member; a Program faculty member; and formerly a member of Christina's dissertation committee.

6.      Jeffrey J. Ekstrand is an individual believed to be residing in Salt Lake County, Utah; a University faculty member; a Program faculty member; Christina's designated independent conflict of interest manager/reviewer; and formerly a member of Christina's dissertation committee.

7.     Bradley Greger is an individual believed to be residing in Maricopa County, Arizona; a former University faculty member; a former Program faculty member; and formerly a member of Christina's dissertation committee.

8.     Jeffrey R. Botkin is an individual believed to be residing in Salt Lake County, Utah; a University faculty member; the University's Vice President for Research Integrity; and the University's Research Integrity Officer.

9.     DOES 1 through 25 are other individuals or entities that may be liable to Christina but whose names and identities have not yet been ascertained.

10.     This court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343(3) because at least one of Christina's claims raises a federal (civil rights) question.  This court has supplemental jurisdiction over Christina's other, non-federal question claims under 28 U.S.C. § 1367 because those claims are both related to Christina's federal claims and part of the same case or controversy.

## GENERAL ALLEGATIONS

11.     The basis for this action is the University's wrongful, disciplinary discharge of Christina from the Program, in violation of her rights under federal and state law, and the other defendants' involvement in that (and other) wrongful conduct.

Christina joins the Program

12.     In 2007, Christina corresponded with then-University professor and Program faculty member Raymond Kesner about joining his lab at the University.  Christina developed an interest in the Program based, in part, on this correspondence.

13.     In or around August 2008, the University accepted Christina into, and Christina enrolled in, the Program as a Ph.D. student.  Christina became a member of Dr. Kesner's lab upon her enrollment.

14.     Prior to joining the Program, Christina had enrolled in and resigned from Boston University's Brain, Behavior, and Cognition Program within the Psychology Department, obtaining a Master's Degree in the process.

15.     Christina and Dr. Kesner discussed the circumstances of her resignation from Boston University prior to her enrollment in the Program.

16.     Dr. Kesner and Christina's advisor at Boston University, Dr. Michael Hasselmo, discussed the circumstances of Christina's resignation from Boston University prior to her enrollment in the Program.

17.     The University accepted Christina into the Program notwithstanding the circumstances of her resignation from Boston University.

18.     After joining Dr. Kesner's lab, Christina began studying lesions in regions of the hippocampus and electrophysiological activity during behavioral tasks in rats.

Christina enjoys early success in the Program

19.     Because Christina had completed certain graduate-level courses with sufficiently high achievement at Boston University, Program administrators waived several course requirements.

20.     Christina excelled academically in her first semester, earning a 4.0 GPA.

21.     Christina completed rotations in the laboratories of Drs. Kesner, Sharif Taha, and Dudek, and earned favorable reviews.

22.     Program faculty considered Christina for a training grant fellowship—Keefe viewed Christina as the top candidate.

23.     Toward the end of Christina's first year in the Program, Keefe joined Christina's advisory committee, and Christina prepared to take her qualifying examination.

24.     Early into her second year, Christina took and passed her qualifying examination.

25.     All five members of Christina's committee—Keefe, Dudek, Bradley Greger,[1] Kesner, and John White[2]—recommended her candidacy for a Ph.D. in Neuroscience.

Christina joins the Dudek Lab and enjoys continued success in the Program

26.     Christina joined the Dudek Lab in or around September 2009 and contemporaneously modified her research to involve mice instead of rats and to eliminate the behavioral component.

27.     Christina earned a 3.90 GPA for Fall Semester 2009.

28.     In or around March 2010, Christina presented and passed her dissertation proposal.

29.     In or around April 2010, Dudek asked Christina to help him evaluate the scientific merit of a manuscript submitted by another scientific group to the Journal of Neurophysiology.

30.     Christina earned a 3.91 GPA for Spring Semester 2010.

31.     Keefe submitted a letter of recommendation for Christina to the National Research Service Award, lauding "numerous traits that bode very well for [Christina's] future success as an independent PhD-level scientist."  Keefe specifically praised Christina's

---

[1] On information and belief, Associate Professor in Arizona State University's School of Biological and Health Systems Engineering.
[2] On information and belief, the University's USTAR Professor of Bioengineering and Executive Director of the Brain Institute.

commitment to research, knowledge of neurobiology and ability to use it in experiments, "excellent written and oral communication skills," and "congenial personality and enthusiasm."

32.     In July of 2010, the Program awarded Christina a one-year $25,000 stipend based on her grantsmanship, service on Neuroscience committees, and academic performance.

33.     In or around Fall 2010, Christina was awarded a one-year, $20,000 pre-doctoral fellowship from the Epilepsy Foundation of America for calendar year 2011.

34.     Christina earned an "A" for the dissertation research she conducted during Fall Semester 2010.

Dudek introduces a conflict of interest into his relationship with Christina

35.     In or around January of 2011, Dudek suggested that Christina use a wireless recording device known as "Epoch" to obtain electroencephalogram and/or local field potential data in mice.

36.     A company called Epitel, Inc. manufactured the "Epoch" device.

37.     Dudek had an ownership interest in Epitel and so was interested in Epitel and the Epoch's successes.

38.     In early 2011, Christina began using the Epoch device in mice.

39.     Dudek did not reveal his interest in Epitel or Epoch to Christina before she began using the device.

40.     Dudek did not reveal to Christina that the Epoch device had not been validated for use in projects like hers.

41.     At the time Christina began using the Epoch device in mice, no other Dudek Lab member had used it in mice.

42.    In or around September 2011, Christina began using the data she collected with the Epoch device for her research project.

43.    After Dudek introduced the Epoch device to Christina, she worked with him and other Dudek Lab members to prepare promotional materials for the device.  Christina also attended conferences at which she would demonstrate the device's uses, including its utility in her research.

<u>Christina continues to succeed in her third and fourth years in the Program</u>

44.    In or around April 2011, Christina had satisfied all Program course requirements.

45.    Christina's dissertation committee members continued to support her efforts to obtain financial support and recognition from organizations related to her research.

46.    By September 16, 2011, Christina's dissertation committee reported that she had "made considerable progress" in her research, and had addressed the committee's prior year comments about her research.  Additionally, the committee reported that Christina had "obtained substantial data" which she planned to present at the American Epilepsy Society and Society for Neuroscience annual meetings.

47.    On September 11, 2012, Christina met with her dissertation committee to discuss the status of her dissertation.  At or around the meeting:

   a.  Dudek stated Christina was making solid progress on her experiments, was working full-time in the lab, knew the relevant literature, and was a "critical" evaluator of her research data;

   b.  Dudek commented Christina had excellent independence, motivation, and overall progress;

7

     c.   Christina and the committee resolved that Christina would defend her dissertation in or around June 2013.

<u>Christina obtains a fellowship offer from Massachusetts Institute of Technology</u>

48.     In September 2012, Christina, believing she would defend her dissertation in June 2013, reached out to MIT professor Weifeng Xu to express interest in obtaining a post-doctoral position in Dr. Xu's lab.

49.     Dr. Xu responded to Christina's interest favorably, inviting Christina to visit MIT.

50.     Christina represented the Dudek Lab at the Society for Neuroscience in October 2012, where she presented a poster of her research that Dudek had reviewed and approved.

51.     After the Society for Neuroscience conference, Christina visited Dr. Xu at MIT, where she presented her research, interviewed with MIT representatives, and attended meetings.

52.     Dr. Xu offered Christina a post-doctoral position in her lab pending the outcome of Christina's dissertation defense.

53.     Christina informed her dissertation committee members about the MIT fellowship offer and asked that they support it by submitting letters of recommendation.

54.     Several of Christina's dissertation committee members submitted a letter of recommendation to MIT.

55.     In Dudek's letter of recommendation dated October 21, 2012, he described Christina as having "considerable research experience" as an undergraduate and graduate student.  He also stated Christina was "enthusiastically accepted" into the Program.  Dudek described Christina's research in his lab as unique, noting that "no one has examined the effects of selective interneuron lesions on seizure generation and progression" and that "any answer that

Christina obtains from [her] data set will be interesting."  Dudek closed his letter by describing

Christina as "a dedicated and thoughtful researcher," "a hard worker," "committed," and "well-

liked and highly respected in the lab and the Program."

<u>Dudek reveals his scientific conflict of interest concerning Epitel and the Epoch device</u>

56.     In a November 21, 2012 letter, Dudek informed Christina for the first time that

financial and scientific conflicts of interest existed because of his ownership interest in Epitel

and Christina's use of the Epoch device in her research.

57.     Dudek explained in the letter: "Dr. Lehmkuhle [a postdoctoral fellow in the

Dudek Lab] and I have a financial interest in Epitel, as does Mr. John Fisher.  Drs. Lehmkuhle,

Roper and I, plus Mr. John Fisher, all receive salary or consulting funds from Epitel, Inc.  Thus,

we stand to gain financially if Epitel products are successful or seen as successful."

58.     To manage the conflict of interest that Dudek identified in his letter, Dudek stated

that Ekstrand would independently review all data that Christina recorded with the Epoch device.

He also stated:

> Of substantial concern for all of us, particularly you individually
> and the University of Utah, is the issue of whether you are ever
> 'pressured' to make the device, the recording system, and/or the data from
> the device and recording system appear better than they actually are.
> Assuming other systems are a possibility for your recordings, you should
> feel free to request that we use them.  You and other trainees and
> employees will not be evaluated based on your participation (or lack
> thereof) in non-University activities related to Epitel.

59.     Dudek's letter did not copy Ekstrand or any other University representative.

60.     Dudek's letter was never a part of Christina's student file at the University.

61.     Dudek did not notify any University representative about his conflict of interest

before Christina began using the Epoch device.

9

62. Dudek did not notify any University representative about his conflict of interest.

63. Ekstrand never independently reviewed Christina's Epoch-generated data.

64. Dudek did not ask Ekstrand to independently review Christina's Epoch-generated data.

65. No University representative ever independently reviewed Christina's Epoch-generated data.

66. The University never undertook any effort to protect Christina from the conflict of interest involving Dudek, Epitel, or the Epoch device.

67. The Program never undertook any effort to protect Christina from the conflict of interest involving Dudek, Epitel, or the Epoch device.

68. Dudek never undertook any effort to protect Christina from the conflict of interest involving him, Epitel, or the Epoch device.

69. Upon handing Christina the November 2012 letter, Dudek told Christina, "If anybody asks you about this letter, tell them I gave it to you."

<u>Dudek's support of Christina diminishes in the months leading to her defense</u>

70. Christina continued her strong academic performance in the Program, earning an "A" for her research efforts for Fall Semester 2012.

71. Despite Christina's strong academic achievement, Dudek's support of her lessened after and because she obtained the MIT postdoctoral position.

72. Between November 2012, the date around which Christina informed Dudek she did not detect any seizures in the experimental animals, and mid-April 2013, Christina had great difficulty obtaining Dudek's feedback on her dissertation efforts.

73.     On several occasions, Christina would ask Dudek for feedback and weeks would go by before he responded, if he responded at all.

74.     Christina asked Dudek to meet with her in person in January and February 2013, and made herself available to meet in person during these months, but Dudek did not meet with her in person at all during this time.

75.     In early March 2013, Christina contacted her dissertation committee members about scheduling a dissertation defense date.  After obtaining feedback from all members, including Dudek, Christina scheduled her dissertation defense for Thursday, April 25, 2013.

76.     Prior to April 16, 2013, no committee member expressed concern, reservation, or anything negative about Christina's ability or readiness to defend on that date.

77.     Also in early March 2013, Christina applied for graduation.

78.     Christina's March 2013 application for graduation required involvement of Program representatives.

79.     No Program representative ever objected to or otherwise negatively responded to Christina's application for graduation.

80.     In early March 2013, Dudek provided some email-based feedback on various sections of her papers.  He also suggested that Christina and he should discuss seizure criteria, which he suggested were controversial, and ways to generate figures based on those criteria.  Even though Christina asked to meet with Dudek about seizure criteria, and made herself available to meet in person, she and Dudek never met to discuss such criteria.

81.     In late March 2013, Dudek reviewed Christina's papers and said they "look[ed] good; mostly very small stuff to consider so far."

82.     In early April 2013, Christina and Dudek discussed her two dissertation papers—one involving theta rhythms ("Theta Paper") and the other involving seizures ("Seizure Paper"). Dudek said the Theta Paper "would probably fly fine" with the committee at her dissertation defense.  Dudek instructed Christina to focus on the Seizure Paper, because, in his view, that paper would be the "limiting factor."

83.     Christina did as Dudek instructed, revised her Seizure Paper, and awaited Dudek's feedback.  More than a week went by without Dudek providing any feedback.

84.     On April 13, 2013, Christina emailed her completed dissertation to Dudek and asked for timely feedback.

85.     When days passed without any feedback from Dudek, Christina contacted White to discuss her dissertation and difficulties obtaining Dudek's feedback on her dissertation.

86.     White encouraged Christina to contact Keefe, suggested that he and Keefe could "get [Dudek's] attention[,]" and "appreciate[d] that this [wa]s a serious problem."

87.     Following White's suggestion, Christina contacted Keefe about her difficulties obtaining Dudek's feedback on her dissertation.  Keefe directed Christina to other Dudek Lab members for assistance.

88.     On April 15, 2013, Dudek and Christina discussed her dissertation in person for the first time in several weeks.  Dudek asked Christina to revise and include several Seizure Paper figures, associated text, and the results section.  He also advised Christina to consider postponing her dissertation defense and perhaps her MIT fellowship, and suggested he had been concerned for months that Christina scheduled her MIT fellowship to start after her April 25, 2013 defense date.

89.     Prior to April 15, 2013, Dudek never expressed any concern to Christina about her April 25, 2013 dissertation defense date.

90.     Prior to April 15, 2013, Dudek never expressed any concern to Christina about her scheduling the MIT postdoctoral position to start after her dissertation defense date.

91.     Prior to April 15, 2013, Dudek never expressed any concern to Christina about her scheduling the MIT postdoctoral position to start after her graduation from the Program.

92.     Dudek's suggestion that she postpone her dissertation defense and MIT fellowship, based on alleged concerns he had not previously shared with Christina, concerned her greatly, as did the imminence of her dissertation defense date.  Consequently, Christina reached out to Lehmkuhle and Keefe for guidance.

93.     Lehmkuhle stated he and Dudek had discussed Christina's dissertation and reported Dudek's impression that her Seizure Paper needed to be improved by adding spectrograms, spikes, figures, and the like.

94.     Considering Christina's dissertation project, there was only one rationale for adding spectrograms, spikes, figures, and the like to her Seizure Paper—to convey that Christina had, in fact, detected seizures among the mice she studied while using Epitel's Epoch device.

95.     Christina had not, in fact, detected seizures among the mice she studied. Accordingly, Christina responded to Lehmkuhle that her Seizure Paper lacked substantial seizure content "due to a negative result."  She also suggested that Dudek wanted her Seizure Paper to reflect "some mega result" that was not warranted.

96.     On April 16, 2013, Christina and Keefe met to discuss Dudek's suggestion that she postpone her dissertation defense.  Keefe assured Christina she would address this issue with Dudek.  With Christina in her office, Keefe emailed Dudek, stating:

> To be honest, as both a member of the supervisory committee and the director of the program, I am dismayed that we are a week out from a scheduled, advertised defense and yet now there is a question of whether it should be postponed, and I have a student in my office who thinks she is hearing that she should have several months of work left (when the post-doc position is arranged and the defense was scheduled with, I assume, your approval).

97.     Dudek and Christina corresponded with Keefe, disputing each other's characterizations of, and reasons for, their dispute.

98.     Concerned that Dudek's unavailability and/or unresponsiveness would plague any possible benefit of postponing her dissertation, Christina communicated to Keefe and Dudek her desire and perceived readiness to defend.

99.     All things considered, Keefe thought that holding the defense as currently scheduled was the best course.

100.    Between April 16 and 19, 2013, Christina modified her dissertation papers to incorporate Dudek's suggestions and comply with his instructions to include certain seizure-related information and figures.

101.    On April 19, 2013, Christina submitted her revised dissertation to her committee and also to Dudek.  She also requested an in person meeting with Dudek, who instructed her to set up a meeting for Monday, April 22, 2013.

<u>Dudek expels Christina from his lab, gives her a failing grade for the research she
conducted that semester, and undertakes to fail her defense before she presented it</u>

102.    On Monday, April 22, 2013, Christina arrived at Dudek's office for the meeting

he asked her to set up.  Upon her arrival, Dudek handed her a letter that read, in part:

> This letter is to inform you that after today your will no longer
> have access to [the Dudek Lab's location at] 420 Chipeta Way.  You may
> only enter the building with permission, and must be in the company of a
> predefined escort at all times.
>
> As the only need for you to be in the building is to reanalyze your
> data, please make arrangements ahead of time to ensure your escort is
> available.

103.    Dudek explained to Christina that he was taking this action because he believed

she was dishonest, had falsified her dissertation results, and he did not trust her.  Dudek insisted

that Christina turn in her data and vacate the lab immediately.

104.    Dudek offered no explanation for his accusation that Christina was dishonest.

105.    Dudek offered no explanation for his accusation that Christina had falsified her

research findings.

106.    Dudek offered no explanation for why he did not trust Christina.

107.    Dudek gave Christina no opportunity to explain or defend herself.

108.    After April 22, 2013, Dudek and Christina did not meet in person again, although

Christina asked to meet with him in person and made herself available to do so.

109.    Christina immediately informed Keefe and White of Dudek's expulsion of her

from his lab.  White referred the matter to Keefe, who refused to get involved in the dispute.

Rather, Keefe encouraged Christina and Dudek to work together to determine whether

Christina's defense should proceed as scheduled.

110.    Dudek refused to interact with Christina further about their dispute or her dissertation defense, stating in an email to Keefe and others:

> I am confused.
>
> From the [April 19, 2013] email [from Christina] below, 'I have spoken with each of my committee members this week, and they were all very supportive and encouraging.  The impression I got is that everyone is on the same page about the work I have done being enough to graduate, and that they don't anticipate any problems with my writing.'
>
> You all have made a decision, and it is clear that you all want to go forward.
>
> See you Thursday ….

111.    White responded to Dudek's email stating he assumed that, when Christina set the defense date, "Ed and Christina agreed that everything could happen by then.  What else would I assume?"  He also said the nature of this dispute was "unprecedented" in his career.

112.    In the evening of April 22, 2013, Dudek instructed Program administrator Tracy Marble ("Marble") to give Christina a failing letter grade for that semester's dissertation research.

113.    At the time Dudek instructed Marble to give Christina a failing grade for Spring Semester 2013, Dudek was her dissertation mentor.

114.    At the time Dudek instructed Marble to give Christina a failing grade for Spring Semester 2013, Dudek had agreed to abide by the Program's mentor-mentee requirements.

115.    At the time Dudek instructed Marble to give Christina a failing grade for Spring Semester 2013, Dudek was one of five members of Christina's dissertation committee.

116.    At the time Dudek instructed Marble to give Christina a failing grade for Spring Semester 2013, Dudek was the only member of Christina's dissertation committee who had agreed to abide by the Program's mentor-mentee requirements.

117.    Christina's dissertation defense could pass if at least three of the five committee members voted it as a passing effort.  Thus, Christina's defense could have passed even if Dudek voted to fail it.

118.    On the morning of Christina's dissertation defense, Dudek admitted to his administrative assistant, Vicki Skelton ("Skelton"), that he was "almost certainly going to vote to fail" Christina's defense.

119.    On April 25, 2013, Christina presented her dissertation defense then prepared for the oral examination that was expected to follow.

120.    Keefe informed Christina there would be no oral examination because the committee decided further work was needed on her dissertation.  According to Keefe, the committee had concerns with the quality of Christina's dissertation writings and representations about her data, and so would not pass her at that time.  However, "the committee decided to provide her with feedback and to not formally register a 'fail' on the final examination at that time, in order to support Christina and give her the opportunity to remedy the deficiencies."

121.    In late May 2015, Christina attended graduation.

122.    At the May 2015 graduation, Keefe hooded Christina and congratulated her while doing so.

<u>Dudek defames and otherwise disparages Christina while she endeavors to complete her dissertation and re-analyze her dissertation data at her committee's instruction</u>

123.    Shortly after Christina's dissertation defense, Keefe provided Christina a commented-on copy of her dissertation and a summary of other committee members' feedback.

124.    Dudek himself provided no written feedback.

125.    Starting in early May and continuing through December 2013 ("Post-defense Period'), Christina worked to address committee feedback on her dissertation ("Post-defense Work").

126.    During the Post-defense Period, Christina worked to re-analyze her dissertation data at the committee's instruction.

127.    During the Post-defense Period, Keefe instituted a blanket prohibition on Christina having any communications with any individual committee member.  Keefe required that all communications about the Post-defense Work go through the entire committee and all in person communications about the Post-defense Work involve Dudek and at least two other committee members.

128.    During the Post-defense Period, Christina worked to re-analyze her dissertation data at the committee's instruction.

129.    Dudek would not allow Christina to perform any Post-defense Work in his lab.

130.    Because Dudek would not allow Christina to perform any Post-defense Work in his lab, Christina had to perform all Post-defense Work in an environment different than the Dudek Lab.

131.    The environment in which Christina performed the Post-defense Work was less well-suited for performance of that Work than was the Dudek Lab environment.

132.     During the Post-defense Period, Dudek suggested that the dissertation committee address potential issues with Keefe serving simultaneously as a committee member and as the Program director.

133.     On several occasions during the Post-defense Period, Christina updated her dissertation writings, submitted the updated writings to her committee, and asked for feedback. Committee members disagreed, or were inconsistent in their feedback, about several aspects of the Post-defense Work, necessitating that Christina bring these disagreements and inconsistencies to the committee's attention for resolution.

134.     On several occasions during the Post-defense Period, the dissertation committee asked Dudek to answer important questions about aspects of Christina's Post-defense Work.

     a.   Dudek failed to answer some of these questions at all.

     b.   Dudek failed to answer some of these questions timely.

135.     On several occasions during the Post-defense Period, Christina asked Dudek to answer questions about aspects of her Post-defense Work.

     a.   Dudek failed to answer some of these questions at all.

     b.   Dudek failed to answer some of these questions timely.

136.     On several occasions during the Post-defense Period, Dudek disparaged Christina to her committee members and other University representatives.  For example,

     a.   In May 2013, Dudek told Christina's dissertation committee members that he expelled her from his lab because she had been dishonest and was untrustworthy.

b. In September 2013, Dudek commented privately to White that Christina's proposal concerning an aspect of Post-defense Work was "another veiled attempt by Rossi to get out of analyzing the data."

c. On October 24, 2013, Dudek contacted University Vice President for Research, Thomas Parks, accusing Christina of falsifying her dissertation data and lacking data to support her dissertation findings.

d. In November 2013, Dudek contacted Parks and University Vice President for Research Integrity Jeffrey Botkin in writing to report that "falsification" abounded in Christina's dissertation work and such "falsifications" deserved a "rigorous investigation."

e. Also in November 2013, Dudek commented privately to Greger that "possible/likely dishonesty issues … permeated" Christina's Post-defense Work.

f. Also in November 2013, Dudek told Christina's entire dissertation committee that he had "veracity" concerns with her seizure data.

g. In December 2013, Dudek told Skelton that Christina had "mislead" him into thinking she had analyzed more data than she really had and had "misrepresented everything."  Dudek suggested to Skelton he would be forced to show in detail problems with Christina, including "scientific misconduct and falsification."

137.    Dudek, Parks, Botkin, and University Associate General Counsel Robert Payne met at least once to discuss Dudek's falsification allegations and evidence against Christina.

138.    No University representative notified Christina of the allegations that Dudek made against her to Parks and/or Botkin.

139.    No University representative invited Christina to participate in Dudek, Parks, Botkin, and Payne's discussion about Dudek's falsification allegations and evidence.

140.    After discussing Dudek's falsification allegations and evidence against Christina, Botkin determined Christina's alleged misconduct did not fall under the definition of research misconduct.

Dudek obtains Christina's blinded and analyzed dissertation data with the intent to use it without her

141.    In early November 2013, Dudek proposed that the dissertation committee permit Christina to send him her "blinded and analyzed" dissertation data.

142.    Keefe consented to Dudek's proposal, provided that "the data would still be Christina's to write up and take credit for …."

143.    Dudek contacted Christina to ask that she provide him her blinded and analyzed dissertation data.

144.    On November 18, 2013, Dudek discussed with Lehmkuhle and Dudek Lab postdoctoral fellow Jay Spampanato his desire to obtain Christina's blinded and analyzed dissertation data.

145.    The following day, Spampanato contacted Dudek with a proposed plan respecting Christina's dissertation data:

> [W]hat I think we need to do at the very least, as far as the data is concerned, is:
>
> 1. Get Christina to submit the analyzed data (as she has indicated that she is willing to do).
>
> 2. Give her the blind code so she can assemble the data in a presentable way.  Have her submit the theta curves for every animal, and the combined average/SD of each group.

3. Spot check the compiled numbers.

This way we will at least know if the theta effect is real.  We can also spot check the seizures.  Without getting her to compile the data in a presentable way, one of us will have to re-analyze all of the data if we end up moving forward without her.

146.     Dudek responded to Spampanato that his plan was "great."  Dudek also suggested that Spampanato, Lehmkuhle, and he meet, assuming they followed Spampanato's plan, to consider "the next options" and "consequences."

147.     Christina gave her blinded and analyzed dissertation data to Dudek per his request.

148.     On information and belief, Dudek has used the dissertation data he acquired from Christina to promote his own interests.

149.     On information and belief, Dudek has used the dissertation data he acquired from Christina to promote his own interests in Epitel.

150.     On information and belief, Dudek has used the dissertation data he acquired from Christina to promote his interests in the Epoch device.

151.     On information and belief, Dudek has used the dissertation data he acquired from Christina without affording her any opportunity to take credit for it.

<u>University attempts to discharge Christina from the Program without providing her notice or an opportunity to be heard and/or arbitrarily</u>

152.     On November 20, 2013, Christina met with her dissertation committee to discuss the status of her Post-defense Work.  After criticizing aspects of her Work not previously identified as problematic, the committee told Christina she was discharged from the Program.

153.     Christina's dissertation committee afforded her no opportunity to defend herself.

154.    Later that night, Christina asked Keefe for a written explanation for her dismissal. Keefe assured Christina such an explanation would be forthcoming.

155.    Two days later, Keefe notified Christina the committee had reversed its dismissal decision.  In that notification, Keefe provided Christina a letter that supplied a "detailed plan for [Christina] to move forward toward receipt of the Ph.D. degree in Neuroscience."

156.    Keefe and Dudek jointly authored the letter that set forth the detailed plan.

157.    That plan required that Christina submit revised methods and introduction sections by specified dates.  If the committee believed Christina's submissions were inadequate and a second defense would not likely be successful, the committee would ask Christina if she nevertheless wished to continue in the Program.  If she did wish to continue, the committee would give her until July 28, 2014 to submit a final dissertation, and, if the document passed by majority committee vote, until the week of August 18, 2014 to orally defend her dissertation.

Christina grieves the committee's discharge action to the University Graduate School and School of Medicine deans but receives no help

158.    The committee's attempt to discharge Christina from the Program the way it did prompted Christina to file a grievance with University Graduate School Dean David Kieda and University School of Medicine Dean Vivian Lee and request an in person meeting with each Dean.

159.    Dean Kieda agreed to meet with Christina because he believed that mediation is "very helpful to break a stalemate."  Dean Kieda also agreed to explore with Dudek and Keefe whether they would meet with him to resolve the difficulties with Christina.

160.    Dean Kieda met with Dudek and afterwards reported to Christina that several issues needed resolution, and that a mediator would need to resolve them.  Keefe could not serve

as a mediator because she was "conflicted with program related issues."  Dean Kieda suggested

that Keefe's conflict made her response to Christina and Dudek's difficulties "somewhat

confusing."

161.    Dean Kieda suggested he could recommend a dispute resolution path after he met

with Keefe.

162.    Dean Kieda never again communicated with Christina.

163.    Dean Lee responded to Christina's grievance in mid-December 2013.  She refused

to meet with Christina but instead encouraged her to communicate her concerns "directly with

Dr. Keefe, Dr. Dudek, [her] dissertation committee, and the other key faculty from [her]

program."

The University of Utah discharges Christina from the Program without providing her
notice or an opportunity to be heard and/or arbitrarily

164.    On January 6, 2014, Keefe provided Christina's most recently updated

dissertation documents to the other committee members and stated the committee needed to

consider whether Christina would be allowed to remain in the Program.

165.    White voted to discharge Christina from the Program, in part, for "character"

issues.

166.    White represented to the committee that "Christina purposefully misrepresented

to [him] the degree to which the dissertation had been reviewed and approved by [Spampanato]

and [Lehmkuhle] from [Dudek's] lab, as well as the degree to which [Dudek] had been available

during the months preceding her defense."

167.    White represented to the committee that the circumstance under which Christina

resigned from Boston University was "evidence of low character."

168.     Other committee members also voted to discharge Christina from the Program.

169.     Other committee members voted to discharge Christina from the Program because of the reasons White provided.

170.     Christina's dissertation committee voted to discharge Christina from the Program because they believed her revised dissertation submissions were inadequate.

171.     Christina's dissertation committee voted to discharge Christina from the Program because they believed a second dissertation defense would be unsuccessful.

172.     On January 13, 2014, Keefe and Dudek jointly authored a letter informing Christina of her immediate dismissal from the Program.  The letter identified a "three-fold" basis for Christina's dismissal:

     a.   Failure to meet the applicable standard of excellence as evidenced by failures to demonstrate competence in independent research and an understanding of the subjects and approaches to her dissertation work;

     b.   Lack of adequate progress toward completing her degree;

     c.   Lack of acceptable interpersonal skills, attitudes, and professional character.

173.     The University dismissed Christina from the Program on January 13, 2014 without providing her advance notice.

174.     The University dismissed Christina from the Program on January 13, 2014 without providing her an opportunity to be heard.

175.     The University dismissed Christina from the Program on January 13, 2014 without asking her whether she wanted to remain in the Program.

176.    The University's dismissal of Christina from the Program on January 13, 2014 conflicted with the plan set forth in Keefe and Dudek's November 22, 2013 letter.

177.    The day after the University dismissed Christina from the Program, Christina asked Skelton to help her resolve the tuition bill she received for Spring Semester 2014.  Skelton referred the matter to Marble, who, in turn, involved Keefe.

178.    Keefe instructed Marble to "sit on [the bill] … [w]e can drop her classes and have the bill waived."

179.    The Program did not drop Christina's Spring Semester 2014 classes.

180.    The Program did not have the Spring Semester 2014 tuition bill waived.

181.    Christina paid some or all of Spring Semester 2014 tuition bill because the Program would not waive it.

182.    In April 2014, Marble asked Dudek to "indicate a letter grade for the Neuroscience student doing research in [his] lab."

183.    Marble identified Christina as a student doing research in Dudek's lab during Spring Semester 2014.

184.    Christina did not do research in Dudek's lab during Spring Semester 2014.

185.    Dudek gave Christina a failing grade for Spring Semester 2014.

186.    Around this same time, Dr. Xu eliminated Christina's MIT post-doctoral position.

**FIRST CAUSE OF ACTION**
**(Infringement of constitutionally-protected property and liberty interests, without due process of law, brought under 42 U.S.C. § 1983 against Dudek, Keefe, White, Ekstrand, Botkin, Greger, and DOES 1-25 in their individual capacities for damages and in their official capacities for prospective injunctive relief)**

187.    Christina realleges and reincorporates all preceding allegations as though set forth verbatim herein.

188.    The federal and Utah constitutions protect against deprivations of life, liberty, or property without due process of law.

189.    Christina had, and has, constitutionally-protected property interests in her pursuit of an education, her academic placement, and her future employment opportunities.

190.    Christina had, and has, constitutionally-protected liberty interests in her good name, reputation, honor, integrity, and pursuit of future employment opportunities.

191.    Christina was dismissed for some disciplinary, non-academic reasons.

192.    Because Christina was discharged for some disciplinary, non-academic reasons, Christina was entitled to both notice and a hearing before Dudek, Keefe, White, Ekstrand, and Greger infringed on her constitutionally-protected interests by dismissing her from the Program.

193.    University policies authorized Christina's dissertation committee members, in their capacities as University faculty and representatives, to judge Christina's performance in the Program.

194.    Dudek, Keefe, White, Ekstrand, and Greger, acting under the authority given them by the University, dismissed Christina from the Program without providing her any notice or a hearing.

27

195.    Dudek, Keefe, White, Ekstrand, and Greger's dismissal of Christina from the Program constituted state action.

196.    Dudek, Keefe, White, Ekstrand, and Greger's dismissal of Christina from the Program without providing pre-dismissal notice and a hearing infringed upon her constitutionally-protected interests without due process, in violation of the federal and Utah constitutions.

197.    Dudek, Keefe, White, Ekstrand, and Greger's deprivation of Christina's constitutionally-protected interests without due process damaged Christina by halting her pursuit of a Ph.D., rendering her unemployable or underemployable in her chosen field, and harming her financially in an amount to be determined at trial.

198.    Policy 7-001 is the University's research misconduct policy.

199.    Policy 7-001 applies "in all instances of alleged or apparent misconduct involving research …."

200.    Policy 7-001's "Misconduct"/"Misconduct in Research" definition includes "falsification."

201.    Policy 7-001's "falsification" definition includes "omitting data or results such that the research is not accurately represented in the research record."

202.    Policy 7-001 requires that the University's Research Integrity Officer take certain action "[u]pon receipt of a written complaint of misconduct[.]"  For example, Policy 7-001 requires that the Research Integrity Officer "establish an ad hoc Inquiry Committee and a committee chair" and "notify the respondent of the allegation and of the committee composition."

203. Policy 7-001 requires that the University "undertake diligent efforts, as appropriate, to restore the reputations of persons alleged to have engaged in misconduct when such allegations are not confirmed …."

204. In October and November 2013, Dudek contacted Parks and Botkin alleging that Christina had committed "falsification" in her dissertation work.

205. Dudek's "falsification" allegations against Christina included his claim that she lacked data to support her dissertation findings.

206. Dudek contacted Parks and Botkin with his "falsification" allegations against Christina because he felt "the situation has escalated to the point where [he] believe[d] [he] need[ed] to report it" to them.

207. Dudek contacted Parks and Botkin with his "falsification" allegations against Christina because he felt his accusations "deserve[d] much more rigorous investigation."

208. Dudek contacted Parks and Botkin with his "falsification" allegations against Christina because he thought he was "require[d] to report it."

209. Dudek's "falsification" allegations against Christina to Parks and Botkin were in writing.

210. Dudek's "falsification" allegations against Christina to Parks and Botkin were allegations of research misconduct under Policy 7-001.

211. Dudek's written "falsification" allegations against Christina to Parks and Botkin constituted a written complaint of research misconduct under Policy 7-001.

212. Neither Botkin nor any other University representative established an ad hoc committee in response to Dudek's written allegations of "falsification" against Christina.

213.    Neither Botkin nor any other University representative notified Christina of Dudek's research misconduct allegations against her.

214.    Several University representatives, including Parks, Botkin, Dudek, and University attorney Payne, discussed Dudek's "falsification" allegations against Christina.

215.    Parks, Botkin, Dudek, and Payne's discussion of Dudek's "falsification" allegations against Christina included verbal discussions of Dudek's allegations.

216.    Parks, Botkin, Dudek, and Payne's discussions of Dudek's "falsification" allegations against Christina generated one or more writings reflecting their discussions of Dudek's allegations.

217.    Parks, Botkin, Dudek, and Payne's discussions of Dudek's "falsification" allegations against Christina included their discussion and/or review of evidence that Dudek believed supported his allegations.

218.    Botkin determined that Dudek's allegations against Christina did not support a finding of research misconduct as defined by Policy 7-001.

219.    Dudek's research misconduct allegations against Christina were not confirmed.

220.    No University representative informed Christina of Parks, Botkin, Dudek, and Payne's discussions respecting Dudek's "falsification" allegations against her.

221.    No University representative allowed Christina to participate in Parks, Botkin, Dudek, and Payne's discussions of Dudek's "falsification" allegations against her.

222.    Neither Botkin nor any other University representative allowed Christina a right to be heard regarding Dudek's "falsification" allegations against her.

223.    Neither Botkin nor any other University representative undertook any efforts to restore Christina's reputation.

224.    Botkin and/or DOES 1-25's conduct described herein constituted state action.

225.    Botkin and/or DOES 1-25 infringed on Christina's constitutionally-protected interests without due process, in violation of the federal and Utah constitutions, by not informing Christina of, or allowing Christina a right to be heard regarding, Dudek's "falsification" allegations against her.

226.    Botkin and/or DOES 1-25's infringement of Christina's constitutionally-protected interests without due process of law, damaged Christina, rendered her unemployable or underemployable in her chosen field, and harmed her financially in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Arbitrary infringement of constitutionally-protected property interests, in violation of substantive due process, brought under 42 U.S.C. § 1983 against Dudek, Keefe, White, Ekstrand, Botkin, Greger, and DOES 1-25 in their individual capacities for damages and in their official capacities for prospective injunctive relief)**

227.    Christina realleges and reincorporates all preceding allegations as though set forth verbatim herein.

228.    The federal and Utah constitutions protect against arbitrary deprivations of life, liberty, or property in violation of substantive due process.

229.    Christina had, and has, constitutionally-protected property interests in her pursuit of an education, her academic placement, and her future employment opportunities.

230.    Christina had, and has, constitutionally-protected liberty interests in her good name, reputation, honor, integrity, and pursuit of future employment opportunities.

231.    Dudek, Keefe, White, Ekstrand, Botkin, Greger, and DOES 1-25, acting under the authority given them by the University, dismissed Christina from the Program and responded to Dudek's research misconduct allegations against her arbitrarily.

232.    Dudek, Keefe, White, Ekstrand, Botkin, Greger, and DOES 1-25's actions described herein constituted state action.

233.    Dudek, Keefe, White, Ekstrand, Botkin, Greger, and DOES 1-25's actions described herein deprived her of constitutionally-protected interests, in violation of the federal and Utah constitutions.

234.    Dudek, Keefe, White, Ekstrand, Botkin, Greger, and DOES 1-25's arbitrary deprivation of Christina's constitutionally-protected interests damaged Christina by halting her pursuit of a Ph.D., rendering her unemployable or underemployable in her chosen field, and harming her financially in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Negligence against University)

235.    Christina realleges and reincorporates all preceding allegations as though set forth verbatim herein.

236.    The University and Program established several policies that affected students, including policies that governed faculty-student and mentor-mentee relationships.

237.    For example, the University established:

a.    Policy 6-400, which provides students "a right to support and assistance from the University in maintaining a climate conducive to thinking and learning.  Students have a right to be treated with courtesy and respect."

32

b.  Policy 6-316(4)(A)(1), which requires that University faculty members "conduct themselves, in their interactions with … students … in accordance with reasonable standards of professionalism."

c.  Policy 6-316(4)(A)(1), which prohibits a University faculty member's "intentional neglect of necessary communications."

d.  Policy 6-316(4)(B)(3), which requires that University faculty members "maintain regular office hours during which they are available for consultation with students."

e.  Policy 1-006, which requires "every member of the University community to disclose in a timely manner his or her personal … involvement in activities listed as Activities Requiring Disclosure (Section III-B)," and identifies "an Investigator['s] … responsib[ility] for the approval, design, conduct, or reporting of sponsored research conducted in whole or in part under the auspices of the University" as an Activity Requiring Disclosure.

f.  Policy 7-001, which requires the University to respond in a certain way to written complaints of research misconduct against students, including by forming an ad hoc committee, notifying the student against whom a complaint has been lodged of the research misconduct allegations, and restoring the reputation of the student.

238.  For example, the Program established a policies and procedures guide which, among other things, required Program faculty to:

a. Abide by The Association of American Medical Colleges' December 2008 "Compact Between Biomedical Graduate Students and Their Advisors" ("the Compact"), which, in turn, required that Program faculty members:

    i. Commit "to the life-long mentoring of the graduate student."

    ii. Agree to "provide for every graduate student under [their] supervision an environment that is intellectually stimulating, emotionally supportive, safe, and free of harassment."

    iii. Commit to meet "one-on-one" with the student "on a regular basis."

    iv. "[N]ot let these [conflicts of interest] interfere with the student's pursuit of his/her thesis/dissertation research."

b. "[C]omply with appropriate disclosure policies regarding possible financial interests in organizations that may have substantial fiscal relationship with the University."

c. Provide 15-days' written notice of his/her intent to discharge a student from his/her laboratory.

239. Every University faculty member is bound by every University policy, unless a particular policy expressly states to the contrary.

240. Policy 6-400 was binding on the University and on Dudek respecting his relationship with Christina while she was enrolled in the Program.

241. Policy 6-400 was binding on the University and on Keefe respecting her relationship with Christina while she was enrolled in the Program.

242.     Policy 6-316 was binding on the University and on Dudek respecting his relationship with Christina while she was enrolled in the Program.

243.     Policy 6-316 was binding on the University and on Keefe respecting her relationship with Christina while she was enrolled in the Program.

244.     Policy 1-006 was binding on the University and on Dudek respecting his relationship with Christina while she was enrolled in the Program.

245.     All Program policies were binding on the University and on Dudek as the mentor of a student enrolled in the Program.

246.     The University breached its obligations under University and Program policies when Dudek:

   a.   Expelled Christina from his lab without providing her requisite notice.

   b.   By expelling Christina from his lab, deprived her of an intellectually stimulating, supportive environment that was conducive to thinking and learning.

   c.   Effective April 22, 2013, ceased mentoring Christina.

   d.   After April 22, 2013, refused to meet with Christina one-on-one on any basis, let alone a regular basis.

   e.   After April 22, 2013, committed to fail Christina's dissertation defense before she even presented it.

   f.   Issued her failing grades during and after the Post-defense Period, including after the University discharged her from the Program.

   g.   Encouraged her to use Epitel's Epoch device without disclosing or managing his conflict of interest.

h.  Encouraged her to use Epitel's Epoch device without disclosing to her that the Epoch device had not been validated for use in work like her dissertation work.

i.  Allowed his interest in Epitel and the Epoch device to interfere with Christina's pursuit of her dissertation research.

j.  Failed to comply with appropriate disclosure policies regarding his financial interest in Epitel, which had a fiscal relationship with the University.

k.  Disparaged her to dissertation committee members, Parks, Botkin, Skelton, and others.

l.  Acquired her analyzed dissertation data with the intent of using it without crediting her.

m.  During the Post-defense Period, failed and/or refused to answer important questions about Christina's Post-defense Work.

n.  During the Post-defense Period, did not timely answer important questions about Christina's Post-defense Work.

247.  All Program policies were binding on the University and on Keefe as the director of the Program.

248.  The University breached its obligations under University and Program policies when Keefe:

a.  Allowed Dudek to discharge Christina from his lab in contravention of Program policy.

b.  Prohibited Christina from having any one-on-one contact with Dudek.

c. Failed and/or refused to drop Christina's Spring Semester 2014 classes, resulting in Dudek's issuance to Christina of a failing grade, and Christina's payment of tuition charges for classes she never took.

249. Botkin was the University's Research Integrity Officer in 2013.

250. Botkin was the University's Research Integrity Officer in 2014.

251. Botkin was the University's Research Integrity Officer for at least some of calendar year 2015.

252. Policy 7-001 was binding on the University and on Botkin during all times he served as the University's Research Integrity Officer.

253. The University breached its obligations under University policy 7-001 by not:

a. After receiving Dudek's written "falsification" allegations against Christina,

i. Establishing an ad hoc committee.

ii. Notifying Christina of Dudek's "falsification" allegations against her.

iii. Notifying Christina of Botkin, Dudek, Parks, and Payne's discussions of Dudek's "falsification" allegations against her.

iv. Allowing Christina to participate in Botkin, Dudek, Parks, and Payne's discussions of Dudek's "falsification" allegations against her.

b. After determining that Dudek's research misconduct allegations against Christina were not confirmed, undertaking any efforts to restore her reputation.

254. The University's breaches of its obligations under University and/or Program policies, through Dudek, Keefe, and Botkin, caused Christina to suffer damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Breach of contract against University)

255.    Christina realleges and reincorporates all preceding allegations as though set forth verbatim herein.

256.    The University and Program policies created contractual duties on the part of the University, Program, and their representatives.

257.    As a matriculated student at the University, Christina was a contractual beneficiary of the University's policies.

258.    As a matriculated student in the Program, Christina was a contractual beneficiary of the Program's policies.

259.    The University (through Dudek, Keefe, and Botkin) breached its obligations under the University and/or Program policies by performing the previously discussed acts.

260.    The University's breaches of its obligations under the applicable policies caused Christina to suffer damages in an amount to be determined at trial.

261.    Christina seeks a declaration from this court of her rights respecting the November 22, 2013 letter; including whether Christina was entitled to rely on the plan specified in the letter, and, if so, what remedies are available to her.

## FIFTH CAUSE OF ACTION
### (Breach of implied covenant of good faith and fair dealing against University)

262.    Christina realleges and reincorporates all preceding allegations as though set forth verbatim herein.

263.    The University and Program policies created contractual duties on the part of the University, Program, and their representatives.

264.     As a matriculated student at the University, Christina was a contractual beneficiary of the University's policies.

265.     As a matriculated student in the Program, Christina was a contractual beneficiary of the Program's policies.

266.     The University, through Dudek, Keefe, and Botkin, breached its duty to deal with Christina fairly and in good faith under the University and/or Program policies, by performing the previously discussed acts.

267.     The University's failure to deal with Christina fairly and in good faith under the University and/or Program policies caused Christina to suffer damages in an amount to be determined at trial.

268.     Christina seeks a declaration from this court of her rights respecting the November 22, 2013 letter; including whether Christina was entitled to rely on the plan specified in the letter, and, if so, what remedies are available to her.

## SIXTH CAUSE OF ACTION
### (Declaratory relief)

269.     Christina realleges and reincorporates all preceding allegations as though set forth verbatim herein.

270.     The University, through Dudek and Keefe, authored a letter dated November 22, 2013 and provided that letter to Christina.

271.     The letter purported to contain a "detailed plan for [Christina] to move forward toward receipt of the Ph.D. degree in Neuroscience."

272.     That plan required that Christina submit revised methods and introduction sections by specified dates.  If the committee believed Christina's submissions were inadequate

and a second defense would not likely be successful, the committee would ask Christina if she nevertheless wished to continue in the Program.  If she did wish to continue, the committee would give her until July 28, 2014 to submit a final dissertation, and, if the document passed by majority committee vote, until the week of August 18, 2014 to orally defend her dissertation.

273.    One or more members of Christina's committee communicated to her as if she were bound by the plan specified in the letter.

274.    At least once in 2013, Christina's committee acted as if it were bound by the plan specified in the letter.

275.    At least once in 2014, Christina's committee acted as if she were bound by the plan specified in the letter.

276.    At least once in 2014, Christina's committee acted as if it were bound by the plan specified in the letter.

277.    Christina submitted revised methods and introduction sections in accordance with plan specified in the letter, as modified with permission from her dissertation committee.

278.    In January 2014, after receiving Christina's revised dissertation papers, Christina's committee determined a second defense likely would not be successful.

279.    After determining a second defense likely would not be successful, Christina's committee discharged her from the Program.

280.    Christina's committee discharged her from the Program without asking whether she wanted to remain in the Program.

281.    Christina's committee discharged her from the Program without giving her until July 28, 2014 to submit revised dissertation papers.

282.     Christina's committee discharged her from the Program in contravention of the plan set forth in the November 22, 2013 letter from Keefe and Dudek.

283.     Christina seeks a declaration from this court of her rights respecting the November 22, 2013 letter; including whether Christina was entitled to rely on the plan specified in the letter, and, if so, what remedies are available to her.

## SEVENTH CAUSE OF ACTION
### (Defamation per se and defamation against Dudek in his individual capacity)

284.     Christina realleges and reincorporates all preceding allegations as though set forth verbatim herein.

285.     Since April 2013, Dudek has published statements, both verbal and written, about Christina to each member of her dissertation committee, Parks, Botkin, and Skelton, and, on information and belief, to his daughter, Amanda Dudek, who was enrolled in a graduate program at Harvard University at the time.

286.     On information and belief, to these individuals Dudek has stated that Christina was dishonest, untrustworthy, falsified her dissertation data, falsified her dissertation findings, that dishonesty permeated her dissertation writings, and that she committed research misconduct.

287.     Dudek's statements that Christina was dishonest were false.

288.     Dudek's statements that dishonesty permeated her dissertation writings were false.

289.     Dudek's statements that Christina was untrustworthy were false.

290.     Dudek's statements that Christina falsified her dissertation data were false.

291.     Dudek's statements that Christina falsified her dissertation findings were false.

292.     Dudek's statements that Christina committed research misconduct were false.

293.     Dudek's false statements about Christina falsifying her dissertation data and dissertation findings and committing research misconduct were defamatory per se in that they charged her with conduct incompatible with the exercise of a lawful business, trade, profession, office, or practice.

294.     Dudek's other false statements about Christina were defamatory.

295.     Dudek made one or more defamatory statements against Christina out of ill will, evidencing his malice toward her.

296.     Dudek made one or more defamatory statement against Christina without reasonably believing such statements, evidencing his malice toward her.

297.     Dudek published his defamatory statements against Christina excessively, evidencing his malice toward her.

298.     Dudek's publication of these false statements damaged Christina, including her reputation, in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### (Breach of fiduciary duties against the University and/or Dudek in his individual capacity)

299.     Christina realleges and reincorporates all preceding allegations as though set forth verbatim herein.

300.     As Christina's dissertation mentor, Dudek was in a position to have and exercise influence over Christina.

301.     Dudek's status as Christina's dissertation mentor placed him in a position of superiority over Christina.

302.     Dudek's status as Christina's dissertation mentor caused that she place peculiar confidence in him respecting her dissertation.

303.    As Christina's dissertation mentor, Dudek, in fact, had and exercised influence over Christina.

304.    Dudek's dissertation mentor-mentee relationship with Christina was a fiduciary relationship under Utah law.

305.    Based on Dudek's dissertation mentor-mentee relationship with Christina, the University and/or Dudek had a duty under Utah law to act primarily for Christina's benefit respecting Dudek and Christina's dissertation mentor-mentee relationship, rather than for their own benefit.

306.    The University and/or Dudek breached its/their/his fiduciary duty to Christina when Dudek:

a.  Expelled her from his lab without providing requisite notice under Program policies.

b.  By expelling Christina from his lab, deprived her of an intellectually stimulating, supportive environment that was conducive to thinking and learning.

c.  Effective April 22, 2013, ceased mentoring Christina.

d.  After April 22, 2013, refused to meet with Christina one-on-one on any basis, let alone a regular basis.

e.  After April 22, 2013, committed to fail Christina's dissertation defense before she even presented it.

f.  Issued her failing grades during and after the Post-defense Period, including after the University discharged her from the Program.

g.   Encouraged her to use Epitel's Epoch device without disclosing or managing his conflict of interest.

h.   Encouraged her to use Epitel's Epoch device without disclosing to her that the Epoch device had not been validated for use in work like her dissertation work.

i.   Allowed his interest in Epitel and the Epoch device to interfere with Christina's pursuit of her dissertation research.

j.   Failed to comply with appropriate disclosure policies regarding his financial interest in Epitel, which had a fiscal relationship with the University.

k.   Disparaged her to dissertation committee members, Parks, Botkin, Skelton, and others.

l.   Acquired her analyzed dissertation data with the intent of using it without crediting her.

m.   During the Post-defense Period, failed and/or refused to answer important questions about Christina's Post-defense Work.

n.   During the Post-defense Period, did not timely answer important questions about Christina's Post-defense Work.

o.   In September 2013 told members of her committee that he wanted to notify Christina's MIT mentor, Dr. Xu that she had failed her defense but thought someone on the Committee (the Program Director) should do it instead of him.

307.   The University and/or Dudek's breach of its/their/his fiduciary duty to Christina caused her to suffer damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### (Prospective Injunctive relief)

308.    Christina realleges and reincorporates all preceding allegations as though set forth

verbatim herein.

309.    Christina seeks a restraining order/injunction from this court that would prohibit

the University from enforcing its discharge of Christina from the Program and thereby would

require the University's reinstatement of Christina into the Program.

310.    Christina has suffered harm since the University discharged her from the

Program, including, but not limited to:

      a.    An inability to complete her Ph.D. in neuroscience at the University.

      b.    An inability to enroll in another institution's Ph.D. neuroscience program to

          complete her existing dissertation.

      c.    An inability to enroll in another institution's Ph.D. neuroscience program without

          having to choose an entirely different dissertation.

      d.    An inability to obtain gainful employment in neuroscience.

      e.    An inability to obtain gainful employment in reliance upon her Ph.D. training.

311.    Christina will continue to suffer the harm referenced in the immediately preceding

paragraph unless the University is both prohibited from enforcing its discharge of Christina from

the Program and required to reinstate her into the Program so she can continue her efforts to

obtain her Ph.D.

312.    The harms that Christina has suffered, and will continue to suffer, since and

because the University discharged her from the Program cannot be adequately compensated in

damages.

313.    The harms that Christina has suffered, and will continue to suffer, since and because the University discharged her from the Program are irreparable.

314.    The occasioned and threatened harms to Christina outweigh whatever damage the order/injunction may cause the University, considering, at a minimum:

a.  The University handled Dudek's "falsification" allegations against Christina without providing her notice or an opportunity to be heard.

b.  The University investigated Dudek's "falsification" allegations against Christina without providing her notice or an opportunity to participate.

c.  The University handled Dudek's "falsification" allegations against Christina in violation of its Policy 7-001.

d.  The University discharged Christina from the Program without providing her pre-discharge notice or an opportunity to be heard.

e.  The University discharged Christina from the Program in violation of the plan set forth in Dudek and Keefe's November 22, 2013 letter.

315.    The order/injunction, if issued, would not be adverse to the Utah public's interest, which favors preservation of constitutional rights, honoring of tort duties, and enforcement of contracts.

316.    There is a substantial likelihood that Christina will prevail on the merits of her constitutional, tort, and contract claims against the University.  Alternatively, Christina's claims against the University present serious issues on the merits that should be the subject of further litigation.

## JURY DEMAND

Christina demands a trial by jury in this case.

## PRAYER FOR RELIEF

**WHEREFORE,** Christina prays for relief as follows:

1.     That a monetary judgment be entered in favor of Christina and against the University in an amount to be determined at trial;

2.     That a monetary judgment be entered in favor of Christina and against the individual defendants in their individual capacities in an amount to be determined at trial;

3.     That the court declare the November 22, 2013 letter from Keefe and Dudek is binding on the University, that Christina could rely upon the representations therein, that Christina complied with her obligations under the letter, that the University discharged her from the Program in violation of the plan set forth in the letter, and that Christina is entitled to a remedy for the University's breach, including, but not limited to, specific performance, which would require that she be reinstated into the Program and afforded a length of time to work on her dissertation identical to that promised in the letter.

4.     That the University be enjoined from continuing its enforcement of its discharge of Christina from the Program, ordered to reinstate her into the Program, and ordered to give the same length of time to complete her Ph.D. as was promised in the November 22, 2013 letter from Dudek and Keefe.

5.     For recovery of her attorney fees and costs incurred in pursuit of this action, including under 42 U.S.C. § 1983 and Utah Code Ann. § 78B-5-825.

6.     For punitive damages.

7.     For such and other relief as this court deems appropriate.

DATED this 18th day of December, 2015.

KESLER & RUST

/s/ RYAN B. H ANCEY

_____

RYAN B. HANCEY
ADAM L. GRUNDVIG
*Attorneys for plaintiff Christina Rossi*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 18th day of December, 2015, I caused to be served the **AMENDED COMPLAINT,** via electronic filing to all counsel of record.

/s/ Rebecca Goldhardt
_____