IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CHRISTINA ROSSI,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>UNIVERSITY OF UTAH, a Utah state educational institution; F. EDWARD DUDEK, an individual, in his official and individual capacities; KRISTIN A. KEEFE, an individual, in her official and individual capacities; JOHN A. WHITE, an individual, in his official and individual capacities; JEFFREY J. EKSTRAND, an individual, in his official and individual capacities; BRADLEY GREGER, an individual, in his official and individual capacities; JEFFREY R. BOTKIN, an individual, in his official and individual capacities; and DOES 1 through 25, inclusive,<br><br>　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:15-cv-767<br><br>Judge Clark Waddoups |

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Committee Members and Their Roles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Rossi's Academic Performance in the Program Prior to Dissertation Defense . . . . . . . . 4

    Rossi's Background Prior to Joining the Program in Utah. . . . . . . . . . . . . . . . . . . . . . . 8

    Dudek's Epoch Device and Rossi's Research . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Unknown Information about Committee Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    Theta and Epilepsy Papers and Dissertation Defense. . . . . . . . . . . . . . . . . . . . . . . . . . 21

    Initial Post-Defense Instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Data Analysis Documentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    Disagreement Over Research Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    Data Production and First Dismissal from the Program. . . . . . . . . . . . . . . . . . . . . . . . 38

    Analysis After First Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    Dudek's Research Misconduct Accusations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    Dudek's Final Report and Rossi's Employment Circumstances . . . . . . . . . . . . . . . . . . 53

ANALYSIS

    I.       MOTION FOR RECONSIDERATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    II.      QUALIFIED IMMUNITY - INDIVIDUAL CAPACITY . . . . . . . . . . . . . . . . . 56

    III.     PROCEDURAL DUE PROCESS - PROPERTY INTEREST. . . . . . . . . . . . . . . 57

         A.      Property Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

i

B.      Adequacy of Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

C.      Three Dismissal Grounds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

D.      Type of Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

E.      Notice Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

F.      Careful and Deliberate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

      i.      Conflict and Biases -  Broad View of Committee's Actions . . . . 71

      ii.      Dudek . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

      iii.      Keefe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

      iv.      White . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

G.      Law Clearly Established . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

H.      Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

IV.      PROCEDURAL DUE PROCESS -  STIGMATIZING DISMISSAL AND
      LIBERTY INTEREST CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

A.      Applicable Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

B.      Application of Standard to Rossi's Allegations . . . . . . . . . . . . . . . . . . . 85

      i.      Alleged Defamatory Statements . . . . . . . . . . . . . . . . . . . . . . . . 85

      ii.      First and Second Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

      iii.      Third and Fourth Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

V.      SUBSTANTIVE DUE PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

A.      Applicable Standard at Public Universities . . . . . . . . . . . . . . . . . . . . . 89

B.      Application of Standard to Conduct of Committee Defendants . . . . . . . 91

      i.      Property Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

|  |  | ii. | Liberty Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91 |

| | C. | Law Clearly Established re Property Interest Claim . . . . . . . . . . . . . . . 91 |

| | D. | Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92 |

| VI. | DEFAMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93 |

| | A. | Standard of Review and Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93 |

| | B. | Identification of the Statements at Issue . . . . . . . . . . . . . . . . . . . . . . . . 94 |

| | C. | Publication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95 |

| | D. | False Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96 |

| | E. | Conditional Privileges and Exceptions . . . . . . . . . . . . . . . . . . . . . . . . . 98 |

| | | i. | Common Interest Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99 |

| | | ii. | Public Interest Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100 |

| | | iii. | Conditional Privilege for Family Relationships . . . . . . . . . . . . 100 |

| | | iv. | Exceptions to Conditional Privileges . . . . . . . . . . . . . . . . . . . . 102 |

| | F. | Requisite Degree of Fault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104 |

| | G. | Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104 |

| | H. | Governmental Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105 |

| VII. | BOTKIN'S SUMMARY JUDGMENT MOTION . . . . . . . . . . . . . . . . . . . . . 107 |

| | A. | Procedural Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107 |

| | B. | Substantive Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108 |

| VIII. | OFFICIAL CAPACITY AND INJUNCTIVE RELIEF . . . . . . . . . . . . . . . . . 109 |

| **CONCLUSION AND SCHEDULING ORDER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110 |

## INTRODUCTION

In 2008, Plaintiff Christina Rossi became a graduate student at the University of Utah's (the "University") Interdepartmental Neuroscience Program to obtain a Ph.D. From Fall 2008 to early 2013, Rossi was a successful student at the University. She joined the lab of Dr. F. Edward Dudek[1] and focused her research on long-term recordings of mice to determine if lesions in a small region of the hippocampus induced seizures. Rossi injected SSP-saporin into the hippocampus of mice to ablate interneurons and evaluate whether such interneuron loss caused epilepsy. Rossi perfected the ablation technique. Rossi also perfected implanting recording electrodes into the hippocampus to continuously record data for thirty days. She initially started with a tethered recording device, and then changed to a wireless device call Epoch.

Next, Rossi analyzed the "local field potentials" or LFPs that were recorded to determine if seizures were noted, and to look at theta rhythms in the hippocampus. The mice were then euthanized, and their brains were sectioned and stained for two purposes. One was to analyze cell counts to confirm interneuron loss, and if the loss was present, to determine how extensive the loss was. The second was to determine if there was any nonspecific damage to the region from some factor besides the injection. It was theorized that loss of cells in a small region of the hippocampus would induce epilepsy. By November 2012, however, Rossi reported such interneuron loss did not induce seizures.

---

[1] This memorandum decision refers to multiple individuals who have the recognized title of Doctor and/or Professor. The court shall refer to their title of Doctor when their name is first mentioned in the decision. Thereafter, they shall only be referred to by their last name in this decision for the sake of simplicity.

Then, through a series of events, as detailed hereafter, Rossi failed her dissertation in April 2013, and ultimately was terminated from the Neuroscience Program in January 2014.  Rossi subsequently sued each member of her dissertation committee (the "Committee") and Dr. Jeffrey R. Botkin, the University's Vice President for Research Integrity.  She also specifically sued Dudek for defamation.

On June 24, 2016, the court dismissed some of Rossi's claims and two of the Committee members in their individual capacities and one in his official capacity.  The remaining Committee members and Botkin now move for summary judgment and Rossi asks the court to reconsider the earlier dismissal of two of the Committee members.  For the reasons stated below, the court grants in part and denies in part summary judgment as to the Committee Defendants.  The court denies Rossi's motion for reconsideration.  The court denies Dudek's motion for summary judgment on the defamation claim.  The court grants Botkin's motion for summary judgment.

## FACTUAL BACKGROUND

**Committee Members and Their Roles**

1.    Rossi's initial Committee members were Dudek, Dr. Raymond P. Kesner, Dr. Kristin A. Keefe, Dr. John A. White, and Dr. Bradley E. Greger.  White Depo., 5:2–9 (ECF No. 86-3).[2]  Rossi invited each person to participate on her Committee and "had a good coverage of mentors to cover all of the scientific disciplines.  In that sense, it was a very strong and appropriate committee."  Dudek Depo., 108:17–19 (ECF No. 86-17).

---

[2]  Throughout this memorandum decision, deposition testimony shall be referenced by the specific page in the deposition.  All other record pincites shall refer to the ECF page number at the top of the page.

2.     Keefe was in the College of Pharmacy and the Director of the Interdepartmental Program in Neuroscience during the time she served on the Committee.  Keefe Depo., 4:16–25, 56:9–13 (ECF No. 86-5).  According to Dudek, Keefe understood the anatomy science well, but "[n]ot the seizure science."  Dudek Depo., 108:7–10 (ECF No. 86-17).

3.     Kesner was in the Psychology Department, and he "was the main person on the behavior."  Dudek Depo., 108:10–12 (ECF No. 86-17); Rossi Depo., 26:14–15 (ECF No. 86-1).

4.     White also had "some interest in the behavior."  Dudek Depo., 108:10–12 (ECF No. 86-17).  White was a Professor of Bioengineering at the University.  White Depo., 6:14–17 (ECF No. 86-3).  He focused on the technical and mathematical aspects of Rossi's work.  *Id.* at 54:13–19.  Greger and White were the main individuals on the analysis of the electrical signals.  Dudek Depo., 108:14–16.

5.     Dudek was a Professor in the Department of Neurosurgery and a chair in the physiology department.  Dudek Depo., 4:2–5:10 (ECF No. 86-17).  He knew the seizure science and seizure literature.  *Id.* at 108:12–14.

6.     In March 2013, shortly before Rossi's dissertation defense in April 2013, Dr. Jeffrey J. Ekstrand replaced Kesner on the Committee.  White Depo., 5:7–8 (ECF No. 86-3) (stating Ekstrand replaced Kesner); Dismissal Lttr., at 3 (ECF No. 78-24) (stating Kesner was removed from Committee in March).  Ekstrand is a pediatric neurologist who also knew the seizure science and seizure literature as an epileptologist.  Dudek Depo., 42:19–21, 44:3, 108:12–14 (ECF No. 86-17).

**Rossi's Academic Performance in the Program Prior to Dissertation Defense**

7.       Rossi entered the University of Utah's neuroscience program in 2008.  She earned

a 4.0 GPA her first semester; a 3.5 GPA her second semester; a 3.9 GPA her third semester; and a

3.909 her fourth semester, which GPAs were derived from grades across multiple classes.  Univ.

Transcript, at 2 (ECF No. 78-25).  Starting in Fall 2010, Rossi's grade solely was based on "Thesis

Research – Ph D."  *Id.*  For the next five semesters, Rossi earned a 4.0 GPA for all but one semester,

where she earned a 3.7 GPA.  *Id.*  In the semester immediately prior to her dissertation defense,

Rossi earned a 4.0 GPA.  *Id.*

8.       Rossi's academic success was demonstrated in other areas as well.  "Early into her

second year, [Rossi] took and passed her qualifying examination."  *Cf* Amended Complaint, ¶ 24

(ECF No. 86-13) *with* Dudek Answer, ¶ 24 (ECF No. 58) (admitting Rossi passed qualifying

exam).  "The Qualifying Examination is an evaluation of the student's knowledge regarding the

fundamentals of neuroscience and may focus on any part of the core training.  It is conducted by

the Supervisory Committee."  Neuroscience Program Acad. Policies & Procedures Guide, at 5

(ECF No. 78-44).  The exam has a written component that involves preparing "a formal research

proposal following NIH/NRSA format," and evaluates a student's scholarship.  *Id.*  The topic had

to be distinct from "the student's thesis research" so the Committee may "determine the student's

ability to think creatively and independently."  *Id.*   The Committee then evaluates the written

proposal and determines if it is adequate for an oral defense, which would include "examin[ation]

by the committee through in-depth questioning during this presentation."  *Id.* at 5–6.  This allows

the Committee to evaluate "the student's knowledge in depth and breadth, as well as organizational

abilities, knowledge of the literature, and analytical skills."  *Id.* at 6.  Rossi not only passed the

Qualifying Examination, her performance was "outstanding."  Keefe Lttr. of Recommend., at 2 (ECF No. 86-2).

9.      By March 2010, Rossi "presented and passed her dissertation proposal." *Cf* Amended Complaint, ¶ 28 (ECF No. 23) *with* Dudek Answer, ¶ 28 (ECF No. 58) (admitting the same).

10.      In April 2010, Keefe wrote a letter of recommendation for Rossi wherein Keefe stated that Rossi was "clearly more mature than the 'typical' graduate student that one encounters" with respect to her "commitment to research and thoughtful career planning."  Keefe Lttr. of Recommend., at 2 (ECF No. 86-2).  She further stated that "relative to other graduate students at this stage in their development," Rossi stood "out in her knowledge of the literature related to the topic at hand and her ability to apply it to her arguments and research."  *Id.*  Moreover, Keefe stated that Rossi had "excellent written and oral communication skills," along with a "congenial personality and enthusiasm."  *Id.* at 2–3.

11.      In Fall 2010, Rossi was awarded a "pre-doctoral fellowship from the Epilepsy Foundation of America" for 2011.  Email, at 2 (ECF No. 86-16).  Because of her strong GPA, National Institute of Health ("NIH") grant applications, and service on committees, the University also awarded her a stipend for 2010–11.  *Id.*

12.      By September 2011, Rossi's Committee reported that "she had made considerable progress." Committee Rpt., at 2 (ECF No. 86-19).  Rossi had addressed concerns about the quality of the interneuron injections and histopathology.  *Id.*  She also had "obtained substantial data with chronic electrophysiological recordings."  *Id.*  She was scheduled to present her "data at the Annual Meeting of the American Epilepsy Society."  *Id.*

5

13.     In September 2012, the Committee noted that Rossi's independence and motivation were excellent.  Committee Rpt., at 5 (ECF No. 86-21).  She had solid, detailed record keeping and continued to demonstrate a knowledge of the literature.  *Id.*  The Committee anticipated she would complete her thesis by June 2013.  *Id.* at 2.

14.     At that same time, Keefe wrote Rossi another letter of recommendation.  Besides stating again that Rossi stood out for her knowledge of the literature and how to apply it, Keefe also stated that Rossi's work was "scholarly, well-written," and "well defended by reference to the literature or her own research findings."  Keefe Lttr. of Recommend., at 3 (Ex. 86-23).

15.     Rossi "represented the Dudek Lab at the Society for Neuroscience in October 2012, where she presented a poster of her research that Dudek had reviewed and approved."  *Cf* Amended Complaint, ¶ 50 (ECF No. 23) *with* Dudek Answer, ¶ 50 (ECF No. 58) (admitting the same).

16.     "After the Society for Neuroscience conference," Rossi met with an MIT professor and "presented her research, interviewed with MIT representatives, and attended meetings."  *Cf* Amended Complaint, ¶ 51 (ECF No. 23) *with* Dudek Answer, ¶ 51 (ECF No. 58) (admitting the same).  The professor "offered [Rossi] a post-doctoral position in her lab pending the outcome of [Rossi's] dissertation defense."  *Cf* Amended Complaint, ¶ 52 *with* Dudek Answer, ¶ 52 (admitting the same).  White noted that MIT is "an extremely successful" institution.  White Depo., 40:11–12 (ECF No. 86-3).

17.     In support of Rossi's post-doctoral application to MIT, Dudek wrote a letter of recommendation on October 21, 2012.  Dudek stated that Rossi's experiments were unique and any answer she obtained would be interesting.  Dudek Lttr. of Recommend., at 2 (ECF No. 86-24).  He further stated Rossi was "a dedicated and thoughtful researcher," as well as "a hard worker

who . . . works well with others and is well-liked and highly respected in the lab and the Program." *Id.*

18.     In February 2013, White wrote a letter of recommendation for Rossi in support of a fellowship from the Simons Center to help fund her anticipated postdoctoral work at MIT.  White said his evaluation of Rossi was based on his service on Rossi's Committee.  White Lttr. of Recommend., at 2 (ECF No. 86-34).  In the letter, White described Rossi's research as "a challenging project, involving elaborate surgeries, instrumentation, data collection and processing, and immunocytochemistry."  *Id.*  He said Rossi had "systematically mastered these disparate techniques.  The results and quality of the story are more impressive at each committee meeting.  She is getting pretty good at even the highly technical and mathematical aspects of the work."  *Id.*

19.     Despite her strong academic performance from Fall 2008 through Fall 2012, the trajectory of Rossi's educational and professional pursuits markedly changed in April 2013.  In that month, Rossi unsuccessfully defended her dissertation.  By unanimous consent, the Committee found her "dissertation was markedly lacking in numerous aspects of scientific rigor," and concerns existed about "what analyses she had/had not completed" and whether her conclusions made during "her public seminar could be supported."  Keefe's Response to Grievance, at 3–4 (ECF No. 78-16).  The Committee found her defense "was clearly not a passing effort" to such a degree that they "did not even move to the oral examination" because "there was nothing to be gained."  *Id.* at 4.  By January 2014, the Committee had dismissed Rossi from the program.  Dismissal Lttr. (ECF No. 78-24).

**Rossi's Background Prior to Joining Program in Utah**

20.      Rossi obtained a bachelor's degree in psychology from Boston University ("BU"). During the second semester of her freshman year, she started working in Dr. Michael Hasselmo's lab on a volunteer basis.  Rossi Depo, 8:17–20 (ECF No. 86-1).  Based on the quality of her work, she became a paid technician at the lab and had "training in neurobiological techniques" while completing her undergraduate work.  *Id.* at 8:20–23.  After receiving her bachelor's degree, Rossi was later accepted into a Ph.D. program at BU and resumed working in Hasselmo's lab.  *Id.* at 10:3–8, 11:7–18.

21.      About two years into the program, Rossi decided to withdraw and was awarded a master's degree for her work.  Rossi Depo., 10:20–21, 17:23, 19:18, 23:25 (ECF No. 86-1).

22.      White worked at Boston University during the same time Rossi attended there.  The reason why Rossi left the program is disputed.  Rossi reports it was a reasoned decision.  She reports she had a personality clash with another graduate student who treated her like a technician rather than a doctoral student, and that it interfered with how she wanted to run her project.  Rossi Depo., 14:19–25, 18:3–12 (ECF No. 91-14).  When she brought the issue up with Hasselmo, he allegedly declined to address the matter.  *Id.* at 18:13–17.  Additionally, her project was purportedly a "fluff project" and the funding for it had ended.  *Id.* at 15:2–5.  Rossi alleges the environment "informed [her] decision to leave" the program.  *Id.* at 18:14–17.  Nevertheless, Hasselmo kept her "on at the lab until [she] was able to find other employment."  Rossi Depo., 19:1–2 (ECF No. 86-1).

23.      According to White, he had heard Rossi was a problematic student, who had marginal quality work, and was asked to leave the lab, and possibly the entire graduate program.

White Depo., 8:19–21, 18:18–19:3 (ECF No. 86-3).  During his deposition, however, White could not recall with certainty if Hasselmo had said those last two things to him.  *Id.* at 13:2–5; 13:15–14:6.

24.     After Rossi left the program, she "worked on a project at Brigham and Women's Hospital," which "is an affiliate of Harvard University."  Rossi Depo., 20:3-5 (ECF No. 86-1).  Her work there "resulted in co-first authorship on a paper" that focused on "novel therapies for a mouse model of . . . ALS."  *Id.* at 20:3–11.  The project required research in "molecular biology, medicinal chemistry, cell biology and in vivo drug testing," but did not involve electrophysiology.  *Id.* at 21:20–22.

25.     Rossi also worked in the lab of John Godleski at the Harvard School of Public Health, where she "designed, obtained funding for and carried out . . . a novel project . . . using rats as the model animal for the first time."  Rossi Depo., at 22:2–6 (ECF No. 86-1).  She worked with a postdoctoral researcher, "coauthored a grant proposal with her," and obtained funding.  *Id.* at 22:6–10.  On that project, Rossi "set up the lab from start to finish, . . . ran all of the experiments, and [they] had a paper published as a result."  *Id.* at 22:10–12.

26.     Based on these projects, Rossi decided she still wanted to pursue a Ph.D., and searched for a program that fit her interests.  Rossi Depo., 24:5–10, 24:17–22 (ECF No. 86-1).  She learned about Kesner's lab at the University of Utah, which was "a natural extension of sort of the general area that [she] was working with . . . in the Hasselmo Lab."  *Id.* at 24:23–25:1.  Kesner "had a good relationship with the Hasselmo Lab."  *Id.* at 25:1–2.

27.     Rossi submitted an application for admission to the University, and in June 2008, an admissions committee reviewed her application. Based on Rossi's publication history, one

committee member initially ranked Rossi first on the list of applicants.  Email, at 2 (ECF No. 86-10).  Another said, "she looks really good on paper and was actually [his] first choice."  Email, at 2 (ECF No. 86-11).  Concerns were expressed, however, because she had dropped out of her previous Ph.D. program and because Kesner's lab had a narrow focus.  Email, at 2 (ECF No. 86-10).

28.    White expressed separate concerns.  White Depo., 16:4–5 (ECF No. 86-3).  In 2007, White had been recruited away from Boston University by the University of Utah.  *Id.* at 7:4–7.  In 2008, he interviewed Rossi as part of her application process.  *Id.* at 8:11–13.  White expressed reservations about Rossi to Dr. Mary Lucero, who was the program director at that time.  *Id.* at 11:12–13; 12:4–6.  He told Lucero "that [he] knew [Rossi had] run into serious trouble over – and left the lab with a cloud over her."  *Id.* at 15:3–7.  Consequently, Lucero asked White to contact Hasselmo about whether he would recommend against Rossi being admitted to the University's program.  *Id.* at 12:4–12.

29.    White reported back that Hasselmo had said Rossi "was not a particularly strong student," or maybe that "she was a poor student," or that she was "a mediocre student" who would "struggle in many environments."  White Depo., 14:6–25 (ECF No. 86-3).  Hasselmo reportedly also said, "he felt the match between her and Dr. Kesner was a good match and that was an environment in which she might thrive" and he was "uncomfortable arguing that she should not be admitted."  *Id.* at 13:9–14.

30.    Besides faculty and administrators having seen Rossi's qualifications on paper and having White's report, Rossi also explained to them, including Kesner, why she had left the program in Boston.  Rossi Decl., ¶ 2 (ECF No. 78-40).  Later, Keefe remarked in a letter of

recommendation that Rossi "leaving the graduate program at BU . . . was a very considered move on [her] part that reflects her thoughtful approach to her scientific development.  She knew that she needed to expand her breadth and to gain new perspectives, which changing graduate programs has allowed her to do."  Keefe Lttr. of Recommend., at 2 (ECF No. 86-2).

31.    Based on all the information, the admissions committee ranked Rossi well and admitted her into the program.  Email, at 2–3 (ECF No. 86–11) (showing "clear break" after Rossi and the next candidates' rankings).  Rossi was among more than 100 applicants, of which twenty-three were interviewed, and eleven admitted.  NeuroNews, Vol. 13, No. 1, at 2 (ECF No. 86-4).

**Dudek's Epoch Device and Rossi's Research**

32.    In April 2009, the semester after Rossi started her Ph.D. program at the University, the Research Integrity and Compliance Office at the University started investigating a co-owned University company called Epitel, which manufactured a device called Epoch or the Epitel device. Dudek Depo., 6:9–11, 20–22 (ECF No. 86-17); NIH Grant, at 13 (ECF No. 86-18); Conflicts Email (ECF No. 86-27).  Epoch "is a wireless recording device that can be used to obtain electrophysiological data from animals."  Dudek Depo. at 6:12–16 (ECF No. 86-17).

33.    Dudek started Epitel cooperatively with the University's Technology Commercialization Office ("TCO") and co-invented the Epoch device.  Conflicts Committee Minutes, at 3 (ECF No. 86-30); Dudek Depo., 7:24–8:3 (ECF No. 86-17).  He and others owned a sixty-six percent interest in Epitel.  Conflicts Committee Minutes, at 3.  Dr. Mark Lehmkuhle and John Fisher were among the other owners.  Lehmkuhle Depo., 5:5–13, 8:8–14 (ECF No. 86-20). Lehmkuhle also was a member of Dudek's lab, and academically, depended on Dudek for his "financial livelihood."  *Id.* at 4:22–25, 5:14–22.

34.    When the University became involved in assessing the conflict of interest associated with Epitel in April 2009, Dudek's study coordinator reported that Dudek was "really upset about the delays" and TCO's involvement.  Conflicts Email, at 3 (ECF No. 86-27).  The coordinator reported that Dudek had "no real interest in profiting from his work.  He [was] more interested in seeing [Epoch] made available to his colleagues for use."  *Id.*  Dudek also testified in his deposition that he "started the company more as a scientific endeavor . . . , I mean, I never really thought we were going to make any money selling telemetry devices for rats and mice."  Dudek Depo., 8:14–18 (ECF No. 86–17).

35.    Concerns were raised, however, because the TCO becomes involved in a product when it has "commercialization promise."  Conflicts Email, at 2 (ECF No. 86-27).  And those involved in Epoch stood to gain financially, thereby potentially creating pressure on those using Epoch to return favorable study results.  *Id.* at 2–3.  At that time, however, it appears the University told Dudek that he did not have to "file a conflict of interest disclosure."  *See* Dudek Depo., 22:7–11 (ECF No. 86-17); Conflict Committee Notes, at 2 (ECF No. 86-30).

36.    Five months later, in September 2009, Dudek obtained a $349,978 grant from the NIH to study Epoch.  NIH Grant, at 2 (ECF No. 86-18).  Dudek and Lehmkuhle were listed as the principal investigators, and all three owners of Epitel were listed as key personnel.  *Id.* at 2, 7.  The grant required the awardees to "have a written administrative process to identify and manage financial conflict of interest and [to] inform investigators of the conflict of interest policy and the investigators' responsibilities."  *Id.* at 2.  The grant proposal stated one aim was to test the feasibility and usefulness of the Epitel device by determining "whether repetitive seizures can be recorded for prolonged periods" using "adult rats with severe chronic epilepsy."  *Id.* at 15.  In

12

Phase II, the goal was to "develop a plan to launch, manufacture, market, distribute and support the Epitel device."  *Id.*

37.     As part of the graduate program at the University, Rossi had to "complete[] three laboratory rotations in the first year."  Keefe Answer, ¶ 13 (ECF No. 55); Rossi Depo., 27:21–24 (ECF No. 86-1).  She then joined Dudek's Lab in or about the same month Dudek obtained the NIH grant—September 2009.  Rossi Decl., at ¶ 4 (ECF No. 78-40) (stating when Rossi joined Dudek's lab).  A few months later, Dudek became Rossi's mentor and chair of her dissertation Committee.  Rossi Depo., 39:24–40:16 (ECF No. 86-1).

38.     Although the NIH grant required Dudek to inform Rossi about the Epoch conflict, Dudek did not provide her with a written notice of the conflict and how to manage it.  Dudek Depo., 17:16–18:3 (ECF No. 86–17).  Instead, he "assumed she knew that" he had a financial interest in Epitel because "everybody in the group knew that we had this company."  *Id.* at 19:14–22.  Dudek asserts he "told her we had a company," and "[t]he company was right at the edge of [Dudek's] lab."  *Id.* at 18:4–7.

39.     Rossi admits she "knew Dudek had an ownership interest in Epitel, the manufacturer of the Epoch device, but did not think Dudek would allow that interest to jeopardize [their] relationship."  Rossi Decl., ¶ 5 (ECF No. 78-40).

40.     Upon Rossi joining Dudek's lab, however, her dissertation project started to change.  In April 8, 2010, Keefe noted in a letter of recommendation that Rossi's "CV [showed] she has been involved in research on the neurobiology of learning and memory since she was an undergraduate, and she maintains that focus to this day.  She is driven by this topic and the desire to understand the underlying neurobiology."  Keefe Lttr. of Recommend., at 2 (ECF No. 86-2).

Despite her long focus on learning and memory, White noted that Rossi's initial project, which she was passionate about, was "a much different project than the project that she ended up pursuing with Dr. Dudek." White Depo., 17:5–9 (ECF No. 86-3).

41.     Kesner was in the Psychology Department, a branch of the Interdepartmental Neuroscience Program at the University. Rossi Depo., 26:11–23 (ECF No. 86-1). In Kesner's lab, Rossi "look[ed] at removal of hippocampal interneurons in the rat and assessing both local field potential arising from that area as well as behavioral tests of memory in the form of novelty detection tasks." *Id.* at 50:5–9. Dudek described Rossi's work in Kesner's lab as doing "SSP-saporin injections to lesion GABAergic interneurons, and then test[ing] hypotheses about theta rhythm and learning in rats." Dudek Lttr. of Recommend., at 2 (ECF No. 86-24). "[T]he project was a collaborative effort between Dudek and Kesner." Rossi Depo., 38:23–25.

42.     When Rossi joined Dudek's lab, the focus of her work shifted. Rossi testified "at the behest of Dr. Dudek, that form of behavioral testing," involving memory, "was eliminated from [her] project." Rossi Depo., 49:3–6 (ECF No. 86-1). Rossi emphasized "it was decided by Dr. Dudek that that portion of the project would be completely eliminated from [her] dissertation project." *Id.* at 49:12–14. "That component was not replaced with anything comparable." *Id.* at 49:20–23.

43.     Rossi also testified that her project changed from rats to mice, at the behest of Dudek, and that rather than using "a traditional tethered recording methodology," she started "using the wireless Epoch device, again, at the behest of Dr. Dudek." Rossi Depo., 52:20–53:2 (ECF No. 86-1). Although Dudek testified he could not recall for certain, he admitted in his

deposition he may have suggested Rossi use Epoch for her dissertation project.  Dudek Depo., 15:2–15 (ECF No. 86–17).

44.     Rossi's project further changed such that her dissertation hypothesis became studying whether "the removal of interneurons within a small area of the hippocampus would result in theta attenuation or seizures leading to progressive epilepsy."  *See* Rossi Depo., 54:2–5 (ECF No. 86-1). In short, Rossi's research effort became focused on "whether interneuron loss alone can result in progressive epilepsy."  Dudek Lttr. of Recommend., at 2 (ECF No. 86-24).  This was Dudek's area of interest for which he had formed that hypothesis.  *See* NIH Grant, 14 (ECF No. 86-33) (obtaining funding to test hypothesis that seizures occur from hippocampal interneuron loss and noting contrary result "would be surprising" due to widely accepted hypothesis).

45.     By August 24, 2010, Rossi asked to meet with her Committee because her "project [had] undergone a fairly significant shift in focus."  Rossi Email, at 6–7 (ECF No. 86-32).  Per one of her Committee members, "the main point of her thesis" was now "on the electrophysiological data," with "[t]he primary metric of interest" being "the difference in electrical signals caused by the lesion."  Greger Email, at 4 (ECF No. 86-32).  This was a marked change from Rossi's past experience and knowledge in learning and memory.

46.     Notably, in his deposition, Dudek admitted, "at the time [Rossi] started using the Epoch device in her thesis project, it had not yet been tested and validated in mice for the amounts of time, the length of time, that [Rossi] was planning on using it."  Dudek Depo., 12:9–14 (ECF No. 86-17).  In his view, however, "the tradeoff in research is that if you're going to do something novel, you have to take that risk, right.  So—so this—part of the strength of her work was to work a novel device."  *Id.* at 12:14–17.

15

47.     Rossi declared, however, that she did not know when she used Epoch for her project that it was in a "primitive" state, and only after litigation had started did she allegedly learn that Dudek had not expected "any of the animal studies in his lab using the device to result in publishable findings."  Rossi Decl., ¶ 11 (ECF No. 86-9); *see generally* NIH Grant, at 16 (ECF No. 86-31) (stating in 2014 that next phase of animal testing to validate another version of Epoch device is "not designed to answer basic scientific questions and will not result in publishable findings").  Rossi asserts "Dudek never communicated either of these beliefs to me."  Rossi Decl., ¶ 11.

48.     Moreover, Dudek knew he had a financial interest in the commercial success of the device.  Dudek Depo., 10:21–24; 15:16–20 (ECF No. 86-17).  He also knew the product was only good if it worked, and if it did not work, then he expected Rossi would go back to a tethered system.  *Id.* at 15:22–16:9.   Thus, if Rossi were "able to report that the Epoch device successfully collected data for her experiments, that would be" helpful to Epitel.  *Id.* at 16:11–14.  Additionally, if her findings were published, showing the device worked, that also would provide some benefit to Epitel.  *Id.* at 17:4–10.  This was so, regardless of what the research answer was, as long as the answer showed the device "really worked."  *Id.* at 17:8–10.  Nevertheless, Dudek denied that Rossi's work "was that big of deal" to Epitel.  *Id.* at 17:1–3.

49.     There appears to be nothing in the record that consideration was given to the impact on Rossi's dissertation if the device had not been successful and she had had to start her research over.

50.     After Rossi's project changed, she started gaining skill using Epoch after January 2011.  Rossi Decl., ¶ 5 (ECF No. 78-40).  Once she "developed particular skill with it," she "began using the Epoch device to collect data for [her] thesis research in September 2011."  *Id.*

51.     In August 2011, Rossi asked Dudek to review a research plan she was submitting to the Epilepsy Foundation.  Dudek responded that the plan was okay, but he was "concerned that we leave the reviewer with the sense that we know the animals develop seizures.  As I recall, you only have one animal with [seizures.]  Is that right."  Email, at 30 (ECF No. 86-32).  Rossi replied that she did not want to "stress the preliminary nature of the current data too much," because "the hypothesis we are trying to examine in this proposal will seem moot, or premature."  *Id.*  It is unclear from the record whether this report of negative seizures was based on Rossi's use of Epoch or a tethered device.  It does show, however, Dudek knew about negative seizure data in 2011, and yet continued to be supportive of Rossi at that time.

52.     "In April of 2012, Epitel-affiliated individuals, John Fisher and Mark Lehmkuhle, approached [Rossi] to ask that [she] begin using a new version of the Epoch device created by Epitel."  Rossi Decl., ¶ 6 (ECF No. 78-40).  Rossi asserts that when she declined because it could "jeopardize [her] thesis data collection, [that] Fisher became very upset at [her] decision."  *Id.*

53.     By June 2012, Dudek was facing another inquiry by the University's Conflict of Interest Committee.  The matter originally was brought to the committee's "attention because some external colleagues requested a review based on published works" that lacked a financial disclosure.  Conflicts Committee Minutes, at 2–3 (ECF No. 86-30).  The "published paper related to the SBIR Phase 1 project."  *Id.* at 4.  The context of the conflicts committee minutes supports an inference that Dudek reported to the conflicts committee that the Epoch "device [was] still not

17

for sale because it [was] *primitive*," and that he was "just now at the point where he [was] utilizing the device in his research."  *Id.* at 2–3 (emphasis added).  Moreover, per the minutes, disclosures had "been made to students and they have been given a choice about selecting projects that [did not] involve the device."  *Id.* at 2.

54.     Dudek asserts he failed to understand the conflict reporting requirements, and a person on the conflicts committee noted that some events pertaining to Dudek's failure to report were "beyond his control."  Dudek Depo., 22:7–22 (ECF No. 86-17); Email, at 2 (ECF No. 86-28).  Questions were raised, however, about whether there was a conflict at the time of the NIH grant, and if discipline should be pursued against Dudek "because of failure to disclose in the past." Conflicts Committee Minutes, at 4 (ECF No. 86-30); Email, at 3 (ECF No. 86-28).

55.     Neither Botkin nor the Committee members, however, thought Dudek's involvement in Epitel and Rossi's use of Epoch created a conflict concern.  *See e.g.*, White Answer, ¶¶ 55-65 (ECF No. 59); Botkin Depo., 117:13–18 (ECF No. 91-17).  Botkin stated that whether a conflict had been disclosed to a student expressly is different from whether the student knew about it.  *Id.* at 117:15–16.  In Dudek's case, "everybody knew about Dr. Dudek's device and company" such that "it was common knowledge within the laboratory environment."  *Id.* at 117:14–18.

56.     By November 2012, five months after the report to the conflicts committee, Rossi had completed her data collection using the Epoch device and had reported to Dudek, that contrary to the hypothesis, "the experimental treatment used in [her] dissertation did not result in any seizures."  Rossi Decl., ¶¶ 9–10 (ECF No. 86-9).

57.     Around that same time, Dudek gave Rossi a letter informing her in writing for the first time that a conflict of interest existed.  Rossi Decl., ¶ 10 (ECF No. 86-9); Conflict Lttr. (ECF

No. 78-29).  Dudek acknowledged in his deposition he "should have given her a letter sooner." Dudek Depo., 26:19–20 (ECF No. 86-17).  The letter informed Rossi that she could use another device for her experiments.  Conflict Lttr., at 2.  By that time, however, the data collection had been completed and switching to another device would have required Rossi to start her research over.  Dudek Depo., 35:21–36:3.

58.     Given that Rossi had been using the Epoch device for research in Dudek's lab for almost a year, that she was using a primitive device for a dissertation project, and that Dudek had provided no written notification to Rossi about the conflict and her research alternatives until November 2012, the facts stated in the conflicts committee minutes may not have been accurate.

59.     In October 2012, Dudek asked White if he would feel okay about writing a letter of recommendation for Rossi.  Dudek said he thought Rossi would need "another year to address the issues raised in the committee meeting, but better to start early than late."  Email, at 2 (ECF No. 86-22).  This was contrary to a Committee meeting the prior month where the Committee anticipated a defense date in June 2013.  *See* Committee Rpt., at 5 (ECF No. 86-21).

60.     Also in October 2012, Dudek wrote the letter of recommendation mentioned above in Paragraph 17.  He said Rossi's "experiments are unique; no one has examined the effects of selective interneuron lesions on seizure generation and progression.  Given the controls that she is performing to confirm interneuron loss, I believe *any answer* that [Rossi] obtains from this data set will be interesting."  Dudek Lttr., at 2 (ECF No. 86-24) (emphasis added).  He again noted Rossi would "probably need another year to complete the studies and write two or three full-length papers."  *Id.*

19

61.     Additionally in October 2012, Rossi asked Dudek to review a poster for a presentation.  He said, "All-in-all – OK. . . . My concern, however, is that only the bottom of part 3 has group data . . . on the recordings.  *Concern about number of days analyzed.*"  Poster Email, at 28 (ECF No. 86-32) (emphasis added).  He further stated, "[n]o problem with seizure result – do you have evidence that it is not a false negative from too weak of an analysis?"  *Id.*  The record does not appear to disclose what particular steps were taken to address the issues raised by Dudek.  But he did raise concerns about Rossi's analysis about six months before her dissertation defense.

62.     Rossi asserts, however, that as of October or November 2012, "Dudek's support of me waned," and her contact with him over the next five or six months was minimal.  Rossi Decl., ¶ 12 (ECF. No. 86-9).  Dudek disputes these allegations.

63.     Although Rossi had a 4.0 GPA for Fall 2012, and Dudek had written a favorable recommendation that semester for her fellowship at MIT, the academic success Rossi had demonstrated over four years at the University crumbled the next semester.

**Unknown Information about Committee Members**

64.     Rossi asserts some of the Committee members failed to disclose important information.  Dudek was Ekstrand's mentor and collaborator.  Dudek Depo., 43:8–9 (ECF No. 86-17); Ekstrand Depo., 143:15–144:8 (ECF No. 86-29).  Yet, Dudek omitted that information from the conflict of interest letter directing Rossi to consult with Ekstrand if she needed an independent reviewer.  *See* Conflict Lttr. (ECF No. 78-29).  It is unclear from the record if Rossi knew that Dudek was Ekstrand's mentor and collaborator.

65.     Rossi also asserts White did not disclose his reservations about serving on her Committee.  Rossi Decl., ¶ 4 (ECF No. 86-9); White Depo., 16:11–25; 140:2–7 (ECF No. 86-3)

(noting he served on her Committee with reservation because "she had trouble in the past" and he had "always had some doubts about her").  She did not know White had a conversation with Hasselmo about her and had expressed reservations about her being admitted to the University. *See* White Depo., at 16:1–9; 141:14–17.  She also did not know he considered her to be a mediocre student despite how she had performed academically at the University.  *See generally* Rossi Decl., ¶¶ 4, 25(q) (ECF No. 86-9); White Depo., 141:14–24 (ECF No. 86-3).

66.     To summarize, Rossi alleges she had a mentor and Committee chair who had a conflict of interest and had Rossi using a primitive device for his own benefit, without expectation it would result in publishable findings.  Rossi also alleges Dudek moved her from her area of expertise into an area in which she had no prior experience and was novel even for those in the field of epilepsy.  Rossi further alleges Dudek was largely unavailable in the five or six months preceding the dissertation, which Dudek disputes.  Moreover, Rossi contends she had another Committee member who had undisclosed reservations about her during her entire time at the University, and a third Committee member who was closely aligned with Dudek in a mentor/collaborator relationship.

**Theta and Epilepsy Papers and Dissertation Defense**

67.     The Committee members anticipated Rossi would have two papers from her project.  One was the Theta paper, and the other was the Epilepsy paper.  Rossi had "a background in theta and learning and memory."  Rossi Depo., 147:23–24 (ECF No. 86-1).  She "did not come in with a background in epilepsy."  *Id.* at 147:22–24.

68.     During pre-defense dissertation Committee meetings, White asserts he had seen signs that Rossi "struggled with the technical aspects of the work."  White Depo., 55:15–16 (ECF

21

No. 86-3).  He asserts she struggled with engineering and mathematical techniques that break down data and look at it a different way.  *Id.* at 56:13–16.  He saw her try, but the work was like a second language for her.  *Id.* at 56:22–23; 57:5–9.  Hence, while she had mastered certain aspects of her project, White thought she was still only getting "pretty good" in the "highly technical and mathematical" areas, rather than being a natural at it.  *Id.* at 56:20–23; White Lttr., at 2 (ECF No. 86-34).  He couched his letter of recommendation for her in those terms to signal reserved support of her.  White Depo., 39:4–8.  As a Professor of Bioengineering, it is unclear if White assessed Rossi's abilities in comparison to bioengineering students or other students with Rossi's background.

69.     In October 2012, Rossi sent notes to Dudek of points she wanted to make in her Theta paper, including that seizures did not occur "likely due to a small lesion area."  Email & Notes, 25–26 (ECF No. 86-32).  Subsequently, she sent Dudek a draft of the Theta paper in December 2012, which he reviewed.  *Id.* at 18.

70.     On March 18, 2013, Rossi sent Dudek another draft of her Theta paper.  Email & Paper, at 11–17 (ECF No. 86-32).  On March 30, 2013, Dudek responded to Rossi, "It looks good; mostly very small stuff to consider so far."  Email, at 2 (ECF No. 86-37).  Then on April 2, 2013, Dudek said, "I think the limiting factor is unlikely to be paper 1 [the Theta paper], but paper 2 [the Epilepsy paper].  Just keep going like you are – paper 2.  If we have to give them what you have now for paper 1, it would probably fly fine."  Email, at 2 (ECF No. 86-38).

71.     On April 10, 2013, Rossi sent an email to the Committee.  Dudek was out of town and had not reviewed her latest papers.  Email, at 2 (ECF No. 86-39).  The deadline for submission was looming, so Rossi asked the Committee if they wanted her un-reviewed papers.  *Id.*

72.     On April 15, 2013, Rossi reached out to White to ask how to proceed because Dudek allegedly had been very busy and had not had time to talk with Rossi about her papers. Email, at 2 (ECF No. 86-40).  White suggested postponing the defense and recommended that Rossi talk with Keefe.  *Id.* at 3.  Rossi then emailed Keefe about the situation.  Email, at 1 (ECF No. 86-41).  Keefe recommended involving other mentors in the area to review the project.  *Id.* at 2.  Keefe warned Rossi that she faced a risk of the document not passing if she did not receive feedback.  *Id.*  Rossi responded that lab members had been involved "as much as possible" and Dudek had reviewed her dissertation with her for the first time that evening.  *Id.*

73.     On April 16, 2013, Dudek emailed Rossi and said he had increasing concerns. Based on her Epilepsy paper, he strongly urged her to postpone, and told her it would not impact her postdoctoral fellowship because a delay "happens all the time."  Email, at 2–3 (ECF No. 86-43).  He said he had previously expressed concerns about a Spring defense and told her he thought a November or December defense would be much more reasonable.  *Id.* at 3.  Dudek further said that while her Committee would be fair, the defense would be rigorous and the Committee would not cut her much slack.  *Id.*  Thus, he said it was best to delay.  Rossi disputes that Dudek told her a November or December defense would be more reasonable.

74.     Notwithstanding Dudek and White's recommendation to postpone, Rossi ignored their suggestions.  She told Dudek she had "tried multiple times to sit down . . . and get some in-depth guidance."  Email, at 2 (ECF No. 86-43).  She expressed concern that if the dissertation were delayed, she would be in the same situation a month or two later.  *Id.*  She said she felt ready to defend her project and that she believed "everyone on my committee understands that epilepsy is not my main field."  *Id.*

75.     Later that same day, Keefe sent an email to Dudek asking for a discussion.  She expressed "dismay[] that we are a week out from a scheduled, advertised defense and yet now there is question of whether it should be postponed."  Email, at 2 (ECF No. 86-44).

76.     On April 19, 2013, Rossi sent revised figures to Dudek.  She then erroneously, or according to defendants falsely, reported to Dudek that all Committee members were supportive of her proceeding and that the work she did was "enough to graduate, and that they don't anticipate any problems with my writing."  Email, at 2 (ECF No. 86-52); Dismissal Lttr., at 3 (ECF No. 78-24).  She further reported White had "mentioned that he is more than happy to sit down with us and go over the theta paper to make sure that it is in great shape for publication."  Email, at 2 (ECF No. 86-52).  Rossi then said she apologized for any appearance of having spoken ill about him, and she asked for an opportunity "to talk things out."  *Id.*

77.     On April 22, 2013, Dudek informed Rossi that she would no longer have access to his lab without an escort. Access Lttr., at 2 (ECF No. 86-46). Rossi then reported to Keefe and White that Dudek had accused her of falsifying her data, and "that he does not trust me and that he wants nothing further to do with me." Email, at 2 (ECF No. 86-49).  Rossi further reported that Dudek had asked for all copies of her data to be turned over to him, but had stated he still would help her publish her papers.  *Id.*  Rossi expressed her confusion over Dudek's actions and asked for guidance.  *Id.*

78.     Keefe responded that neither she nor White could adjudicate the matter because they were on Rossi's Committee.  Email, at 2 (ECF No. 86-51).  Additionally, Keefe was the Director of the Program.  *Id.*  She asked Dudek and Rossi to "work civilly together to reach a" resolution, and if that failed, to "contact the Dean of the Graduate School."  *Id.*  Keefe also asked

24

them to "reach a decision as to whether the defense should go forward," and said she would await their decision.  *Id.*

79.     Dudek sent an email to the Committee about twenty minutes later.  Rather than attempting to work out the dispute or involving the Dean, Dudek quoted from Rossi's April 19, 2013 email that incorrectly reported the Committee was supportive of her proceeding with her defense.  Email, at 2 (ECF No. 86-52).  Dudek then said, "[y]ou all have made a decision, and it is clear that you all want to go forward.  See you Thursday."  *Id.*

80.      Later the same evening, White sent an email to the Committee stating, "[t]his situation is unprecedented in my career.  If the defense goes forward, I will do my part.  However, I want to go on record that this defense should be postponed" until there was agreement between Rossi and Dudek.  Email, at 2 (ECF No. 86-53).

81.     Dudek responded to White that he had spent "an **enormous** amount of time on [Rossi's] project," and provided emails to White to show "**part**" of what he had done.  Dudek Email, at 2 (ECF No. 86-54) (emphasis in original).  He asked White to correct his statement that the situation was unprecedented because of the history they had had with another student.  Email, at 2 (ECF No. 86-55).

82.     These events directly before the dissertation defense impacted the Committee's view of Rossi.  White testified that he believed Rossi acted in a "slippery and manipulative" manner in April 2013.  White Depo., 26:23–27:4 (ECF No. 91-11).  He said, "she went to committee members individually and told us different stories."  *Id.* at 26:9–10.  For example, White asserts Rossi told him "that [Dudek] was very supportive of an April 25th defense," and "[s]he told others that [White] was very supportive of an April 25th defense when [he] was certainly not."  *Id.*

at 26:10–13.  White also believed Rossi did not accurately represent "the degree to which [Dudek] had been available during the months preceding her defense," and such conduct "reflected poorly on her professional character."  *Id.* at 26:17–27:18.  The evidence supports that other Committee members had similar views.  *See* Dismissal Lttr., at 3 (ECF No. 78-24).

83.     Keefe testified in her deposition that Rossi had engaged in "a blatant misrepresentation" about what Committee members had said to her regarding her readiness to proceed with her defense.  Keefe Depo., 55:2–13 (ECF No. 86-5).  Keefe testified she also thought Rossi had misrepresented how much the lab members had reviewed her work because her written product was so poor.  *Id.* at 55:14–20.  Keefe never confirmed whether her belief was correct with the lab members.  *Id.* at 55:21–56:8.

84.     Keefe further testified that Rossi's decision to proceed with her defense showed Rossi lacked the minimum attitudes of a Ph.D. student because she was non-responsive to advise from Committee members.  Keefe Depo., 105:8–16 (ECF No. 86-5).

85.     On April 25, 2013, the day of the defense, Dudek sent an email to Vicki Skelton, a department administrative assistant who became a supervisor during Rossi's time at the University.  Email, at 2 (ECF No. 86-56); Skelton Depo., 9:6–10 (ECF No. 86-45) (stating her job titles).  Dudek informed Skelton he thought the defense would be "unpleasant," but he would "hold my nose and try to 'do the right thing.'  As much as [Rossi] has annoyed me, one hates to see a student or anyone be dishonest, and then pull it off."  Email, at 2 (ECF No. 86-56).  He indicated he had been thinking about resigning, but was leaning against it and would see how it went for *him* that day.  *Id.*  He further stated, "I am almost certainly going to vote to fail, because she does not have

an adequate thesis.  [Keefe] will probably support her, [Ekstrand and Greger] probably not, but hard to say.  [White]—see next email.”  *Id.*

86.    Thus, prior to her defense, multiple Committee members had developed negative views about Rossi's character and competency.

87.    During the defense, Wendy Pouliot, a person who worked in Dudek's lab, asked Rossi "how many days of seizure data [she] had analyzed.  Pouliot asked this question in relation to a figure in [Rossi's] thesis."  Rossi Decl., ¶ 19 (ECF No. 86-9); *see also* Ekstrand Depo., 54:14–22 (ECF No. 86-29) (stating Pouliot was a member of Dudek's lab).  The Committee reports that Rossi said she only analyzed seizure data for day 5.  *See* ¶¶ 88–90 *infra*.  Rossi disputes saying that and contends she "had analyzed 30 days of seizure activity," but "had observed seizures mainly on the fifth day of experimentation, hence the figure focusing on that day."  Rossi Decl., ¶ 19.

88.    White stated in his deposition it was not clear from Rossi's document and presentation what data analysis she had done.  White Depo., 34:21–23 (ECF No. 91-11).  Then "during the public question-and-answer phase," when a member of Dudek's lab asked Rossi about the data, "it was an extremely important moment *that led to the—her failure at the defense*."  *Id.* at 34:16–35:9 (emphasis added).  Before that question, "it was generally believed that the data analysis had been much more detailed," even though Rossi's dissertation was weak.  *Id.* at 35:9–14.  Following the question, they thought she had only looked at day five for each animal.  *Id.* at 35:1–6.

89.    Keefe described that moment as follows: "We were all floored by the fact that she answered  . . . she had only analyzed day five, because that was not the impression given at all the

way she wrote her dissertation," and that limited analysis was "completely inappropriate for the conclusions that were being drawn both in the written document and as presented publicly in the seminar." Keefe Depo., 97:21–25, 100:8–11 (ECF No. 78-34).

90.    Ekstrand stated in his deposition that Rossi's answer surprised him and gave him "concerns about . . . the conclusion of the—that particular experiment." Ekstrand Depo., 117:17–21 (ECF No. 91-9).

91.    Dr. Jay Spampanato, a postdoctoral research assistant in Dudek's lab, stated in his deposition that based on Rossi's answer at the defense, "we all found out that [Rossi] was, at the very least, misrepresenting the amount of work that she had done." Spampanato Depo., 14:15–17 (ECF No. 78-36); Spampanato Depo., at 5:17–22 (ECF No. 86-47) (stating his position in Dudek's lab). He asserted that Rossi had represented to him "she had analyzed all this data, particularly pertaining to when the animals were having seizures," but then at the defense they found out she only had analyzed one day. *Id.* at 14:18–25 (ECF No. 78-36). He said that was a specific misrepresentation to him. *Id.* at 14:24–25. After that, Dudek started raising research misconduct concerns. *Id.* at 15:11–22.

92.    Whether Rossi misspoke or people misheard, the evidence supports that Rossi actually did analyze more data than just one day, and from that analysis learned seizures mainly occurred on day five. Rossi Decl., ¶¶ 19–21 (ECF No. 86-9); Email, at 2–3 (ECF No. 86-68). She then included a figure in her dissertation about seizures on that day. Thus, while the figure pertained to only one day, her analysis and conclusions pertained to more days. Rossi Decl., ¶¶ 19–21.

93.     Nevertheless, based on the alleged weaknesses in her dissertation and that key turning point, the Committee did not allow Rossi to proceed with her oral examination and failed her.  *See* Keefe Grievance Response, at 4 (ECF No. 78-16); Rossi Decl., ¶ 12 (ECF No. 78-40).

94.     Because of Rossi's complaints that Dudek had not given her adequate feedback, the Committee agreed "to not formally register a 'fail' on the final examination . . . to give her the opportunity to remedy the deficiencies."  Keefe Grievance Response, at 4 (ECF No. 78-16).

95.     According to White, though, her defense "was the worst dissertation [he] had ever read, and it was the worst defense [he] had ever attend[ed]."  White Depo., 49:16–18 (ECF No. 86-3).  The Committee's written report to Rossi was more measured.  The Committee informed Rossi her dissertation needed to "be significantly expanded and more scholarly in terms of the depth of review of the relevant literature."  Email, at 4 (ECF No. 78-2).  Additionally, "there need[ed] to be more in-depth and rigorous analysis of the data."  *Id.* at 5.  Keefe, Greger, and Ekstrand then gave Rossi specific feedback about how to improve the dissertation and where to focus her analysis.  Email & Attachment, 4–7 (ECF No. 78-2).

96.     On April 30, 2013, White sent an email to the Simons Center asking to retract the letter of recommendation he had written in February 2013 for Rossi.  Although the Simons Center had already declined Rossi's application, White informed the Center that "[r]ecent events have led me to reconsider" his recommendation.  White Email, at 2 (ECF No. 86-57); Email, at 2 (ECF No. 91-6) (stating application denied on April 10, 2013).  White said, "[i]n particular, [Rossi's] performance at her defense was substantially weaker than I expected it to be, leading me to doubt her potential for independent postdoctoral work."  *Id.*  In response, the project coordinator said the Center would keep White's "email on file in the event that [Rossi] should reapply."  *Id.* at 3.

97.     At a meeting on May 7, 2013, Keefe informed Rossi that she could no longer speak with Committee members individually.  *See* Email, at 13 (ECF No. 78-5).  All communications had to be made to the Committee as a whole.  *Id.*  Keefe testified this was because "[n]obody was questioning the veracity of what members of the committee were saying."  Keefe Depo., 54:18–19 (ECF No. 86-5).  Instead, it was "apparent to everyone on the committee" that Rossi "was not always accurately representing" information, so the Committee was "questioning the validity of what we were being told by her."  *Id.* at 53:18–54:1.  Consequently, they did not want a situation "where there was no one to witness what actually was going on."  *Id.* at 54:1–3.

**Initial Post-Defense Instructions**

98.     At the May 7, 2013 meeting, Rossi also was told by the Committee that she needed further analysis on the theta data and behaviors.  Meeting Summary, at 2 (ECF No. 78-4).  This evaluation was inconsistent with Dudek's statement to Rossi in March 2013 that her Theta paper should pass.  As for the Epilepsy paper, Dudek referred Rossi to the "Kadam paper" for an idea of how to measure seizures.  *Id.*  Concerns were raised whether Rossi's blinded research had been "compromised by the procedures used for the analysis."  Email, at 2 (ECF No. 78-19).  Rossi "was instructed to go back and re-analyze her data," which data was re-blinded before it was given to her.  Dudek Depo., 63:16–19 (ECF No. 86-17); Meeting Summary, at 2 (ECF No. 78-4).

99.     Because Dudek had restricted Rossi's lab access, she could no longer go into the lab freely to analyze her data or have the typical lab interaction with others.  *See* Spampanato Depo., 6:18–21 (ECF No. 86-47) (stating "[a]s a postdoctoral member of [Dudek's] lab," he "would be involved as a senior, sort of, consultant-type with students").  Even if she could have gone in, Rossi said she would not have felt comfortable knowing Dudek did not want her there.

Email, at 4 (ECF No. 78-2).  She asked to move her lab computer to another location on campus since her personal computer lacked the power to run the "data analysis scripts."  *Id.*  Instead, Dudek said he would provide a different computer for her.  Email, at 4 (ECF No. 86-58).

100.    On May 15, 2013, Dudek informed Rossi, "[i]t will be critical to have LFP and seizure data for all of the animals for all days."  Email, at 3 (ECF No. 86-62).  He also gave combined Committee remarks about other areas to address.  *Id.*

101.    Rossi responded the next day that she thought Dudek's "notes run contrary to what we discussed at our last meeting (e.g. doing behavioral quantification for all days instead of just those in which theta is attenuated)."  Email, at 3 (ECF No. 86-62).  Dudek disagreed and said the decision was unanimous.  *Id.* at 2.  He included the Committee on his response.  *Id.*

102.    The Meeting Summary from March 7, 2013 said "Theta needs to be evaluated and reported *every day* and 24/7 in experiments and controls.  And by behavioral state *for select days* once theta is analyzed."  Meeting Summary, at 2 (ECF No. 78-4) (emphasis added).  Separately, the summary said Rossi needed to propose a measure for seizures.  *Id.*  Whether Rossi and Dudek were communicating on the same issue or talking past each other is unclear.  The issue of how the behavioral state would be measured and blinded, however, was an area of disagreement among Committee members as discussed further below.

**Data Analysis Documentation**

103.    On May 19, 2013, Dudek sent an email to Rossi and copied the Committee on it.  He informed Rossi that they had only found two spreadsheets for her research.  Email, at 2 (ECF No. 86-62); *see also* Email, at 2 (ECF No. 86-66) (noting Dudek received the spreadsheets on April 29, 2013).  He then raised the incident during the dissertation defense where Rossi allegedly

had said she analyzed only one day of data.  *Id.*  He asserted "several statements about seizures . . . do not appear to be justified," and "[n]umerous statements directly to me in the months before your defense made it appear that you had analyzed substantially more data than you alluded to in your response at the presentation, including the data on seizures."  *Id.*  Dudek therefore asked Rossi to "provide a detailed, written clarification of these issues," including explaining what data had been analyzed.  *Id.* at 2–3.

104.   Rossi replied to Dudek the same day and informed him that she would be happy to provide him all of the data and analyses, but she needed access to her lab computer.  Email, at 4 (ECF No. 86-58).

105.   In response to Rossi's email, rather than focusing on obtaining proof of her analyses, Dudek sent an email to the Committee stating that Rossi did have access to the lab; she just needed an escort.  He asked for their opinion if it would be ok for him to tell Rossi "I do not trust you; I am concerned that you have been dishonest."  Email, at 2 (ECF No. 86-58).  He said that is how he and others in his group felt, and it was a paraphrase of what he had already told her.  He then said Rossi was trying to focus on the data when the real issue was what she would do with the project proposal.  *Id.*

106.   Dudek allegedly never accepted Rossi's offer to show him the data she had analyzed.  Rossi Decl., ¶ 22 (ECF No. 86-9).  Instead, Dudek maintained during his deposition that Rossi had been dishonest by saying "there was no seizure in the theta study when" she had not "analyzed the data."  Dudek Depo., 177:14–178:7 (ECF No. 86-17).  When asked if he had confirmed that she had not analyzed the data, he said, "[t]hat would be dumb.  That would be a complete waste of time."  *Id.* at 178:11–12.  She had said during the defense "she didn't analyze

the data," so it was "ridiculous" to think he would go sort through the data to see if she may have analyzed it.  *Id.* at 178:14–20.  He finished by telling plaintiff's counsel he was "clueless."  *Id.* at 179:14–17.

107.    In fact, the evidence supports that Rossi's lab computer showed Rossi had analyzed the data for more than Day 5.  Spampanato searched Rossi's lab computer and found in the EEG folders: "an individual folder for each animal that was analyzed for the LFP figure.  In those folders there [were] LFP recordings and analyzed Matlab files for each day that was included in the original LFP analysis: Days 2, 5, 7, 10, 15, 20, and 30."  Email, at 3 (ECF No. 86-68).  Additionally, there were "folders for: Explore, Groom PSD, and Sleep.  Each of which [had] a Saline and Saporin folder in them.  And they each [had] Matlab and Acknowledge files in them."  *Id.* at 2.  Finally, "[i]n the histology folder," there was "a folder with all the masks used to do the cell counts, and a spreadhseet [sic] with the original counts," which were done blind the first time around as well. *Id.*  Rossi had no access to the computer after April 22, 2013, so all of the files were there before Dudek started accusing Rossi of not analyzing the data.  Rossi Decl., ¶ 21 (ECF No. 86-9).  And the files also were there before Committee members accused Rossi of misrepresenting to them the analyses she had done.

108.    Besides not accepting Rossi's invitation to view the analyses she had done, Dudek controlled how Rossi could access data on her lab computer.  On May 19, 2013, Rossi sent an email to the Committee asking for a meeting time so she could have a clear picture of what they wanted her to do.  Email, at 6 (ECF No. 78-6).  She asked for access to her lab "computer and data so that I can present to *everyone* what *has already been done*."  *Id.* at 6 (emphasis added).

109.    Dudek's lab restriction letter to Rossi stated, "the only need for you to be in the building is to reanalyze your data."  Access Lttr., at 2 (ECF No. 86-46).  Skelton and Spampanato said, however, they were under the impression that Rossi was not permitted to analyze data while in the lab.  Email, at 2 (ECF No. 86-48); *see also* Ekstrand Depo., 55:1–3 (ECF No. 86-29) (stating understanding that Rossi was "restricted, she would have access to the data," but "she would be expected to still analyze her data off site").  Because of the lab limitations, Skelton reported to Dudek that Spampanato suggested allowing Rossi to borrow her lab computer due to the amount of time it would take to copy the large data files Rossi had on the computer. Email, at 2 (ECF No. 86-48).

110.    Rather than agreeing to allow Rossi to borrow the lab computer, Dudek sent an email to the Committee telling them Rossi had access to her data; thereby making it appear Rossi was creating a problem.  Email, at 2 (ECF No. 86-58).  He also sent Rossi an email stating, "[a]s you know, you have had access to the data, you simply need to arrange with Vicki Skelton to oversee your visit to the lab."  Email, at 5 (ECF No. 78-6).  He further said Spampanato "has been copying the files; all have been copied except the video files.  Please contact Vicki and Jay about an appropriate time to pick up [a different] computer *to use at home*."  *Id.* (emphasis added).

111.    Rossi contacted Skelton that same day, but Skelton was unavailable.  Email, at 5 (ECF No. 78-6).  Rossi then contacted Spampanato, who said back-up copies were still being completed.  *Id.* at 4.  Additionally, the data needed to re-coded so Rossi would be doing a blind re-analysis.  *Id.*  Thus, the computer and data were not ready.  *Id.*

112.    Rossi finally received a computer on May 22, 2013, along with the first round of data from her lab computer.  Email, at 2 (ECF No. 78-6).  Because of Dudek's actions, it appears

that Rossi lacked access to her data from April 22, 2013 to May 22, 2013, even though Dudek told the Committee otherwise.  And when she did eventually receive data, it was only part of it.  Rossi never did gain full access to her data post-defense.

**Disagreement Over Requirements**

113.    In September 2013, Rossi reported that she was working on the LFP analysis of 1,000 files, with each file containing 4 to 12 channels.  Email, at 4 (ECF No. 86-59).  Because each channel had up to 24 hours of data, Rossi informed the Committee the LFP analysis likely would not be completed until late October or early November.  *Id.*

114.    In the meantime, Keefe asked the Committee to respond to Rossi's proposed Methods write up.  Email, at 3 (ECF No. 86-59).  Issues still existed about how the behavioral analysis would be done while maintaining a blind on the data.  *Id.* at 2–3.

115.    On September 16, 2013, White reviewed the Methods sections, and stated, "[t]he behavioral methods seem fine to me.  The naïve observers would have to be paid.  The costs could be reduced by having those observers analyze only a randomly chosen subset of the blinded data.  Analyzing all the behavioral data is better, of course, but it may be too time consuming.  I don't have a good sense of that."  Email, at 12 (ECF No. 78-7).  He further said, "I have no concerns about the cell-counting methods."  *Id.*

116.    Also on September 16, 2013, Spampanato and Dudek discussed certain files, and Spampanato said he thought the cell count method largely looked okay as well, and the counting seemed sufficient.   Email, at 3 (ECF No. 78-7). With respect to the behavioral analysis, Spampanato said it "seems awfully tedious.  And it's not clear how [Rossi] will be blinded, or who will be watching the videos.  I think the idea of watching 24 hours of mouse behavior and writing

down every time they switch from moving, digging, scratching etc, to sitting still is about enough to make me start looking for work at McDonald's." *Id.* In other words, similar to White, Spampanato questioned the practicalities of analyzing all the behavioral data for every moment. Nevertheless, Dudek told Rossi a few days later, "how you will analyze the behavior data and remain blinded" needs more thought. *Id.* at 4.

117.    On September 19, 2013, Rossi responded, "[i]t is my understanding from our last committee meeting, and from John White's email, that analysis of the [behavioral] video would be done by individuals who are naïve to the experimental conditions." Email, at 7 (ECF No. 78-7).

118.    Dudek then emailed White and Ekstrand and stated, "I believe I have understated the fact that I have said several times that I will not hire people to analyze [Rossi's] data.  I am concerned that this is another veiled attempt by Rossi to get out of analyzing the data." Email, at 7 (ECF No. 78-7).

119.    And yet, Keefe sent Rossi an email on September 20, 2013 saying, "[I]f you need to recruit students to score video, I know" the person "teaching the undergrad neuroscience course in Biology.  He asked me last week if I was interested in having any undergraduate students work in my lab.  There may be students in that class who would be interested in getting some research experience." Email, at 12 (ECF No. 78-7).  Also, Keefe's "former post-doc" was "teaching the Brain and Behavior course," and Keefe suggested, "[t]here may also be students in that class who would be interested in getting research experience/scoring videos." *Id.*

120.    Shortly thereafter, Rossi sent an email stating, "[r]e video scoring, there seems to be some disagreement.  [Keefe and White] have suggested having undergrads do the scoring,

which would make sense as they would be naïve observers who could score video in a truly unbiased manner.  However [Dudek] wants me to do the scoring myself, which presents a problem, as we are not sure how to remove the animal IDs from the video itself.  I am happy to do analysis either way, but I do need a consensus from the committee."  Email, at 11 (ECF No. 78-7).

121.    About ten minutes later, Ekstrand replied, "[w]e will have to clarify the behavioral analysis, but my understanding from the committee meeting was that tape would be put over the monitor area that identified the animal to blind *you* to the information."  Email, at 11 (ECF No. 78-7) (emphasis added).  Thus, Ekstrand joined with Dudek in disallowing naïve observers to do the scoring.

122.    Rossi acknowledged the tape method was discussed, but she came away with the impression it "was not sufficient."  Email, at 4 (ECF No. 78-10).  White responded, "I am not sure about the behavioral analysis.  I am fine with taping over the animal-identifier spot on the monitor. [Dudek], can you suggest a method that is *efficient and workable*?"  *Id.* (emphasis added).  The record does not appear to contain a response to that inquiry.

123.    As to the cell counting methodology, although Spampanato told Dudek it was largely okay, and White saw no problems with it, Keefe wanted more.  She said the cell quantification itself was fine, but Rossi needed to include more detail about "the sectioning, staining, and imaging methods as well."  Email, at 11 (ECF No. 78-7).  Ekstrand agreed with Keefe. *Id.*

124.    Thus, the Committee itself seemed to have differences of opinion about how Rossi should proceed and whether her work was adequate at various points in the process.

**Data Production and First Dismissal from the Program**

125.    On October 24, 2013, Rossi informed the Committee she was "nearly done with LFP analysis," and wanted to "know what information is required in exchange for the blinding code so that [she could] hand that over in a timely manner."  Email, at 4 (ECF No. 78-10).  Once Rossi had completed a substantial part of the re-analysis, arguably another shift seemed to occur.

126.    The following day, Dudek reminded Rossi "that the seizure data still has to be analyzed, and it should also be analyzed with blind procedures."  Email, at 4 (ECF No. 78-10). Rossi informed the Committee she had "been keeping a record of all files which seem, upon visual inspection, to contain seizures.  As movement artifacts from grooming tend to closely resemble seizure activity in LFPs," her records "contain[ed] many false positives that [she could] only rule out once [she] had access to the video records."  Email, at 3 (ECF No. 78-10).  She thought "to hand over a log of the presumptive seizures" and LFP files "at the same time" she received "the blinding code."  *Id.*

127.    On October 28, 2013, Dudek responded that Rossi still needed to complete her Methods section, and he suggested to sort what she had already done from what needed to be done. Email, at 3 (ECF No. 78-10).  Rossi submitted a revised Methods section on November 11, 2013. *Id.*

128.    On November 18, 2013, at 1:07 p.m., Dudek sent Rossi an email based largely on input from Spampanato and Lehmkuhle.  Email, at 2 (ECF No. 78-10).  Dudek informed her the Methods papers were still lacking.  Dudek further informed Rossi that Spampanato and Lehmkuhle had "agreed to facilitate further some aspects of [her] analyses," without breaking the blind.  *Id.* Dudek proposed that Rossi provide her blinded LFP data to his lab so they could "check some key

time points to begin to assess that theta is reduced relative to controls." *Id.* Additionally, they would "check seizures on Day 5 and at least a few later time points to check electrographic data with behavior." *Id.* As to the disputed behavioral analysis, Lehmkuhle proposed that Rossi, he, and Spampanato "get together to outline on the white board how this would go forward step-by-step, including which figures would be generated. Once we are all satisfied, we can then have [Rossi] rewrite the methods to have this cookbook outline on how the behavior will be analyzed." *Id.* Then, after the methods was rewritten it would then be reviewed "once more before going forward." *Id.* at 2–3.

129.    Rossi said she would be in touch with Lehmkuhle to arrange the meeting, and said she would be happy "to provide you with the blinded analyzed data." Email, at 12–13 (ECF No. 78-10). She informed them it would require disk space of "at least 1.5Tb." *Id.* at 12.

130.    Also on November 18, 2013, at 4:41 p.m., Keefe gave Rossi her comments on how to improve her last Methods section. Keefe informed Rossi not to turn her next Methods section around "right away." Email, at 11 (ECF No. 78-10). Instead, Keefe informed her it "will take time to write, proof and revise." *Id.* She "strongly urge[d]" Rossi to "get help at the writing center if possible" so her next draft essentially would be final. *Id.*

131.    That evening, at 10:20 p.m., Lehmkuhle sent an email changing the brainstorming plan. He told Rossi to "take a crack at the Methods to include the behavioral analysis. Perhaps then, when you think it looks good, send it to me and Spampanato to ponder for a day or two *and then* we all have a meeting." Email, at 27 (ECF No. 78-10) (emphasis added). Additionally, rather than supplying the 1.5Tb of Matlab files, Lehmkuhle asked Rossi if she had "an excel spreadsheet

39

summarizing the values [she had] calculated with the matlab routine."[3]  *Id.*  He also told her to

consider writing a full Methods paper because he was "pretty sure no one has done long-term

monitoring in mice."  *Id.*  Rossi, therefore, was back to figuring out a Methods paper, in a novel

area, without that brainstorming session, that would satisfy the Committee.

     132.     By 9:00 a.m. the following day, Dudek contacted Greger and asked him to review

an email he proposed sending to Keefe, which said: " I am sorry [Keefe], but from my perspective,

your email" informing Rossi her Methods section would take time to rewrite and needed more

detail, "would have been appropriate 6 months ago, but are we not past this?"  Email, at 4 (ECF

No. 78-11).  Citing to past emails from Rossi, he reminded Keefe of past instructions to Rossi.  He

then said, "I will not discuss here the *possible/likely dishonesty issues* that permeate these

documents."  *Id.* (emphasis added).  He argued that Rossi should know how to write a Methods

section.  "If she can't write the Methods, how can she write an acceptable Introduction, Discussion,

and/or Conclusions?  Has she proven that she is incapable of writing a Ph.D. thesis?"  *Id.*

     133.     Greger made a few edits, including changing the dishonesty accusation to "Whether

or not the statements in these document[s] constitutes dishonesty, [Rossi] has not demonstrated

the ability to produce a thesis of sufficient quality to warrant a Ph.D."  Email, at 3 (ECF No. 78-

11).  Dudek then sent an email to Ekstrand at 11:31 a.m. on the same subject.  *Id.*  Ekstrand said

he agreed with Greger's suggested changes.  *Id.*

     134.     In between sending an email to Greger and getting his response, Dudek was in

communication with Spampanato.  At 9:32 a.m., Spampanato said, "[t]o follow-up on our

---

[3]  The email heading shows a different date, time, and person on the email chain, but the content
tracks the email exchanged on November 18, 2013.

discussion *yesterday*," we need to get Rossi "to submit the analyzed data (as she has indicated that she is willing to do)."  Email, at 2 (ECF No. 78-11) (emphasis added).  We also should give "her the blind code so she can assemble the data in a presentable way.  Have her submit the theta curves for every animal, and the combined average/SD of each group."  *Id.*  They would then "spot check the compiled numbers.  This way we will at least know if the theta effect is real.  We can also spot check the seizures.  Without getting her to compile the data in a presentable way, one of us will have to re-analyze all of the data if we end up moving forward without her."  *Id.*

135.    At 9:39 a.m., Dudek responded, "OK . . . this is great."  Email, at 2 (ECF No. 78-11).  "If we give her the data, let's formalize how the seizure data would be treated (blind broken on the ephys, but not behavior)."  *Id.*  He suggested they also meet with Lehmkuhle, and then asked, "Let's assume we do this, what are the next options?  And consequences?"  *Id.*  Thus, at the same time he was making research misconduct accusations against Rossi, Dudek also was trying to obtain her work for potential future use by his lab.  A lab where both Dudek and Lehmkuhle had a financial interest in the recording device used to conduct the experiments.

136.    On November 20, 2013, two days after Keefe informed Rossi her Methods write-up would take time to write and should not be rushed, Rossi met with the Committee in a previously scheduled meeting.  Keefe Depo., 153:19–24 (ECF No. 78-34).  Keefe testified the Committee decided they "should still meet" although they all felt they "were pretty much spinning our wheels and . . . there was no progress being made."  *Id.* at 157:2–6.  After meeting with Rossi, the Committee asked her "to leave the meeting so the committee could meet privately."  Grievance, at 4 (ECF No. 78-14).  When she was called back in, they informed her she was dismissed from the program.  *Id.*

137.    After the meeting, Rossi sent an email to Keefe requesting "a formal dismissal in writing, and also some explanation of the reasons for my dismissal so that I have a record of these things while deciding how to proceed."  Email, at 2 (ECF No. 86-75).

138.    Keefe responded to Rossi's email on November 21, 2013.  She said, "[a]s we noted in your meeting yesterday, you will be receiving a formal letter in the coming few days notifying you of our decision to dismiss you from the program.  That letter will provide explanation for the committee's decision in this regard . . . [and] options available to you in light of the committee's academic action."  Email, at 2 (ECF No. 86-75).

139.    Dudek, however, talked with the University's general counsel at some point after the meeting, and upon "the advice of counsel," it was concluded they needed to "give [Rossi] another chance with very clearly defined dates and expectations," and a "written warning that her performance" was "not meeting academic standards."  Keefe Depo., 157:7–15 (ECF No. 78-34).

140.    Accordingly, on November 22, 2013, Keefe sent Rossi an email stating the Committee had engaged in "considerable additional deliberation yesterday," and had "decided to not move forward with dismissal at this time."  Email, at 2 (ECF No. 78-13).  Keefe attached a three-page letter from the Committee informing Rossi about their expectations and setting arguably tight deadlines.  *Id.* at 3–5.  Keefe testified the Committee was committed to following the letter and helping Rossi meet her goal to graduate.  Keefe Depo., 71:3–8 (ECF No. 78-34).

141.    Rossi filed a grievance with Deans David Kieda and Vivian Lee on November 27, 2013, and proposed specific items to help her earn a doctoral degree.  *See generally* Grievance Lttr. (ECF No. 78-14).  Similar to the April 2013 events, Rossi erroneously or falsely reported that her Committee supported her proceeding with her dissertation defense; that she had received no

"negative feedback on [her] revised plan;" and, except for Dudek, everyone else was "very supportive of [her] efforts." *Id.* at 3–4.

**Analysis After First Dismissal**

142.    On December 9, 2013, Rossi submitted another draft of her Methods.  Keefe asked the Committee to comment on it.  Keefe noted, "I am certainly capable of providing feedback on the immune/SSP=SAP lesions, as well as to some extent on the behavioral analyses; however, I can not possibly comment on the methods for LFP analysis."  Email, at 2 (ECF No. 78-18).  She said she "simply [had] no basis to evaluate how that would typically be reported in the literature in a Methods section.  You all will have to provide that feedback."  *Id.*; *see also id.* at 31 (stating Keefe "couldn't really comment on the LFP analysis, other than to generally ask her to elaborate how the periods of increased activity would be identified").

143.    White noted that Rossi still seemed to be "struggling to understand these methods sufficiently well."  Email, at 32 (ECF No. 78-18).  He noted specific concerns with her proposal, and said he got the impression Rossi's analysis did "not meet the standards of the field," but Dudek and Ekstrand were in a better position to evaluate whether that part of Rossi's proposal was acceptable.  *Id.*

144.    On December 15, 2013, Keefe sent another email to the Committee after she reviewed past comments that had been made by them.  She remarked that in July 2013, the Committee seemed comfortable with certain Methods Rossi had proposed and "*were OK* with her then moving forward with the analysis of seizures/theta."  Email, at 30 (ECF No. 78-18) (emphasis added).  She also commented that Rossi's chosen analysis "to count positive items in thresholded images *is pretty standard*."  *Id.* (emphasis added).  Thus, in Keefe's opinion what Rossi did for

part of her Methods was "*consistent with what people do in the field*."  *Id.* (emphasis added).

Critically, Keefe then commented:

> *It seems the real crux is how/when to analyze the behavior and also the LFP data for seizures.*  Obviously, I am totally naive here, so the question I have is what is the standard in the field?  I just have no concept of how this is typically done. We've told [Rossi] repeatedly that she needs to provide methods that can be replicated and that are standard or to justify the use of a novel one.  She's not been able to address that request.  So, the question that I'm not clear on is whether there are standard methods out there and she is simply not adequately reading/thinking about the literature (where such methods are laid out), or are there not standard methods to detect seizures in the continuous LFP recordings, in which case she does have to develop new methods and she's spinning her wheels because doing so is beyond her -- *and if the latter are we more obligated to help her in this regard (i.e. provide a bit more direction)*?

*Id.* (emphasis added).  Keefe's question was in harmony with Lehmkuhle encouraging Rossi to write a full Methods paper because he was pretty sure no one had done so in her project area.

145.    White said he agreed with Keefe as to the issues on the second paper.  Email, at 26 (ECF No. 78-18).  He further said he had "much less experience than [Dudek and Ekstrand], but my impression is that she is trying to do something non-standard without validating it."  *Id.*

146.    Dudek responded with an explanation that the gold standard was the "expert human observer."  Email, at 36 (ECF No. 78-18).  He noted he had referred previously to the Kadam paper as an appropriate comparative.  *Id.*  He then summarized in three paragraphs how Rossi could approach the Methods sections.  *Id.*  Not with detailed step-by-step guidance, but as an overview of how to approach the analysis.  *See id*.  Dudek further said he told Rossi ten days before her dissertation defense to generate figures similar to Kadam's.  *Id.*

147.    Based on Dudek's comments, the Committee apparently determined Rossi had been given enough information and informed her by letter that her Methods were lacking. Committee Lttr., at 41–43 (ECF No. 78-18).

148.    In the end, Rossi never was able to produce a product sufficient to satisfy the Committee.  They therefore dismissed her from the program on January 13, 2014.  *See* Dismissal Lttr. (ECF No. 78-24).  They informed her she had (1) "failed to demonstrate competence in independent research," (2) her work was untimely, and (3) she lacked professional character.  *Id.* at 2–4.

149.    As part of the dismissal discussion, White sent an email to the Committee.  He remarked that Rossi's December 2013 revisions were "rote and uninspired."  Email, at 3 (ECF No. 86-76).  He did not understand how she could have made so little progress over the last nine months.  *Id.*  He said Rossi's approach was to "do the bare minimum," and her Methods would not reveal "beyond a doubt" that there were no seizures.  *Id.*  He further remarked that he "remain[ed] deeply concerned about the conclusions reached at the defense.  I think none of us know what analysis was done to reach those big conclusions."  *Id.*  Moreover, Rossi chose to defend despite his and Dudek's advice.  *Id.*  And "she came to important-sounding conclusions based on analysis that was flawed at best."  *Id.*  Finally, White referred back to Spring 2013 and Rossi's alleged purposeful misrepresentations to him.  *Id.*  Those, combined with Rossi's "infamous Facebook posting" about Dudek and the circumstances under which she left Boston University, were "evidence of low character."  *Id.*

150.    Ekstrand agreed with White's assessment.  Email, at 2 (ECF No. 86-77).  Although Ekstrand considered and agreed with all of White's factors, he said in his deposition that Rossi's

low character was not as great a factor as White's other points.  Ekstrand Depo., 141:19–142:1
(ECF No. 78-33).

151.    The dismissal letter did not mention any events at Boston University were taken
into account by the Committee when deciding to dismiss Rossi.  *See generally* Dismissal Lttr.
(ECF No. 78-24).  The Committee members also did not disclose that they considered Rossi's
conclusions at the dissertation defense to be "flawed at best" because Rossi may have mispresented
the amount of analysis she had done to draw her conclusions.  *See generally id.*

152.    Thereafter, Rossi appealed the dismissal through each level available to her post-
dismissal.  At the final level, based on the Committee members' "strong established track records
of mentoring graduate students" and "*their judgment* of Ms. Rossi's insufficient progress to expect
a successful completion of the dissertation," the adjudicator upheld the Committee's decision.
Final Review Decision, at 8 (ECF No. 78-27) (emphasis added).  Moreover, the adjudicator
concluded the Committee's decision "was neither arbitrary nor capricious," and that it fell within
the scope of their authority to evaluate "academic performance."  *Id.* at 9.

**Dudek's Research Misconduct Accusations**

153.    Although the Committee dismissed Rossi from the program, in part due to the lack
of her professional character, Dudek accused Rossi of more.  On October 24, 2013, the same day
that Rossi reported she was almost done with the LFP analysis, Dudek spoke with Thomas Parks,
the University's Vice President for Research.  Email, at 6 (ECF No. 78-17); Botkin Depo., 36:12–
17 (ECF No. 78-32).  He raised concerns that Rossi had falsified seizure data.  Email, at 6 (ECF
No. 78-17).  Per Dudek, Parks allegedly said "the available data were equivocal in terms of
falsification," and so they "concluded tentatively that the available information at the time

suggested this was probably more of a student naivete or misbehavior issue than scientific misconduct, particularly since this was work in progress and nothing had been published." *Id.*

154.    On November 11, 2013, Dudek retrieved an email Keefe had sent him in May 2013 stating any mentor-student issues between Dudek and Rossi needed to be addressed by the Dean of the Graduate School per program policy.  Email, at 2 (ECF No. 78-9).  Six months after Keefe sent the email, Dudek finally made an appointment to speak with the Dean.  *Id.*

155.    On November 17, 2013, Dudek sent another email to Parks and included Jeffrey Botkin.  Dr. Botkin is a "professor of Pediatrics, Chief of the Division of Medical Ethics and Humanities, . . .  Associate Vice President for Research . . . [and] the University's Research Integrity Officer."  Mem. in Opp'n, at 58 (ECF No. 84).  Dudek reported that while assessing Rossi's work, he had "increasing concern that certain data from her work may not be available, and that some conclusions in her failed Ph.D. thesis were invalid at best."  Email, at 6 (ECF No. 78-17).  He stated that he was "much more concerned that Rossi does not have spreadsheets for most of the purported analyses.  In essence, my concern that falsification occurred has increased substantially, and that the possible falsification in her work may be more widespread than I had previously suspected."  *Id.*  Dudek further noted Rossi's research formed part of the basis for an NIH grant.  *Id.*  He was "extremely concerned that the analyses [were] corrupted" and thought this deserved a "rigorous investigation."  *Id.*

156.    Botkin responded back the same day.  He told Dudek, "[t]he first step is to keep your concerns confidential so that nobody in the lab is alerted. . . .  If it appears that data fabrication or falsification is a possibility, then I would take the next steps of sequestering the data and organizing an inquiry committee."  Email, at 5–6 (ECF No. 78-17).

47

157.    A half hour later, Dudek told Botkin that he had had concerns about Rossi since last Spring.  Email, at 5 (ECF No. 78-17).  But "it all came to a head in my own mind yesterday and this morning."  *Id.*  Because the issue was "a progressive matter, some workers in the lab already know the general situation.  Also, I have expressed concerns to members of her Committee. *I will not, however, discuss this further with anyone* and I will do whatever seems appropriate to keep it confidential." *Id.* (emphasis added).  Moreover, Dudek reported to Botkin that Rossi had had limited access to his lab since April 2013, to indicate her data had been sequestered since that time. *Id.*

158.    Accusations of scientific misconduct are extremely serious.   Ekstrand Depo., 58:16–59:2 (ECF No. 86-29).  Such an accusation "is one of the most serious allegations that you can make against a scientist," and is potentially devastating to one's reputation.  Botkin Depo., 26:2–9 (ECF No. 78-32).  A scandal had erupted at the University over scientific misconduct in September 2013, where a distinguished lab had "recklessly misrepresented data in 11 published papers."  Article, at 2–3 (ECF No. 78-8).  Consequently, the University had "redoubled" its "efforts to diminish future scientific misconduct." *Id.* at 9.

159.    On November 18, 2013, Spampanato reported to Dudek the extensive folders containing data and analyses on Rossi's sequestered lab computer.  Email, at 2–3 (ECF No. 86-68).  Dudek then asked, "[w]hat about the cell counts and behavioral data that was in her thesis?" *Id.* at 2.  After "taking another *quick look*," Spampanato reported even more folders containing data and a spreadsheet based on blinded cell count information. *Id.* at 2 (emphasis added).  He also reported folders associated with the behaviors of exploring, grooming, and so forth. *Id.*

160. The next day, Dudek sent Botkin an email saying the situation has changed, but he was "still concerned about scientific misconduct." Email, at 4 (ECF No. 78-17). He said it was a "fast-moving" situation, and he had feared "there was a *complete* lack of spreadsheets that represented a set of quantitative and statistical analyses of data sets that comprised figures in a failed Ph.D. thesis." *Id.* (emphasis added). Dudek reported, however, that a lab member had "*dug much deeper* into the complex data," and "was able to find spreadsheets." *Id.* (emphasis added). He noted Rossi's academic performance may warrant dismissal, but still asked for guidance about how to investigate research misconduct. *Id.*

161. Shortly thereafter, Botkin responded to Dudek and said the research misconduct process was "a big deal." Email, at 4 (ECF No. 78-17). It defined a narrow category of conduct, although there were other ways to misbehave that are dealt with differently. *Id.* Botkin advised Dudek if he had reasonable suspicions of misconduct, Botkin's' office could "organize the next steps," but if Dudek needed more time to evaluate the situation, that would be appropriate. *Id.*

162. Dudek's communications with Botkin occurred during the same time frame that he was seeking to obtain Rossi's data and analysis and discussing with Spampanato and Lehmkuhle how they could use Rossi's analyses if she were to be dismissed. *See* ¶¶ 134–35 *supra*. It also was during the same time frame Spampanato and Lehmkuhle said they would help Rossi map out the Methods section, and later changed the offer. *See* ¶¶ 128–29, 131 *supra*. It further was at the time Dudek, Greger, and Ekstrand had been discussing language for an email to Keefe to persuade her to dismiss Rossi from the program. *See* ¶¶ 132–33 *supra*.

163. Then, after the Committee had told Rossi on November 20, 2013, she was being dismissed from the program, Dudek sent an email to the Committee expressing his concerns about

the *veracity* of Rossi's data, and again referring them back to her thesis statements.  Email, at 2 (ECF No. 78-12).  Dudek took these actions notwithstanding telling Botkin he would not "discuss this further with anyone."

164.    White asserted in his deposition that he had formed his own opinions by then and "did not feel that" Rossi's conduct "rose to the level of academic misconduct.  I felt that it was sloppiness."  White Depo., 78:1–14 (ECF No. 91-11); White Depo., 69:20–70:9, 71:11–19 (ECF No. 86-3) (reporting his discussions with Dudek were about trustworthiness and not scientific misconduct).  Similarly, the other members of the Committee claimed not to "share [Dudek's] view or at least were not as persuaded by it."  Appeal Decision, at 5 (ECF No. 78-27).

165.    When Rossi filed her grievance on November 27, 2013, Skelton sent an email to Dudek about the misinformation in Rossi's grievance.  Dudek said he would now have to show in detail the problems with Rossi's research.  Email, at 2 (ECF No. 78-15).  Despite saying he would do so, that never happened.

166.    At a meeting with Botkin and the University's general counsel on December 16, 2013, Dudek was asked about "specific evidence" he had "about fabrication or falsification" of data in Rossi's dissertation.  Botkin Depo., 51:13–52:10, 85:7–14 (ECF No. 78-32).  Botkin later testified, "there was nothing specific forthcoming from Dr. Dudek about that."  *Id.* at 51:13–52:10.  Botkin also knew Rossi's "expert committee [was] knee deep in her data" and they could raise concerns if they saw any.  *Id.* at 54:2–4.  No one but Dudek ever reported any concerns to Botkin.

167.    Botkin made it clear to Dudek during the December meeting that what Dudek was alleging did not constitute research misconduct, "and that that language should not be used as part of this process."  Botkin Depo., 64:17–23 (ECF No. 78-32); *see also id.* at 92:3–5 (testifying that

during the December meeting, Botkin "articulated clearly to . . . Dudek" his "decision that this did not constitute an issue of misconduct that was going to be pursued"). And because the policy requiring investigation had not been triggered, Botkin did nothing else. *Id.* at 62:10–63:6. Botkin reached these conclusions even though the University had recently re-doubled its efforts to ensure no research misconduct was occurring.

168. Botkin acknowledged in his deposition that if Rossi's data were on her lab computer at the time Dudek accused her of scientific misconduct, and that Dudek had not "bothered checking" before making the accusations, Botkin would have been concerned about that. Botkin Depo., 58:3–60:7 (ECF No. 78-32).

169. On January 25, 2014, after Rossi had already been dismissed from the program, Dudek sent emails and documents to Dr. Michael Sanguinetti to keep him "in the loop." Email, at 3 (ECF No. 86-61). Sanguinetti was the Director of Graduate Education in Physiology at the University. *Id.* Dudek sent Sanguinetti documents to show Rossi's "lack of data analysis in the thesis, the critical data to make ANY worthwhile conclusions." *Id.* at 2 (emphasis in original). Dudek made the accusation even though he acknowledged the issue "[s]hould be no problem for Physiology." *Id.* at 3. Sanguinetti replied that he agreed "this is not a concern for Physiology because Rossi [is] in the Neurosci Program." *Id.* In fact, Sanguinetti had no affiliation with Dudek's lab or with Rossi's research project. Dudek Depo., 174:4–18 (ECF No. 86-17). Dudek admitted in his deposition he discussed Rossi in a negative light with Sanguinetti. *Id.* at 175:4–6. Additionally, although he testified he did not recall if he told Sanguinetti that Rossi was dishonest, he admitted he might have done so. *Id.* at 177:5–7.

51

170.    Dudek further spoke with his daughter, Amanda Dudek, about Rossi.  Amanda was studying at Harvard at the time and had previously met Rossi.  Dudek Depo., 163:10–12 (ECF No. 86-17); A. Dudek Depo., 8:13–16 (ECF No. 86-63).  Dudek initially spoke to Amanda after Rossi had failed her dissertation defense in April 2013.  A. Dudek Depo., 9:22–10:10 (ECF No. 86-63).  Dudek reported to Amanda "that everyone kind of rolled their eyes" because Rossi had only analyzed one day of research.  *Id.* at 10:12–15.  Since Dudek's lab focuses on "long-term monitoring of seizures," his comment stuck in her mind.  *Id.* at 11:10–15.

171.    Dudek also spoke with Amanda after the lawsuit was filed.  Amanda knew he "was concerned about the validity" of Rossi's data and about how long the dispute had gone on."  A. Dudek Depo., 19:20–25 (ECF No. 86-63).  "He was concerned that she had falsified data."  *Id.* at 22:17–25.  The concern "went along with her not analyzing enough of the data."  *Id.* at 23:2–5.  Dudek specifically told his daughter that Rossi "had falsified her data."  *Id.* at 23:6–8.  In 2014, during a research ethics class, Amanda informed the class that her father "had a student who failed her dissertation because she didn't analyze enough of the data, and that they were looking into . . . the validity of that data."  *Id.* at 28:11–25.  Amanda did not mention Rossi by name in that discussion.  *Id.* at 28:14.

172.    Dudek, however, also spoke with Kevin Staley, a collaborator of Dudek's from Harvard Medical School.  Dudek Depo., 231:5–18 (ECF No. 86-17).  Staley was going to be a collaborator on a third manuscript associated with Rossi's project.  *Id.* at 231:23–232:10.  Dudek did not recall what he said to Staley about Rossi, but conceded he may have expressed concerns about research misconduct.  *Id.* at 232:11–17.

173.   Dudek further spoke with his daughter, Sara Dudek, about Rossi.  Sara's opinion is that Rossi was dishonest.  S. Dudek Depo., 8:12–24 (ECF No. 86-64).  Sara did not recall Dudek saying Rossi had falsified her data.  Sara's opinion pertains more to Rossi "misrepresenting her readiness to her committee" to defend her dissertation.  *Id.* at 15:24–16:3.  Dudek did tell Sara that Rossi had only analyzed one day of data.  *Id.* at 16:12–18.  Dudek's wife Kathleen Dudek testified similarly to Sara.  K. Dudek Depo., at 51:2–25, 55:6–23 (ECF No. 86-65).

**Dudek's Final Report and Rossi's Employment Circumstances**

174.   In or after May 2015, about a year-and-a-half after Rossi had been dismissed from her graduate program, Dudek gave a Final Progress Report on an NIH R21 grant.  A previous progress report had been provided in April 2013, which was the same month as Rossi's dissertation defense.  The total project period began on June 1, 2012 and ended on May 31, 2015.  Final Rpt., at 36 (ECF No. 86-32).  During that period, the goals for the funded studies remained the same.  According to the earlier April 2013 report, the studies conducted by Rossi showed "a small, localized interneuron ablation does not produce seizures."  April Rpt., 35 (ECF No. 86-32).  "Instead, loss of these interneurons produced a transient (~1 week) attenuation of theta oscillation power that recovered in their absence."  *Id.*

175.   In the later 2015 report, Dudek reported, "[a]fter a small and selective lesion of the interneurons, seizures were not detected, even when the treated animals were monitored for weeks.  Loss of these interneurons produced a transient (~1 week) attenuation of theta oscillation power that recovered in their absence."  Final Rpt., at 36 (ECF No. 86-32).  In other words, despite the Committee concluding Rossi lacked competency and that her research was so poor it warranted

dismissing her from the program, the conclusion of the final report was the same as what Rossi had reported in her dissertation more than two years earlier.

176.    Rossi's research involved SSP-saporin ablation.  Dudek's lab started a different study involving a diphtheria toxin ablation to control for the effect the SSP-saporin ablation may have had on seizures.  *See* Email, at 8 (ECF No. 78-5).  That study was merely preliminary in April 2013.  April Rpt., at 35 (ECF No. 86-32).  By 2015, however, Dudek found the results he expected—spontaneous recurrent seizures—but even those only lasted a few days.  Final Rpt., at 36 (ECF No. 86-32)*.*  The Final Progress Report ended by saying a manuscript reporting the outcomes was "in preparation."  *Id.*  Rossi, however, received no credit for her research.

177.    Rossi asserts that since her dismissal she has not been able to obtain employment in her field, even at a master's level.  Rossi Depo., 215:23–217:21 (ECF No. 86-1).  She has offered an expert who has opined that when a person achieves "all-but-dissertation," that "signals low capacity in function and productivity to prospective employers."  Expert Rpt., at 6 (ECF No. 86-79).

**ANALYSIS**

## I.    MOTION FOR RECONSIDERATION

At the motion to dismiss stage, the court dismissed Greger in both his individual and official capacities.  *Rossi v. Univ. of Utah*, No. 2:15-cv-767, 2016 WL 3570620, at \*6 (D. Utah June 24, 2016).  The court also dismissed Ekstrand in his individual capacity.  *Id.* at \*7.  Rossi has filed a Motion for Reconsideration that seeks reinstatement of the individual capacity claims against both defendants.  Before addressing the remaining defendants' motions for summary

judgment, the court first determines whether Greger and Ekstrand also should be added back as parties in this action.

Rule 54(b) allows the court to reconsider a non-final decision. Fed. R. Civ. P. 54(b) (2020). In *Major v. Benton*, 647 F.2d 110, 112 (10th Cir. 1981), the Tenth Circuit noted that even though a court may reconsider a prior ruling, parties rely upon the law of the case. Consequently, a prior ruling generally should not be disturbed unless there is (1) "substantially different, new evidence;" (2) "subsequent, contradictory controlling authority," or (3) the original ruling was "clearly erroneous." *Id.* (citations omitted). Rossi relies upon the first ground.

During discovery, Ekstrand admitted during his deposition that he had conversations with Dudek about Rossi's alleged research misconduct and that Greger also may have been involved in those conversations. Ekstrand Depo., 106:16–24 (ECF No. 86-29). Rossi contends this evidence is sufficient to show they did not just "rubber stamp" the Committee's decision. Instead, the evidence would support that they considered research misconduct and factored in those allegations when deciding to terminate her.

At the time of the Motion to Dismiss, Rossi already had extensive discovery because of the appeal process at the University. Almost all the evidence she now cites in her Motion to Reconsider was known to her at the time of the court's prior ruling. While Ekstrand's deposition testimony is new evidence, and supports he and maybe Greger had a conversation with Dudek about Rossi's alleged research misconduct, this does not constitute substantially different, new evidence. Accordingly, the court will not disturb the law of the case and denies Rossi's Motion for Reconsideration to allow Ekstrand and Greger to be brought back into the case.

The following qualified immunity analysis therefore applies only to Committee members Dudek, Keefe, and White (the "Committee Defendants"). Botkin's motion for summary judgment is dealt with separately.

## II.    QUALIFIED IMMUNITY – INDIVIDUAL CAPACITY

Each of the remaining defendants assert qualified immunity from suit in his or her individual capacity. "[Q]ualified immunity provides, not simply a defense to liability, but a right not to stand trial in the first place." *Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J*, 464 F.3d 1182, 1188 (10th Cir. 2006) (citation omitted). "It represents 'the norm' for public officials, *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982), and serves to insulate from suit 'all but the plainly incompetent or those who knowingly violate the law.'" *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

"After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citations omitted). The court "must determine whether the plaintiff has satisfied a heavy two-part burden." *Id.* (quotations and citations omitted). Specifically, "[a] plaintiff may overcome a public official's qualified immunity only by showing, first, that the official violated the plaintiff's federal statutory or constitutional rights, and second, that the rights in question were clearly established at the time of their alleged violation." *Lewis*, 604 F.3d at 1225 (citing *Pearson*, 555 U.S. at 232). Nevertheless, a motion "for summary judgment based on qualified immunity," still requires a court to "view the facts in

the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor." *Henderson v. Glanz*, 813 F.3d 938, 952 (10th Cir. 2015). As discussed below, Rossi contends she was deprived of procedural and substantive due process based on property rights and liberty interests.

## III.   PROCEDURAL DUE PROCESS – PROPERTY INTEREST

Rossi asserts she was deprived of a property interest without procedural due process when the Committee dismissed her from the Neuroscience Program. "Procedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision." *Kirkland*, 464 F.3d at 1189 (quotations and citation omitted). This means, "'due process requires that when a State seeks to terminate a protected interest, it must afford notice and opportunity for hearing appropriate to the nature of the case before the termination becomes effective.'" *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 n.7 (1972)) (emphasis added). "The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Id.* (quoting *Bd. of Regents of State Colls.*, 408 U.S. at 570 n.8). In this general framework, "to state a procedural due process claim, a plaintiff must establish (1) the deprivation of (2) a constitutionally cognizable liberty or property interest, (3) without adequate due process procedures." *Abdi v. Wray*, 942 F.3d 1019, 1031 (10th Cir. 2019).

### A.   Property Interest

In January 2014, Rossi was dismissed from the University's Neuroscience Ph.D. Program. Rossi alleges her enrollment at the University was a constitutionally protected property interest. In other cases, it has been stated that "[u]nder rulings of the Tenth Circuit, graduate students at

public institutions have a protected property interest in their continued enrollment." *Roach v. Univ. of Utah*, 968 F. Supp. 1446, 1451 (D. Utah 1997) (citing *Harris v. Blake*, 798 F.2d 419, 422 (10th Cir. 1986); *Gaspar v. Bruton*, 513 F.2d 843, 850 (10th Cir. 1975)); *see also Gossett v. Okla ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1181 (10th Cir. 2001) (stating student "had a property interest in his place in the Nursing School program," and that interest "entitled [him] to due process protection under the Constitution"); *Yeasin v. Durham*, 719 F. App'x 844, 852 (10th Cir. 2018) (stating the Tenth Circuit has "held that university students have a property interest in their continued education"); *Assenov v. Univ. of Utah*, 553 F. Supp. 2d 1319, 1327 (D. Utah 2008) (stating a student's continued enrollment in a doctoral program at the University of Utah was "a property interest entitled to constitutional due process protections").

In *Lee v. Guikema*, however, the Tenth Circuit was more equivocal when addressing whether a student had "a protected property interest in her graduate position." *Lee*, 645 F. App'x 780, 782 (10th Cir. 2016) (quotations and citation omitted). It stated "[c]ourts ordinarily look to existing rules or understandings that stem from an independent source such as state law to define the dimensions of protected property interests." *Id.* at 783 (quotations and citations omitted). This court therefore addresses the matter more completely.

In *Goss v. Lopez*, 419 U.S. 565 (1975), the United States Supreme Court held that a high school student had a right to receive due process before being suspended because the student was entitled to a public education under Ohio law. *Id.* at 574. That same year, the Tenth Circuit faced the question of whether a student at a technical college had a protected property interest in continued enrollment. The Court stated that if "public school students" have a recognized property interest based on *Goss*, it had "no difficulty in concluding . . . that certainly such a right must be

58

recognized to have vested with [the college student], and the more prominently so in that she paid a specific, separate fee for enrollment and attendance." *Gaspar v. Bruton*, 513 F.2d 843, 850 (10th Cir. 1975).

In *Harris*, the Court looked to *Goss*, *Gasper*, and a Colorado law that directed the relevant college "be open . . . to all persons resident in this state upon payment of a reasonable tuition fee." *Harris*, 798 F.2d at 422 (citing Colo. Rev. Stat. § 23-50-109 (1973)) (alteration in original).  Since the payment of tuition allowed enrollment under Colorado law, the Court concluded that "secure[d] an individual's claim of entitlement."  *Id.* (citation omitted).  In 2001, the Court cited only to *Harris* when concluding that a nursing student "had a property interest in his place in the Nursing School program that [was] entitled to due process protection under the Constitution." *Gossett*, 245 F.3d at 1181 (citing *Harris*, 798 F.2d at 422).  *Gossett* involved a university in Oklahoma.  The Colorado law cited in *Harris* therefore had no applicability to the Court's ruling in *Gossett*.  The published decisions in the Tenth Circuit, therefore, have recognized a university student has a protected property interest that requires due process before enrollment may be terminated.  These principles require the same conclusion in this case.

Moreover, Utah's constitution requires the establishment of "a higher education system." UTAH CONST. art. X, § 1.  The Legislature also requires its higher education institutions to report performance metrics, including identifying completion rates "measured by degrees and certificates awarded."  Utah Code Ann. § 53B-7-706(2)(a)(i) (2015).  At the time of Rossi's dismissal, the Legislature required the State Board of Regents to report information about "student assessment at entry to each institution, at critical midway points, and at exit." *Id.* § 53B-6-101(4)(c)(ii) (2011). The Utah Constitution and statutory history support that the State places value on higher education

and completion of education programs.  Legislative monitoring helps protect that which it values.

Additionally, although Rossi was dismissed on January 13, 2014, the University did not waive

payment of tuition for that semester.  *Cf* Amended Complaint, ¶ 180 (ECF No. 23) *with* Keefe

Answer, ¶ 180 (ECF No. 55) (admitting Program did not waive Rossi's tuition bill for that

semester).  Based on established Tenth Circuit precedent, Utah law, and the facts of this case, the

court concludes Rossi had a property interest requiring due process before she was terminated from

the program.

### B.    Adequacy of Process

Having determined that Rossi had a constitutionally protected property interest, the court

must determine whether she received adequate process.  Even though due process typically

requires notice and a right to be heard, the United States Supreme Court has applied a more refined

analysis as it pertains to students.  In *Horowitz*, the Court distinguished disciplinary dismissals

from academic dismissals.  A disciplinary dismissal is adversarial in nature and requires greater

protections.  *See Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 89–90 (1978)

(stating disciplinary dismissals resemble traditional judicial proceedings).  A "student should

receive both notice and a hearing *before* the dismissal." *Assenov*, 553 F. Supp. 2d at 1328 (citing

*Goss*, 419 U.S. at 581).  "The notice and hearing need not necessarily be formal, but should be

commensurate with the circumstances and severity of the situation." *Id.* (citing *Goss*, 419 U.S. at

581–84).

On the other hand, an academic dismissal is "more subjective and evaluative." *Horowitz*,

435 U.S. at 90.  It "requires an expert evaluation of cumulative information and is not readily

adapted to the procedural tools of judicial or administrative decisionmaking." *Id.*  For academic

dismissals, the Court has declined to "enlarge the judicial presence in the academic community." *Id.* In 1985, the Court reaffirmed that "[w]hen judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment." *Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 225 (1985).

Even before *Horowitz,* the Tenth Circuit had reached the same conclusion. It acknowledged that "courts are not equipped to review academic records based upon academic standards within the particular knowledge, experience and expertise of academicians." *Gaspar,* 513 F.2d at 851. Consequently, "when presented with a challenge that the school authorities suspended or dismissed a student for failure re academic standards," it usually "requires a decision in favor of defendants." *Id.* (quotations and citation omitted).

This does not mean, however, that no due process is necessary for an academic dismissal. It simply means the standard is lower than the one for a disciplinary dismissal. For an academic dismissal, "the procedural requirements . . . are satisfied if the student is given prior notice of the deficiencies in his academic performance *and* if the challenged decision is 'careful and deliberate.'" *Gossett,* 245 F.3d at 1181 (citing *Horowitz,* 435 U.S. at 85; *Trotter v. Regents of Univ. of N. Mex.,* 219 F.3d 1179, 1184–85 (10th Cir. 2000)) (emphasis added). This standard "purposely leaves out a [pre-termination] hearing requirement because courts are reluctant to interfere in the educational process or to second guess an educator's expert judgment on academic matters." *Assenov,* 553 F. Supp. 2d at 1328 (citing *Horowitz,* 435 U.S. at 88–90).

Notably, however, an academic decision actually must be based on academics. When a decisionmaker dismisses a student due to "ill will or bad motive," then due process is lacking. *See Gaspar,* 513 F.2d at 851. In other words, "the notion of judicial deference to academic decisions

loses force when . . . the decisionmaker is 'accused of *concealing nonacademi*c or constitutionally impermissible reasons' for its action." *Gossett*, 245 F.3d at 1181 (quoting *Ewing*, 474 U.S. at 225) (emphasis added).  Once ill will or bad motive are involved, a seemingly careful and deliberate academic decision is transformed into the caprice or animus of a decisionmaker.  Thus, adequacy of process is not met under such circumstances.

The court now addresses whether Rossi has come forward with sufficient evidence to support a finding that the Committee Defendants violated the law by depriving her of a property right without adequate process.  The review that the court undertakes in the next sections does not pertain to "the propriety of the decision" to dismiss Rossi from the program.  *Ewing v. Bd. of Regents of Univ. of Mich.*, 559 F. Supp. 791, 799 (E.D. Mich. 1983).  The court is not equipped to make such a determination.  Instead, the court limits its analysis to "objective factors which may have tainted or otherwise affected the decision."  *Id.*  Although the Committee itself was not sued, at times the Committee's conduct is viewed together.  At other times, some of the individual members acted apart from other members.  In those situations, the conduct is viewed separately.

## C.   Three Dismissal Grounds

Rossi asserts she was dismissed for "disciplinary, non-academic reasons."  Amended Complaint, ¶ 191 (ECF No. 23).  She also asserts "[a] reasonable jury could find" the Committee Defendants' decision was "neither careful nor deliberate."  Mem. in Opp'n, at 93, 98 n.18 (ECF No. 82) (section heading and footnote).  Additionally, she asserts she was not given proper notice of all concerns, nor a hearing prior to termination.  The Committee Defendants contend Rossi's dismissal was academic and the result of careful and deliberate consideration of Rossi's academic

performance.  The University's Student Code and the Neuroscience's Program Standards inform faculty about what are academic decisions and what are disciplinary.

The University's Student Code states "'academic misconduct' includes, but is not limited to, cheating, misrepresenting one's work, inappropriately collaborating, plagiarism, and fabrication or falsification of information."  Policy 6-400, § I.B.2 (ECF No. 78-41).  Each term is then defined.  "Misrepresenting one's work includes" such things as "representing material prepared by another as one's own work, or submitting the same work in more than one course without prior permission."  *Id.* § I.B.2(b).  "'Fabrication' or 'falsification' includes reporting experiments or measurements or statistical analyses never performed; manipulating or altering data or other manifestations of research to achieve a desired result," and so forth.  *Id.* § I.B.2(d).  Under the University's own definitions, this type of conduct is disciplinary, and the Student Code puts faculty on notice about what procedures are required for dismissal on such grounds.  *Id.* § 5.

In contrast, the University also addresses "academic performance" and specifies "[f]aculty members are qualified as professionals to observe and judge *all aspects* of a student's *academic performance*, including demonstrated knowledge, technical and interpersonal skills, attitudes and *professional character*, and ability to master the required curriculum."  *Id.* § IV.A.2 (emphasis added).  Dismissal on those grounds is academic in nature and has different procedures.  *Id.* § IV.

In addition to the University's Student Code, Rossi was subject to the Policy Statement on Academic Standards of the Neuroscience Program ("Program Standards").  The Program Standards specify an "academic action" includes the authority "to suspend or dismiss a student from an academic program because the student failed to meet the relevant academic standards of the discipline or program."  Program Standards, at 12 (ECF No. 86-7).  "An academic action does

*not* include academic sanctions imposed for academic dishonesty *or* for specific violations of professional and ethical standards of the profession or program for which the student is preparing." *Id.* (emphasis added).  The Program Standards define "academic dishonesty" in the same manner that "academic misconduct" is defined under the Student Code.  *See id.*  Those terms essentially are coterminous in that both require cheating, misrepresenting one's own work, plagiarism, or fabrication.  *Id.* at 12–13.

Importantly, however, the Program Standards also include a distinct definition of "academic misconduct," which is broader than the "academic misconduct" definition in the Student Code.  The Program defines academic misconduct to include both academic dishonesty *and* any "violations of the professional or ethical standards for the profession or discipline for which the student is preparing *or* other specific misconduct that demonstrates *unfitness* for such profession or discipline."  *Id.* at 13 (emphasis added).  Because the Program Standards specify such violations are outside of academic actions, it sets forth heightened protections to allow a student to be heard and comment on such allegations.  *Id.* at 11.  These requirements are specific to the Neuroscience Program.  As a result, each member of the Committee should have been aware of the standards for what constituted academic actions and what constituted disciplinary actions.

Here, the term "academic misconduct" appears throughout the record.  It has been used to describe Dudek's accusations against Rossi for misrepresentation and falsification of her research.  There is, however, no evidence of academic dishonesty or academic misconduct that would satisfy that definition in this case other than Dudek's own statements.  Defendants dispute they relied on Dudek's misrepresentation and falsification accusations.  Thus, the "academic misconduct" definition relevant to the court's analysis is the one included in the Program Standards pertaining

to fitness for the profession.  Whatever Dudek accused Rossi of doing did not place her on notice of this latter type of misconduct.

In the January 2014 dismissal letter, the Committee stated three grounds for dismissal: failure to perform academically, failure to meet deadlines, and failure to satisfy professional standards of fitness and character.  The first two grounds are academic in nature.  Satisfying academic requirements and a student's timely submission of academic work are inherent in the academic process.  *See Horowitz*, 435 U.S. at 91 n.6 (noting timeliness concerns may be an important academic consideration).

To support the third ground, the Committee cited to Policy 6-400 regarding interpersonal skills and professional character.  The members informed Rossi her behavior she had "exhibited since early this spring[4] lead the committee to the opinion that you do not display the interpersonal skills, attitudes, and professional character *fitting* of a Ph.D. recipient."  Dismissal Lttr., at 3 (ECF No. 78-24).  The Committee then detailed the following deficits:

> For example, it became clear to members of the committee this past spring that you were providing inconsistent, if not deliberately misleading, information to members of the committee when you met with them.  Specific examples include the reasons given for the removal of Dr. Kesner from your dissertation committee in early March and your statements regarding the availability and involvement of Dr. Dudek with respect to guidance on your dissertation document and also his position on whether your dissertation defense should proceed as scheduled.  Additionally, lack of professional character was evident in your posting on Facebook vilifying Dr. Dudek after you failed to pass your defense.  Finally, you presented numerous misrepresentations in your Nov. 27, 2013 letter of grievance to Deans Lee and Kieda [in three main categories].

---

[4]  Based on the examples provided, it appears that "early this spring" referred to April 2013 and not the start of January 2014 as a school semester.

*Id.* Thus, the Committee "strongly believe[d]" Rossi lacked "acceptable interpersonal skills, attitudes, and professional character" to meet minimum program requirements. *Id.* Rossi contends the allegations fall within the scope of "specific misconduct that demonstrates *unfitness* for such profession or discipline" and required notice and an opportunity to be heard.

Although the Committee cited to Policy 6-400, the court must resolve where "professional character" ends and "unfitness for such a profession" begins. In *Ewing* and *Horowitz*, the Supreme Court noted issues such as personal hygiene, timeliness, inability to handle stress, lack of appropriate judgment, and inability to prioritize tasks are academic. *Ewing*, 474 U.S. at 227 n.13; *Horowitz*, 435 U.S. at 91 n.6. Such conduct generally goes to professionalism and not to misconduct. "Unfitness for such profession," is different because it is based on "specific misconduct" and is more objective than subjective. Program Standards, at 13 (ECF No. 86-7).

During a 30(b)(6) deposition, where Keefe testified as the University's representative, she acknowledged there probably was no difference between the professional character deficiencies noted in the dismissal letter and "fitness for the neuroscience profession." Keefe Depo., 66:21–67:9 (ECF No. 86-6). She further acknowledged the Committee considered Rossi's fitness for the program as one factor in the dismissal. *Id.* at 67:10–19. The Committee's examples in the dismissal letter largely did not pertain to a subjective determination of professional character involving appropriate judgment, ability to prioritize, or ability to handle stress. The examples focused on dishonesty and objective conduct unbecoming of the profession. Thus, by considering the Neuroscience Program Standards, and not just the Student Code, the court concludes the third

ground was disciplinary in nature.[5]  *See also Horowitz*, 435 U.S. at 87 (stating "[m]isconduct is a very different matter from failure to attain a standard of excellence in studies.  A determination as to the fact involves investigation of a quite different kind") (quotations and citations omitted)); *Gaspar*, 513 F.2d at 849 (noting disciplinary matters are "in the nature of misconduct, immorality, or refusal to conform to [regulations]").

### D.      Type of Dismissal

Although the third ground in the dismissal letter was disciplinary in nature, the court must look to the dismissal as a whole to determine whether it was academic or disciplinary.  *See Lee v. Guikema*, 645 F. App'x 780, 783 (10th Cir. 2016) (viewing academic and misconduct reports to determine overall nature of the dismissal).  Classifying a decision as academic or disciplinary is necessary because the level of due process turns on that classification.  *Id.* (citations omitted).

The record supports that it was the third ground that tipped the scales as to *when* Rossi was dismissed, but it was not the main reason for her dismissal.  The Committee told Rossi on November 20, 2013, she was being dismissed for academic reasons.  On advice of University counsel, the Committee reinstated her two days later and formally put her on notice about her

---

[5]   The court notes after Keefe asserted in her response that Rossi had misrepresented facts in her grievance, Rossi attempted to be heard.  On December 16, 2013, Dean Kieda did hear from Rossi but said the matter would require a mediator and did not address it at that time.  Email, at 2 (ECF No. 78-19).  In the meantime, however, Dean Kieda told Rossi to try to work to answer the Committee's questions the best she could.  *Id.*  On December 19, 2013, Dean Lee informed Rossi she would not meet with her on the matter and encouraged Rossi to discuss her concerns with the Committee.  Email, at 2 (ECF No. 78-21).  The requirement to be heard is not for a student merely to have an opportunity to speak.  It is for the listener to become aware of the student's version of facts and determine if the action being reported is still deemed proper.  *Horowitz*, 435 U.S. at 89.  Defendants have not shown Rossi had an opportunity to be heard, in this sense, on the Committee's allegations.  Rossi should have had an opportunity to be heard before the Committee relied on this ground for dismissal.

academic performance.  The Committee informed her about specific deadlines and standards she had to meet, but the November 22nd letter allowed Rossi to make a choice in January 2014 about whether to proceed in the program if the Committee still felt her work was deficient by then.  If she chose to remain, then she could submit a second dissertation in July 2014.

On November 27, 2013, Rossi filed a grievance that included incorrect information.  In December 2013, Rossi requested an extension of one of the deadlines.  She did not miss the deadline.  She asked for an extension of it.  The Committee granted the extension, but Keefe informed Rossi that the Committee would review her progress and let her know by January 15, 2014, "whether you will be allowed to continue in the program/toward a defense."  Email, at 3 (ECF No. 78-20).  This plan change came after Rossi had filed her grievance on November 27, 2013, and Keefe had responded on November 29, 2013, with the Committee's misconduct allegations.

When the Committee did dismiss Rossi in January 2014, in contravention of the plan set forth in the November 22nd letter, the Committee expressly referenced Rossi's grievance as one of the misconduct grounds for dismissal.  Dismissal Lttr., at 3 (ECF No. 78-24).  It also referred to events from Spring 2013 and further raised new misconduct allegations that were never raised with Rossi before.  And the record shows that White's assessment of Rossi's "low character" at Boston University also was considered by the Committee, but not disclosed.  *Cf* Email, at 3 (ECF No. 86-76) *with* Dismissal Lttr., at 3.

The evidence supports that Rossi's alleged misconduct was not an "aside" of little consequence, but an important factor in the Committee's dismissal decision.  It further supports that the issues had been simmering with the Committee at least since Spring 2013.  In the dismissal

letter, more lines are dedicated to addressing Rossi's misconduct than to either Rossi's academic performance or to timeliness issues. *See* Dismissal Lttr., at 2–3 (ECF No. 78-24). The evidence would allow a reasonable factfinder to conclude that the misconduct grounds were the tipping factor that led to Rossi's dismissal in January 2014.

Even though Rossi's alleged misconduct may have tipped the Committee's decision as to *when* it decided to dismiss her, the context for the dismissal nevertheless was primarily academic. The record supports the Committee had informed Rossi about alleged deficiencies in her academic performance from the time she failed her dissertation defense in April 2013 until the Committee dismissed her in January 2014. By November 2013, the Committee determined Rossi's academic performance warranted dismissal, and the work Rossi submitted thereafter did not change their mind. Thus, while the allegations of misconduct may have caused the Committee to discard the November 22nd plan, the primary context for Rossi's dismissal was the Committee's allegations about her academic performance. The court therefore concludes Rossi's dismissal was academic.

### E.    Notice Requirements

Having concluded that Rossi's dismissal should be evaluated under academic standards, the court must determine whether due process has been satisfied by Rossi receiving notice of the grounds for dismissal. A pre-termination hearing was not required. In *Trotter*, the Tenth Circuit stated notice requirements for an academic dismissal are met "if the student had prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal." *Trotter v. Regents of Univ. of N. Mex.*, 219 F.3d 1179, 1185 (10th Cir. 2000) (quotations and citations omitted). From the time of the failed dissertation defense, the Committee informed Rossi during in-person meetings and in written feedback of concerns about her academic performance. In the

November 22, 2013 reinstatement letter and in the December 17, 2013 email, the Committee warned Rossi that dismissal was possible if her academic performance did not improve.  Nov. Lttr., at 4–5 (ECF No. 78-13); Email, at 3 (ECF No. 78-20).

Timeliness concerns also were raised in Keefe's November 29, 2013, response letter to Rossi's grievance, *see* Keefe Response, Item 8 at 6 (ECF No. 78-16), and in Keefe' email granting Rossi an extension, *see* Email, at 3 (ECF No. 78-20).  While it is true the Committee raised additional timeliness concerns for the first time in the January dismissal letter, that fact does not negate Rossi had been given earlier notice about timeliness concerns.

Finally, Keefe's response letter also identified multiple misstatements in Rossi's grievance. *See generally* Keefe Response (ECF No. 78-16).  The Committee included the same statements in the dismissal letter.  The Committee asserted that Rossi mispresented (1) facts about how her dissertation defense had proceeded, (2) the "committee's feedback on [Rossi's] dissertation work," and (3) the Committee's "position regarding the acceptability of [Rossi's] work."  Dismissal Lttr., at 3 (ECF No. 78-24).  The dismissal letter added on the allegation about Rossi misrepresenting why she left Kesner's lab and the criticism about Rossi's Facebook posting.  The evidence supports the Committee also considered Rossi's conduct at Boston University, which was not disclosed in the letter. Although Rossi did not receive prior notice of all misconduct allegations, notice requirements for *academic* dismissals do not appear to require notice with such particularity.  It was sufficient that Rossi was put on notice of the main grounds for dismissal.  The court therefore concludes Rossi received sufficient notice prior to her academic dismissal.

**F.      Careful and Deliberate**

In addition to claiming inadequate notice, Rossi also contends her dismissal was disciplinary, nonacademic, and neither careful nor deliberate.[6]  Although the court has concluded Rossi's dismissal was not disciplinary and should be evaluated under the academic due process standards, the second prong of those standards still requires that the academic decision be careful and deliberate.  A decision based on ill will, bad motive, or other concealed nonacademic reasons does not satisfy this requirement.

The question at this stage is not whether there are material facts in dispute.  *Cox v. Glanz*, 800 F.3d 1231, 1243 (10th Cir. 2015) (citation omitted).  Instead, the court "is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court."  *Id.* (quotations and citations omitted) (alteration in original).  Stated differently, the question is whether Rossi has come forward with sufficient evidence to support her allegations that the Committee's determination was not careful or deliberate.  If so, then the court must determine whether the Committee Defendants have satisfied their burden for summary judgment.

> **i.      Conflict and Biases – Broad View of Committee's Action**

"Bias is easy to attribute to others and difficult to discern in oneself."  *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905, 195 L. Ed. 2d 132 (2016).  It is challenging to determine the impact of bias on a decision maker.  In the context of an impartial tribunal standard for quasi-

---

[6]   Although Rossi's arguments focused on a disciplinary dismissal, the same evidence and arguments she presented to show a disciplinary dismissal is used by the court to address whether the Committee Defendants' decision was careful and deliberate.

judicial proceedings, the Tenth Circuit has noted, "the presence of even one biased member on a tribunal is sufficient *to deprive* a plaintiff of *procedural due process*." *McClure v. Indep. Sch. Dist.*, 228 F.3d 1205, 1216 n.8 (10th Cir. 2000) (emphasis added).  This is so because "there is no way which we know of whereby the influence of one upon the others can be quantitatively measured." *Id.* (quotations and citations omitted).  Although the Committee was not a tribunal in the typical sense, Rossi has come forward with evidence sufficient to support that the Committee's decision was neither careful nor deliberate.

During several stages of the appeal process, adjudicators noted the strained relationship between Rossi and Dudek, and his lack of mentorship after a certain point.  *See* Appeal Decisions, at 2, 5, and 7 (ECF No. 78-27).  Because Rossi had other Committee members, however, the adjudicators concluded Rossi's dismissal was neither arbitrary nor capricious.  *See id.*, at 5, 7.  At the final appeal level, the adjudicator relied upon the Committee's past "track record of mentoring graduate students," and the Committee' judgment about Rossi's poor performance.  *Id.* at 8.  The adjudicator noted Rossi had failed to attend to feedback "given by experienced scientists and mentors." *Id.* at 8–9.  The adjudicator therefore concurred that the dismissal decision "was neither arbitrary nor capricious." *Id.* at 9.  By assuming Rossi had appropriate mentorship from Committee members other than Dudek, the Committee's judgment about Rossi's performance also was accepted.  The impact of taint by multiple Committee members was not factored into the analysis.

From a broad view, Rossi has come forward with evidence to show factual inconsistencies that satisfy her burden.  Keefe asserted Rossi's dissertation was so poor the Committee could have refused to allow her to proceed to her defense.  White asserted it was the worst dissertation he had

ever seen during his entire career.  The Committee required her to redo both papers because her work was that terrible.

These assertions seem inconsistent with the prior assessments of Rossi's work.  Before Rossi came to the University, Rossi worked on two separate projects associated with Harvard University.  As part of those projects, she helped write a grant proposal and coauthored two papers that were published.  At the University, Rossi passed her qualifying exams.  Keefe noted her performance was "outstanding."  Not only in letters of recommendation, but in Committee notes, the Committee remarked that Rossi's work was scholarly, well-written, and that she was detailed and had good record keeping.  She helped write grant applications.  She also obtained a pre-doctoral fellowship from the Epilepsy Foundation and had a prestigious post-doctoral fellowship planned at MIT.

On March 30, 2013, Dudek told Rossi her worked looked good, "mostly very small stuff to consider so far."  Email, at 2 (ECF No. 86-37).  On April 2, 2013, Dudek told Rossi her theta paper was unlikely to be a limiting factor and "would probably fly fine" even if it was submitted as it was.  Email, at 2 (ECF No. 86-38).  He told her instead to focus on paper 2 – the epilepsy paper.  She was to just keep going as she was on paper 2.  Dudek was Rossi's mentor and Committee chair.  His statement that at least Rossi's theta paper seemed fine came prior to the alleged misrepresentations Rossi made to the Committee later that month and ensuing discord.

Rossi has presented evidence that the Committee and members of Dudek's lab heavily relied on Rossi's answer during her defense that she had analyzed only one day of data.  Based on that answer, the Committee determined Rossi should not proceed to oral defense because her analysis was too deficient.  Additionally, Dudek, and to some extent Keefe, concluded Rossi must

73

have misrepresented how much analyses she had done.  For reasons that are unclear from the present record, during their depositions, the Committee continued to rely on Rossi's answer to prove how deficient Rossi's dissertation was and how she had misrepresented information.  And yet, Rossi has presented evidence to show her data was comprehensive and that she did analyze many days of data.  She has presented evidence that she offered to show her analyses to the Committee, but they did not accept her offer.  She has presented evidence that all the data and analyses were on her computer pre-defense and remained sequestered thereafter.

As to the adequacy of Rossi's proposed methods, Committee members disagreed during Committee meetings and subsequent communications about the appropriateness of what methods Rossi should use.  The evidence supports the Committee never agreed upon the appropriate methods for the behavioral or seizures analyses.  The evidence further supports that Keefe, and to some extent White, deferred to Dudek as to the adequacy of Rossi's methods in these areas, even though he had consistently spoken negatively about Rossi.  When Rossi did propose a method satisfying industry standards as to the interneuron data, the Committee still reported back to her that she had made no progress.  Keefe admonished Rossi to take more time on her next methods write up, but two days later the Committee dismissed Rossi.  After consulting with University counsel, two days after that, the Committee told Rossi she was reinstated and gave her detailed information about what procedures would be used to evaluate her.  The Committee then abandoned the plan after Rossi filed a grievance, and they dismissed her in January 2014.

Rossi also has presented evidence that Dudek worked behind the scenes with his lab members to identify what research of Rossi's they needed so his lab could continue with Rossi's research.  Yet, at the same time, Dudek reported to others that Rossi had falsified her research.

74

Rossi also has presented evidence that Dudek further worked behind the scenes with Greger and Ekstrand on an email to convince Keefe to terminate Rossi.  And despite Keefe concluding that Rossi's work was so terrible that it did not even warrant a defense or White concluding Rossi's work did not warrant a place above the lowest rung on a ladder, Rossi's reported results in April 2013 were accurate.

When Dudek submitted his final NIH report in 2015, the results of Rossi's research did not change from what had been reported in the April 2013 NIH progress report.  On a complex, novel project, Rossi had reached a conclusion that was accurate for both the theta and epilepsy papers despite the Committee's assessment that her work was so poor she had to be dismissed from the program.  In broad terms, Rossi's evidence does not fit the typical profile of a student failing academically.  The court now addresses the conduct of the Committee Defendants more specifically.

### ii. Dudek

Rossi has presented sufficient evidence to support her factual allegation that Dudek's decision to dismiss her was based on ill will or bad motive.  Rossi's evidence supports that Dudek did have a conflict of interest with respect to the Epoch device, and that he modified Rossi's project for his benefit.  By moving her from a tethered device to using Epoch and having her focus her research on seizures, rather than her original focus on learning and memory, Rossi helped validate Dudek's device.  It was not a problem that the device did not record seizures during Rossi's project, provided the device was accurate.  To prove the "stability of the recordings," Dudek's lab had started a parallel project with a different type of ablation to control for possible immune responses from the SSP-saporin injections.  Email, at 8 (ECF No. 78-5) (stating plan on how to confirm

stability of recordings using another method than Rossi's). Dudek needed time to get results from that project.[7]

In the April 2013 NIH progress report, Dudek reported that Rossi's project did not yield seizures, but the diphtheria ablation project did show seizures. *Id.* NIH Rpt., at 35 (ECF No. 86-32). Data from the diphtheria project, however, was preliminary and the analysis incomplete at the time of the report. *Id.* Thus, the stability of the recordings was still in question. *See* Email, at 8 (ECF No. 78-5). By 2015, in the final NIH report, Dudek's was able to report that short term seizures occurred based on the diphtheria project. Thus, his device accurately reported when seizures were present and when they were not. Having reached those conclusions from Rossi's project and the diphtheria project, a manuscript was expected to be published. This evidence does not support that Rossi's work failed to meet academic standards.

The evidence supports that Rossi angered Dudek in April 2013 by proceeding with her defense and telling others she had not had much contact with Dudek in recent months. He admitted in his deposition that his dislike of Rossi started as early as April 2013, and the evidence supports that Dudek said before Rossi's dissertation defense that he would likely vote to fail her. The evidence further supports he had a concern about protecting his reputation. But for a few emails,

---

[7] Rossi's evidence also supports that Dudek received grant money to conduct research about his hypothesis that interneuron loss in the hippocampus resulted in epilepsy. Grant, at 13 (ECF No. 86-33). Rossi's research results were contrary to his theory. One aim of Rossi's study and the diphtheria study was to "[d]etermine the magnitude . . . of interneuron loss that is necessary to produce" seizures. NIH Progress Rpts., at 35–36 (ECF No. 86-32). The diphtheria project created a larger area of interneuron loss than the area in Rossi's project. *Id.* As with the Epoch device, it was not a problem that a small lesion area did not produce seizures as long as Dudek had time to research if a larger lesion area did. The evidence supports that by delaying publication of Rossi's research results, Dudek had time to run the parallel project to meet the study goal and prove his theory.

there is no evidence in the present record showing Dudek did have substantial contact with Rossi in the months leading up to her dissertation.  He waited until April 2, 2013, to bring up any concerns with her epilepsy paper, and it was not until one week before her defense that he told Rossi to postpone it based on his increased concerns.  Nevertheless, the Committee concluded that Rossi had misrepresented to them Dudek's availability.

Dudek removed Rossi from his lab three days before her dissertation and required her to work from home the remainder of her time at the University.  The evidence supports Rossi did not have access to her data from April 22, 2013 through about May 22, 2013.  During that same time Dudek reported to Committee members that she did have access.

Dudek began accusing Rossi of research misconduct in May 2013; one of the most serious accusations one can make against a scientist.  Yet, he never reported the information to Botkin until about six months later, in November 2013.  Dudek did not take care to check Rossi's lab computer before reporting to Botkin there was a complete lack of spreadsheets.  When Spampanato reported to Dudek he had found research files after a quick look, Dudek represented to Botkin they had had to dig much deeper to find them.  After Botkin informed Dudek his evidence against Rossi did not rise to the level to warrant even an investigation, Dudek continued to tell others Rossi had engaged in misconduct.  He never informed his lab members or the Committee about Botkin's conclusions.  This summary includes only some of the evidence, but it is sufficient to provide a foundation for Rossi's allegation that her dismissal was not careful and deliberate as to Dudek.

### iii.    Keefe

The court also concludes the evidence provides a foundation to proceed against Keefe.  In doing so, the court looks to the context stated above, and to other specific evidence Rossi asserts.

The evidence supports that Keefe initially tried to moderate the situation in April 2013, but then concluded Rossi had "blatantly misrepresented" information about what she and other Committee members had said.  After the Committee failed Rossi at her dissertation defense, Keefe put in place a protocol where Rossi could not have one-on-one contact with any Committee member.  Keefe asserts this was necessary so there would be witnesses.  She testified the veracity of the Committee members was never in question, notwithstanding Dudek's actions.

Keefe wrote two letters of recommendation for Rossi and was involved in multiple Committee reports.  For four years, Rossi performed well.  Keefe spoke highly of Rossi in terms of Rossi's maturity, the depth of her knowledge of the literature, and her scholarly writing.  Once Keefe decided that Rossi had blatantly misrepresented information, Keefe also concluded Rossi's dissertation was so poor the Committee could have refused to allow her to proceed to her defense.

Keefe further assumed without verifying that Rossi must have misrepresented how much Dudek's lab members reviewed her work.  And, after Rossi offered to provide the Committee with evidence to show the depth of her data and analyses, Keefe was among the Committee members who did not take Rossi up on her offer, but continued to rely on Rossi's incomplete answer to explain why Rossi had failed her dissertation.

On November 18, 2013, Keefe admonished Rossi not to do a quick turn around of the next Methods paper, but two days later voted to dismiss her.  This was after Dudek presumedly encouraged her to do so.  She then wrote a letter reinstating Rossi two days after that saying the Committed had changed its decision after careful deliberation, when the evidence supports the actual ground was because counsel advised them to do so.  In other words, the evidence would allow an inference that the Committee reinstated Rossi to satisfy legal requirements and not

because she was being given an actual chance to succeed.  Despite the procedures outlined in the November 22nd letter, they were abandoned in January 2014 after Rossi filed a grievance containing further alleged misrepresentations.

Rossi's evidence supports that the Committee never reached consensus about how the behavioral and seizure analysis should occur, and yet expected Rossi to meet their requirements for a detailed methods section.  As to the interneuron loss and non-epilepsy data, Keefe reviewed past communications between Rossi and the Committee in December 2013.  On December 15, 2013, Keefe informed the Committee they had found some of Rossi's methods acceptable back in July 2013.  Keefe further noted that Rossi's methods proposal on December 9, 2013 satisfied industry standards for the non-epilepsy data, such as interneuron loss.  The evidence supports that at that time Keefe was looking at Rossi's work academically.  Later that same day, however, Keefe informed Rossi by letter that her methods were lacking, including with respect to interneuron loss.  Keefe Lttr, at 42 (ECF No. 78-18).  Rossi was not told in the letter what she did right.  This reversal occurred after Keefe asked if Rossi should be provided more guidance on the epilepsy analysis and Dudek quelled that inquiry.  In other words, when Rossi's academic performance was viewed by Keefe, and found to be satisfactory, Keefe's views were later modified by negative comments about Rossi from Committee members.

The court is not equipped to analyze whether Rossi's Methods sections were done well.  It has no basis to do so.  But the court can address whether the evidence appears to show taint.  While allegations against Keefe may not be as strong as the evidence against Dudek, they meet the required foundation to proceed against Keefe.  Although she continued to provide advice to Rossi after the defense and raised important questions with the Committee about methodology, the

evidence supports that Keefe held strong views about Rossi's alleged misrepresentations, and arguably had formed conclusions that Rossi was the problem and not Dudek.  When a student engages in misconduct, the law does not preclude a faculty member from forming opinions about a student's honesty or integrity.[8]  If those opinions, however, create such ill will against a student that one cannot carefully and deliberately evaluate a student's academic performance, then an issue arises about whether a student's dismissal actually was based on academics.

The evidence shows significant disparities in what the Committee said from one day to the next in their instructions to Rossi.  Keefe drafted many of those summaries and letters.  Some of the disparities in Keefe's actions are temporally tied to Dudek's negative assessment of Rossi. This supports that Keefe accepted and judged Rossi's performance based on Dudek's reactions to Rossi rather than on the merits of Rossi's actual performance.  Coupled with the evidence stated above, the court therefore concludes Rossi has come forward with sufficient evidence to support her allegations against Keefe at this stage of the proceeding.

     iv.   <u>White</u>

Rossi alleges that White also showed personal bias against her.  The evidence shows that White had undisclosed reservations about Rossi during the entire time she was at the University. His reservations arose based on his perception of events at Boston University.  According to White, Rossi had gotten into serious trouble at BU; she left Hasselmo's lab with a cloud over her; and her conduct there was evidence of low character.  The basis for these accusations is not evident in the

---

[8]  If faculty determine a student's misconduct is serious enough to warrant dismissal, the law also allows for that, but faculty must disclose the grounds for the dismissal and provide an opportunity to be heard.  *Gaspar*, 513 F.2d at 849 (noting misconduct is in the nature of a disciplinary matter).

present record.  White also had the belief that Rossi was a mediocre student regardless of how good her grades were or how many publications she had.

White knew that Rossi did not have a background in highly technical and mathematical areas.  He knew Rossi's project was being altered from an area where she had knowledge to an area where she did not.  But he raised no concerns during Committee discussions about that change.  When issues arose at the time of her dissertation defense and thereafter, White seemed to have no problem tying his conclusions about Rossi's conduct to his view of her past conduct, presumedly based on second-hand knowledge or rumor.

Rossi invited White to be on her Committee, and she went to White for help in April 2013 without ever knowing that White had such negative views about her.  During the time in which other Committee members viewed Rossi's academic performance positively, White only wrote a reserved letter of recommendation for her.  After she failed her dissertation, he wrote to withdraw his letter and informed the Simons Center that Rossi had performed poorly at her dissertation defense and that he had doubts about her potential.  He took this action without regard to the status of Rossi's application.  Indeed, the Simons Center had already denied Rossi's application twenty days earlier.

White concealed his views from Rossi.  Even in the dismissal letter, Rossi was not informed the Committee had relied upon possible misconduct at BU; conduct that White raised.  Rossi left BU around 2006.  Eight years later, White still was relying upon some undisclosed conduct at BU to determine whether Rossi should be dismissed at the University.

Similar to Keefe, the evidence against White may not be as strong as the evidence against Dudek.  White did evaluate Rossi's proposed Methods after the defense, and he attempted to have

Dudek identify an efficient method that Rossi could use for the behavioral analysis.  Moreover, the evidence does not support that White had animosity towards Rossi.  But the evidence does support that he concealed nonacademic reasons for his decision and failed to support Rossi fully despite agreeing to be on her Committee.  Coupled with the evidence stated above, the court concludes Rossi has come forward with sufficient evidence to support her allegations against White at this stage of the proceeding.

### G.    Law Clearly Established

Having determined that Rossi has come forward with sufficient evidence to satisfy the first prong of the qualified immunity analysis, Rossi must now show that the law was clearly established at the time of the alleged procedural due process violations.  With respect to the second prong, the Tenth Circuit has stated:

> [F]or a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. The Supreme Court has explained that officials can still be on notice that their conduct violates established law even in novel factual circumstances.

*Cortez v. McCauley*, 478 F.3d 1108, 1114–15 (10th Cir. 2007) (en banc) (quotations and citations omitted).  The Supreme Court has clarified that while it does "not require a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L.Ed.2d 255 (2015) (citations omitted).  Additionally, a court may not "define clearly established law at a high level of generality.  The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.* (quotations and citations omitted) (emphasis in original).

The law in the Tenth Circuit has recognized a property right of continued enrollment for college and university students, particularly when a student pays tuition. This law was clearly established. At the same time the law was developed about a student's property rights, both the Supreme Court and the Tenth Circuit developed law about disciplinary versus academic dismissals. Clear standards were set forth about what procedural due process requirements were under both types of dismissals. And the law of both Courts warned that academic dismissals truly must be academic in nature. A dismissal decision must be careful and deliberate. It cannot be based on ill will, bad motive, or other concealed nonacademic reasons.

The court concludes the violative nature of the particular conduct alleged against the Committee Defendants meets this requirement. Rossi has not proven the Committee Defendants engaged in such conduct. That is not the standard at this stage. The standard is whether Rossi's factual allegations are sufficiently grounded in the record that they may form a foundation for answering the legal question before the court. Rossi has come forward with sufficient evidence to pass the qualified immunity bar.

### H.      Summary Judgment

Under Tenth Circuit case law, after a court addresses qualified immunity, it should then determine if a defendant has met his or her burden to show there are no issues of material fact, or that a reasonable fact finder could not find in favor of the plaintiff. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring). The court must view the evidence in the light most favorable to the plaintiff. *Henderson v. Glanz*, 813 F.3d 938, 952 (10th Cir. 2015).

In this case, the facts are voluminous.  The Committee Defendants' deposition testimony and other evidence tell a competing story about why Rossi was dismissed.  The facts are in dispute and are of such a nature that a reasonable fact finder may credit Rossi's allegations or the Committee Defendants' assertions.  The court therefore denies the Committee Defendants' motion for summary judgment on this claim.

## IV.   PROCEDURAL DUE PROCESS – STIGMATIZING DISMISSAL AND LIBERTY INTEREST CLAIMS

Rossi further alleges that even if her dismissal were purely academic, it carried a stigma and deprived her of her good name and reputation.  This, in turn, she asserts has precluded her from obtaining gainful employment in her educational field.  Consequently, she contends she was entitled to a name clearing hearing before dismissal, which she did not receive.  Rossi asserts the same facts and legal analysis apply for a stigmatizing academic dismissal as they do for deprivation of a liberty interest.  *Cf* Mem. in Opp'n, at 85–88 (ECF No. 82) *with id.* at 88–89.  The court therefore addresses these two claims together.

### A.   Applicable Standard

"Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."  *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).  Stated differently, when "a liberty interest is implicated, the due process protections of the Fourteenth Amendment are innervated" and a person must then "show he was not afforded an adequate name-clearing hearing."  *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994) (citations omitted).  Notwithstanding these pronouncements, reputational harm alone does not give rise to a due process violation.  *Paul v. Davis*, 424 U.S. 693,

701 (1976).  Such harm must be coupled with "more tangible interests such as employment" for due process to be implicated.  *Id.*

In applying *Paul*, the Tenth Circuit has developed a "stigma-plus" standard for reputational harm.  The standard requires "(1) governmental defamation and (2) an alteration in legal status." *Guttman v. Khalsa*, 669 F.3d 1101, 1125 (10th Cir. 2012) (citations omitted).  For example, some employees have a protected property interest in continued employment.  If the government defames an employee's good name and reputation, which results in termination of the protected employment and preclusion of future similar employment, that equates to alteration of legal status based on governmental defamation.  *See Guttman*, 669 F.3d at 1125–26; *Workman*, 32 F.3d at 480–81).  In this case, the tangible interest at play was Rossi's continued enrollment in a graduate program to obtain a Ph.D.

To ensure the liberty interest at issue involves both governmental defamation and alteration in legal status, the Tenth Circuit has more particularly broken down the stigma-plus standard as follows: "(1) the statements must impugn the [person's] good name, reputation, honor or integrity; (2) the statements must be false; (3) the statements must occur in the course of terminating the [person] or must foreclose other employment opportunities; and (4) the statements must be published."  *Guttman*, 669 F.3d at 1125–26 (citations omitted).  "These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest."  *Workman*, 32 F.3d at 481 (citations omitted).  For the third factor, the Tenth Circuit has clarified the defamation does have to occur "'incident to the termination of . . . employment,'" meaning it is not an "either/or" situation despite use of the word "or" in that factor.  *Guttman*, 669 F.3d at 1126 (quoting *Siegert v. Gilley*, 500 U.S. 226, 234 (1991)).

**B.     Application of Standard to Rossi's Allegations**

      i.     <u>Alleged Defamatory Statements</u>

For these two claims, Rossi identifies the following statements as both stigmatizing and false.  For simplicity, the court follows Rossi's practice of using her first name in the quoted language:

1.     "Dudek told members of Christina's thesis committee that her efforts were dishonest, misleading, and falsified."

2.     "Dudek expressed similar concerns to academic persons entirely unrelated to the Program or Christina's dissertation, including Staley and Sanguinetti."

3.     "Dudek told Spampanato and other members of his lab that Christina engaged in research misconduct such as falsification or fabrication."

4.     "Dudek told Parks and Botkin that Christina 'complete[ly] lack[ed]' spreadsheets for her analysis and said aspects of her work were likely falsified.  However, almost six months prior to these representations, Dudek received two spreadsheets pertaining to Christina's thesis data and analyses."

5.     "Dudek told Botkin that Christina failed her thesis defense and had not analyzed as much data as she should have."

6.     "Even after determining that Christina had, in fact, analyzed more data [than] he thought she had, Dudek failed to retract his false statements to Botkin."

7.     "Dudek described Christina's thesis defense work to his family in a way that they could conclude Christina was dishonest.  He told his daughter, Amanda, that Christina failed her thesis defense and falsified data.  He told his other daughter, Sara, that Christina had engaged in misrepresentation and analyzed less data than she should have.  He told his wife, Kathleen, that Christina had flunked out of school and analyzed less data than she should have."

Mem. in Opp'n, at 86–87 (ECF No. 82) (citations omitted).  This list is notable because the allegations only include statements made by Dudek.  Rossi has not identified any statement made by the other Committee Defendants.  Accordingly, these two claims must be dismissed against Keefe and White.  The court now addresses the claims as they apply to Dudek.

### ii.    First and Second Factors

Rossi has provided evidence to show her name, reputation, and integrity were impugned from about April 2013 through January 2014 by Dudek.  Through her own declaration, emails about lab documents, Botkin's conclusions about Dudek's allegations, and Dudek's subsequent use and report about Rossi's research, she has provided evidence to support that Dudek's allegations about Rossi falsifying her data and analyses were not true.  Thus, Rossi has come forward with sufficient evidence to satisfy the first two factors.

### iii.    Third and Fourth Factors

For the next two factors, the court addresses the fourth factor first to determine which statements are at issue.  This is a § 1983 action, so the court looks to Tenth Circuit law as to what constitutes publication under the liberty interest standard.  "'A statement is 'published' if it is 'made public.'"  *Alcorn v. La Barge, WY*, 784 F. App'x 614, 619 (10th Cir. 2019) (quoting *Bishop v. Wood*, 426 U.S. 341, 348 (1976)).  The Tenth Circuit has "held that 'intra-government dissemination, by itself, falls short of the Supreme Court's notion of publication' because such statements are not made public."  *Id.* (quoting *Asbill v. Hous. Auth. of the Choctaw Nation of Okla.*, 726 F.2d 1499, 1503 (10th Cir. 1984)).  The Court noted in *Alcorn* that it had not "precisely defined the scope of intra-governmental disseminations."  *Id.* (citation omitted).  The *Alcorn* Court, therefore, analyzed prior rulings about how "intra-government dissemination" had been applied, and concluded it should be applied broadly.  *Id.* (citations omitted).  The Court then applied it to communications between a municipal government and a state agency.  *Id.*  Although one may argue such communications should be viewed as *inter*-governmental dissemination, because the municipality was "akin to sub-units of the state," the Court nevertheless determined the

communication was *intra*-governmental. *Id.* (citation omitted). *Alcorn* is an unpublished decision, but due to its review and application of prior rulings, the court finds its reasoning persuasive.

If intra-governmental communication extends from a municipality to a state agency, then it also extends from Dudek to his lab members, from Dudek to other Committee members, and from Dudek to other employees of the same University. Under Tenth Circuit law, Dudek's communications to such individuals do not satisfy the requirement for publication, or alternatively, Dudek lacked notice, for purposes of qualified immunity, that such communications would constitute publication.

Dudek's comments to Staley and to his family, however, were not intra-government communications. It also is questionable if such communications were made public to satisfy publication requirements. Even if they were, however, Rossi "must show that as a result of the" alleged false statements, Rossi's legal status changed. *Al-Turki v. Tomsic*, 926 F.3d 610, 617 (10th Cir. 2019) (citation omitted). In other words, she must "show[] her dismissal resulted in the publication of information that was false and stigmatizing," *and* that "she was foreclosed from taking advantage of future employment opportunities *as a result* of the false publication." *Beus v. Uinta Cty. Bd. of Cty. Comm'rs*, 143 F. App'x 945, 950 (10th Cir. 2005) (citations omitted) (emphasis added).

In this case, Rossi was dismissed from a graduate program. The dismissal alone precludes her future employment in the neuroscience field, and it also damages her ability to obtain employment at a master's level according to an expert opinion. The fact that she was dismissed, however, is a true statement. The alleged false statements published by Dudek to *Staley and Dudek's family* around the time of the dismissal were damaging to Rossi's reputation. But, as

stated above, damage to reputation alone is not enough.  Rossi must show the interconnection between the statements that were published and Rossi's loss of future employment opportunities. Because only the statements to Staley and Dudek's family are relevant here, such evidence is lacking.  Accordingly, the court also grants summary judgment to Dudek on this claim.

## V.   SUBSTANTIVE DUE PROCESS

### A.   Applicable Standard at Public Universities

Next, Rossi asserts she was deprived of substantive due process both as it applies to her property interest and her liberty interest.  "Substantive due process bars certain government actions regardless of the fairness of the procedures used to implement them."  *Abdi v. Wray*, 942 F.3d 1019, 1027 (10th Cir. 2019) (quotations and citation omitted).  A substantive due process violation occurs "'where government action deprives a person of life, liberty, or property in a manner so arbitrary it 'shocks the conscience.'"[9]  *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  This approach applies "when the plaintiff seeks relief for tortious executive action." *Id.* (quotations and citation omitted).  The Supreme Court has cautioned, however, "that only the most egregious official conduct can be said to be arbitrary in the constitutional sense."  *County of Sacramento*, 523 U.S. at 846 (quotations and citation omitted).  This means "a plaintiff must do more than show the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006)

---

[9]  A substantive due process violation also may occur "where government action has infringed a 'fundamental' right without a 'compelling' government purpose."  *Abdi*, 942 F.3d at 1027 (citation omitted).  Fundamental rights are "so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (quotations and citation omitted).  There has not been a clear pronouncement that the property right to continued enrollment in a graduate program rises to the level of a fundamental right.  Thus, the court only addresses Rossi's due process claim under a "shocks the conscience" standard.

(quotations and citation omitted).  The official's arbitrary conduct must shock the conscience.  *Id.*

If it does not, then a plaintiff must look to state tort law for possible redress.  *County of Sacramento*,

523 U.S. at 848.

It is important to note, however, what may shock the conscience in one setting may not do

so in another.  *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008).  For example, "cases

recognize that common-sense distinctions exist between force in one setting (say, a prison) and

force in another (say, a kennel business)."  *Id.*  Moreover, case law "recognizes official conduct

may be more egregious in circumstances allowing for deliberation . . . than in circumstances calling

for quick decisions."  *Id.* at 1220–21 (citation omitted).

In *Ewing*, when addressing the possibility of substantive due process in an academic

setting, the Court stated it may not override a faculty's professional judgment "unless it is such a

substantial departure from accepted academic norms as to demonstrate that the person or

committee responsible did not actually exercise professional judgment."  *Regent of Univ. of Mich.*

*v. Ewing*, 474 U.S. 214, 225 (1985).  In this sense, the standard requiring a careful and deliberate

decision for procedural due process is similar to the standard for substantive due process.  For if

an academic decision "was arbitrary, lacked a rational basis, or shocks the conscience," then it

constitutes a substantial departure from accepted norms.  *Yeasin v. Durham*, 719 F. App'x 844,

853 (10th Cir. 2018) (citing *Butler v. Rio Rancho Pub. Sch. Bd. of Educ.*, 341 F.3d 1197, 1200–01

(10th Cir. 2003)); *see also Disesa v. St. Louis Cmty. Coll.*, 79 F.3d 92, 95 (8th Cir. 1996) (stating

to prove substantive due process, plaintiff must show "no rational basis" for academic decision or

that "the decision was motivated by bad faith or ill will").

**B.     Application of Standard to Conduct of Committee Defendants**

      i.    <u>Property Rights</u>

Earlier, the court analyzed whether Rossi had come forward with sufficient evidence to support her allegation that the Committee's decision was motivated by ill will, bad motive, or another concealed nonacademic reason. An academic decision motivated by such factors constitutes a substantial departure from accepted norms in violation of substantive due process. Applying that same analysis here, the court concludes Rossi has come forward with sufficient evidence to support the Committee Defendants deprived her of a property right without substantive due process. Consequently, they are not entitled to qualified immunity based on the first prong as to Rossi's property rights claim.

      ii.    <u>Liberty Interest</u>

Rossi asserts "[t]o establish a substantive due process violation of her liberty interest in a good name, [she] must establish the four elements applicable in procedural due process infringements of liberty interests." Mem. in Opp'n, at 89 (ECF No. 82). The court addressed those four elements above and held that Rossi failed to satisfy her burden as to her liberty interest claim. For the same reasons stated above, the court grants summary judgment in favor of the Committee Defendants' on Rossi's substantive due process – liberty interest claim.

**C.     Law Clearly Established re Property Interest Claim**

In *Horowitz* and *Ewing*, the Supreme Court "assumed, without deciding, that federal courts can review an academic decision of a public educational institution under a substantive due process standard." *Ewing*, 474 U.S. at 222–23 (citing *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 91–92 (1978)). In 2001, however, the Tenth Circuit cited to *Ewing* and concluded that a

student may assert "a substantive due process claim based on an academic decision" if the student provides evidence that shows "the challenged decision was based on nonacademic or constitutionally impermissible reasons rather than the product of conscientious and careful deliberation." *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1182 (10th Cir. 2001) (quotations and citations omitted).

In 2018, the Tenth Circuit cited *Gossett* and *Harris* for "the underlying principle" that a substantive due process claim may be maintained when a student shows a purported academic decision "was the product of arbitrary state action rather than a conscientious, careful and deliberate exercise of professional judgment." *Yeasin*, 719 F. App'x at 853–54. The court then reaffirmed a student may prove such a violation by coming forward with the evidence specified in *Gossett*. *Id.* (citing *Gossett*, 245 F.3d at 1182). Because *Gossett* and *Harris* preceded the conduct at issue in this case, the court concludes the law was clearly established at the time of the alleged substantive due process violation with respect to Rossi's property rights claim.

**D.    Summary Judgment**

Having concluded Dudek, Keefe, and White are not entitled to qualified immunity on Rossi's substantive due process – property rights claim, the court now addresses whether these defendants are entitled to summary judgment. As stated previously, the facts in this case are voluminous. Rossi and the Committee Defendants have come forward with evidence that puts at issue why Rossi was dismissed. The facts are in dispute and are of such a nature that a reasonable fact finder may credit Rossi's allegations or the Committee Defendants' regarding the alleged substantive due process violation. The court therefore denies the Committee Defendants' motion for summary judgment on Rossi's substantive due process – property rights claim.

## VI.   DEFAMATION

Rossi contends that Dudek defamed her when he informed multiple people that he thought Rossi falsified data and otherwise engaged in research misconduct.  Rossi only asserts this claim against Dudek.  It is a state law claims that requires the court to look at Utah law in deciding Dudek's motion for summary judgment.

### A.   Standard of Review and Elements

The Utah Supreme Court has stated that "[d]efamation claims always reside in the shadow of the First Amendment." *Jensen v. Sawyers*, 2005 UT 81, ¶ 50, 130 P.3d 325.  To address that interplay, "defamation has accumulated a considerable assortment of defenses, privileges, heightened burdens of proof, and particularized standards of review." *Id.*

The standard of review for summary judgment "leaves no room for indulging inferences in favor of the nonmoving party." *O'Connor v. Burningham*, 2007 UT 58, ¶ 27, 165 P.3d 1214.  Additionally, the court "must weigh competing definitions and make sense of context." *Id.*  Then, it must determine if the relevant statement is susceptible "to a defamatory interpretation." *Id.* ¶ 26.  "This is not to say that" a court determines "whether a statement *is* defamatory as a matter of law." *Id.* (emphasis in original).  But, a court must determine the statement's "defamatory *susceptibility* as a matter of law in a nondeferential manner." *Id.* (emphasis in original).

To prove defamation, Rossi must show that "(1) the defendant published the statements [in question]; (2) the statements were false; (3) the statements were not subject to any privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements resulted in damages." *Jacob v. Bezzant*, 2009 UT 37, ¶ 21, 212 P.3d 535 (citation omitted).

**B.      Identification of the Statements at Issue**

Before the court addresses the elements, it must identify the statements at issue.  In her Amended Complaint, Rossi identified specific statements she alleged were defamatory.  In her opposition memorandum to Dudek's motion, Rossi identified modified statements.  *Cf* Amended Complaint, ¶ 136 (ECF No. 23) *with* Mem. in Opp'n, at 69–70 (ECF No. 83).  Although the statements in Rossi's Amended Complaint are not identical to those stated in her opposition memorandum, they do not need to be.  Notice is sufficient if it informs a defendant about which words or "words to that effect" are alleged to be defamatory.  *Zoumadakis v. Uintah Basin Med. Ctr., Inc.*, 2005 UT App 325, ¶¶ 3–4, 122 P.3d 891 (stating Utah law does not require the complaint to state with "specificity when, where, to whom, or by whom, the alleged defamatory statements were made").

The statements in the Amended Complaint and in the opposition memorandum pertain to Dudek's assertions that Rossi's academic efforts were dishonest, misleading, falsified, and constituted "research misconduct" and "falsification."[10]  The following are the statements or statements to that effect that are at issue on summary judgment.

1. "Dudek falsely told members of Christina's thesis committee her efforts were dishonest, misleading, falsified, and constituted 'research misconduct' and 'falsification.'  These untrue allegations were very serious, implicating her integrity, character, trustworthiness, and ability to function as a Ph.D. neuroscientist."

2. "Dudek expressed similar concerns to persons entirely unrelated to the Program or Christina's dissertation, including Staley and Sanguinetti."

---

[10]  Such statements are distinct from the misrepresentations alleged by the Committee members in the January 2014 dismissal letter.  The dismissal letter pertained to how Rossi represented comments made by Committee members about her preparation for her dissertation defense, comments she made about Dudek's availability, and so forth.  The letter did not address misleading data and analyses, research misconduct, or falsification.

3. "Dudek told Spampanato and other members of his lab that Christina engaged in research misconduct such as falsification or fabrication."

4. "Dudek told Parks and Botkin that Christina 'complete[ly] lack[ed]' spreadsheets for her analysis and said aspects of her work were likely falsified.  However, almost six months prior to these representations, Dudek received two spreadsheets pertaining to Christina's thesis data and analyses."

5. "Dudek told Botkin that Christina failed her thesis defense and had not analyzed as much data as she should have."

6. "Even after determining that Christina had, in fact, analyzed more data than he thought she had, Dudek failed to retract his false statements to Botkin."

7. "Dudek described Christina's thesis defense work to his family in a way that they could conclude Christina was dishonest.  He told his daughter, Amanda, that Christina failed her thesis defense and falsified data.  He told his other daughter, Sara, that Christina had engaged in misrepresentation and analyzed less data than she should have.  He told his wife Kathleen that Christina had flunked out of school and analyzed less data than she should have."

8. "The Committee Defendants dismissed Christina from the Program, in part, because they equated alleged misrepresentations on her part with lacking the skills, attitudes, or professional character befitting a recipient of a Ph.D. from the Program, which probably is the same as lacking fitness for the neuroscience profession."

9. "Christina did not fail her thesis defense."

Mem. in Opp'n, at 69–70 (ECF No. 83) (citations and parenthetical omitted).

### C.   Publication

Rossi has provided evidence that Dudek made the above statements and Dudek does not deny making those statements.  Dudek does not appear to challenge that he published the statements, other than to say he did not publish them excessively, and that he did not publish them on a publicly accessible website for the public to view.  Mem. in Supp. of Mot. for Sum. J., at 28 (ECF No. 80); Reply Memo., at 7 n.1 (ECF No. 93).

Publication required for a defamation claim is different from the publication required for a § 1983 stigmatizing liberty interest claim. It also differs in degree from false light claims that must be published "more widely." *Jensen*, 2005 UT 81, ¶ 49. For defamation, the Utah Supreme Court has cited with approval a Massachusetts case "holding that publication to *one person* is sufficient to maintain [an] action for defamation." *Id.* ¶ 49 n.8 (citing *Brauer v. Globe Newspaper Corp.*, 217 N.E.2d 736 (Mass. 1966)). It further cited to the Restatement of Torts. The Restatement provides "[p]ublication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." Restatement (Second) of Torts § 577 (1977). This publication includes statements made "to an agent of the defamer." *Id.* at cmt. e.

Thus, even though Dudek did not publish his statements to the public, the statements to members of his lab, the Committee, other University employees, his Harvard colleague, and his family still constituted publication under a defamation claim.

### D.      False Statements

When a private individual is involved and the communication is not made through a media source, "[i]t is the general rule that each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises." Restatement (Second) of Torts § 577A cmt. a (1977); *see also Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 n.3 (1984) (noting same general rule and that "single publication rule" is an exception). Although the court must look at the context in which the statements were made, it also must look at the statements individually to determine if they were false. Any "minor inaccuracies" are not actionable if the substance of the statement is

96

correct. *Davidson v. Baird*, 2019 UT App 8, ¶ 34, 438 P.3d 928 (citation omitted). Mere statements of opinion also are not actionable "because such statements are incapable of being verified." *Id.* ¶¶ 29, 31 (quotations and citation omitted). Nevertheless, when an opinion contains underlying facts that are false and defamatory, a defamation action may ensue. *Id.* ¶ 31 (citation omitted). Facts that are "objectively verifiable . . . are not entitled to the same degree of protection afforded expressions of opinion." *Id.* ¶ 33 (quotations and citation omitted).

Here, Statements One through Four, the second part of Statement Five, and Statement Six identified in section VI.B. above, when considered in context, fall within Rossi's defamation per se allegations and sufficient evidence exists as to falsity to withstand a motion for summary judgment. Dudek's reports about the absence of data and analyses are facts that may be objectively verified. Dudek chose not to view Rossi's research when offered. Yet, he continued to report to individuals that Rossi had engaged in research misconduct and falsification. After Botkin reviewed the evidence Dudek offered, he concluded it did not rise to the level to even warrant an investigation. Moreover, the circumstances in November 2013, where Dudek simultaneously sought Rossi's data and analyses while he was trying to convince his colleagues to dismiss her and reporting research misconduct to Botkin, makes his assertions of falsification troubling and doubtful. Importantly, the Final NIH Report in 2015 showed the same outcome that Rossi reported in her dissertation. Affording Dudek the belief that he would not knowingly use a false analysis in a report, a reasonable factfinder may conclude Dudek's statements about Rossi's research misconduct were false.

With respect to Statement Seven, it groups together statements Dudek made to his daughters and his wife. Only the statements Dudek made to Amanda constituted reports of

97

research misconduct and falsification.  While Sara and Kathleen were left with the impression that Rossi was dishonest, the dishonesty pertained to trustworthiness as opposed to research misconduct.  Thus, Rossi has provided sufficient evidence to show falsity as to statements made to Amanda, but not to the other family members.  The court therefore excludes the statements Dudek made to his daughter Sara and to his wife Kathleen.

 For Statement Eight, Rossi has failed to show how that statement is false.  She has failed to show what statement Dudek made about her.  The statement pertains to the January 2014 dismissal letter issued by the Committee.  Based on full context, Rossi has failed to come forward with sufficient evidence to prove falsity for Statement Eight.

The same is true with respect to Statement Nine and the first part of Statement Five. Although Rossi did not officially fail her dissertation, she did fail it in the context at issue.  Minor inaccuracies are not actionable, and this statement by Dudek cannot support a defamation claim.

## E.    Conditional Privileges and Exceptions

Even if a person publishes false statements, the person may avoid liability through an absolute or conditional privilege.  Dudek asserts his statements about Rossi were protected based on the following three conditional privileges: common interest privilege, public interest privilege and conditional privilege for family relationships. "Whether a publication is conditionally privileged is a question of law, unless a genuine factual issue exists regarding whether" an exception applies. *Wayment v. Clear Channel Broad., Inc.*, 2005 UT 25, ¶ 53, 116 P.3d 271 (citation and alteration omitted).

i.    Common Interest Privilege

"A conditional privilege arises to protect a legitimate interest of the publisher, the recipient, or a third person." *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 27, 221 P.3d 205 (citation omitted).  "The privilege also extends to statements made to advance a legitimate common interest between the publisher and the recipient of the publication."  *Id.* (citation omitted).  "Were statements not so privileged, a chilling effect would harm legitimate interests."  *Id.*  Additionally, "[t]he conditional privilege also permits mistakes to be made; otherwise there would be no need for the privilege."  *Id.* (citation omitted).

In this case, Dudek was a member of the dissertation Committee.  The Committee had a legitimate interest to ensure Rossi's reported results were supported by sound data and scientific analyses.  They had the obligation to judge her dissertation and whether her academic performance was sufficient to obtain a Ph.D.  The University, faculty, and lab members had a common interest to guard against falsified research.  Although Staley was not an employee of the University, he was supposed to collaborate on Phase III of the project at issue and arguably benefitted from knowing what occurred with the prior research.  Finally, reporting allegations of research misconduct to the Research Integrity Officer warrants particular protection.  Otherwise one's speech may be chilled on a matter of significant importance.  Thus, the court concludes Dudek's statements to the lab members, the Committee, Staley, and the Research Integrity Office fall within this category.

The statements to Sanguinetti do not fall under a common interest privilege for he was not involved in the neuroscience program at the University and Dudek's statements to him were not temporally appropriate.  The statements to Amanda Dudek also do not fall within this category.

ii.     Public Interest Privilege

The public interest privilege applies "when there is a legitimate issue with respect to the functioning of governmental bodies, officials, or public institutions, or with respect to matters involving the expenditure of public funds." *Jacob*, 2009 UT 37, ¶ 24 (quotations and citation omitted). Dudek asserts this privilege applies because the University is a public entity and it paid Rossi a stipend while she was in the program. The court also notes that Dudek had responsibility for the proper expenditure of the NIH grant money, and he discussed that matter with Botkin. The court concludes that when a public University expends public funds on a student or has reporting responsibilities under a government grant about expenditures, it has an interest in the proper performance of any research by a student receiving such funds. An allegation that Rossi engaged in research misconduct, while supported by public funds, falls within the public interest privilege with respect to the Committee members, Botkin, and Parks. Dudek has failed to show how the privilege extends to statements made to his lab members, Sanguinetti, Staley, or Amanda.

iii.    Conditional Privilege for Family Relationships

The statements Dudek made to Amanda are the only family statements that remain. Dudek contends those statements were protected because they were "beneficial to Amanda's well-being." Mem. in Supp., at 29 (ECF No. 80). Dudek correctly states that defamatory statements made by one family member to another may be privileged. In 2007, the Utah Supreme Court adopted Restatement (Second) of Torts, section 597. *O'Connor*, 2007 UT 58, ¶ 36. Section 597 has two provisions. Dudek relies upon the first provision, which states:

> (1) An occasion makes a publication conditionally privileged if the circumstances *induce a correct or reasonable belief* that
>
>> (a) there is information that affects the well-being of a member of the immediate family of the publisher, and
>>
>> (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the well-being of the member of the family.

*O'Connor*, 2007 UT 58, ¶ 36 (quoting Restatement (Second) of Torts § 597) (1977) (emphasis added); *see also* Mem. in Support, at 17, 28–29 (ECF No. 80).   Comment (c) states, "defamatory matter concerning another" may be published to a family member "when, if the matter were true, the recipient's knowledge would be of service in protecting their well-being."   Restatement (Second) of Torts § 597 cmt. c.

An example of this is when a family member sees a child with certain friends and communicates defamatory statements about the friends to the child's parent for purposes of protecting the child.   The type of well-being alleged by Dudek does not fall cleanly within the scope of this privilege.   The court cannot say, however, that the well-being of a family member would not benefit from knowing about the cause of another family member's stress.   Amanda was concerned about her father and his statements gave "her [an] understanding as to the stresses in her father's life," thus, helping her well-being.   Mem. in Supp., at 29.

Dudek fails to allege, however, what his reasonable belief was at the time he made the statements to Amanda.   In other words, he fails to allege that he made the statements to Amanda based on his reasonable belief that it would aid in her well-being.   It does not appear Dudek has satisfied this threshold showing.   Accordingly, the court holds that this privilege does not apply.

iv.   Exceptions to Conditional Privilege

Even if the conditional privileges did apply to all of the relevant statements made by Dudek, the court concludes an issue of fact exists as to whether the privileges have been abused. "'[A]n action for defamation is intended to protect an individual's interest in maintaining a good reputation.'" *Ferguson*, 2009 UT 49, ¶ 27 (citation omitted).  When a defamatory statement is protected by privilege, it means an injured person has no redress.  *Id.*  Hence, a conditional privilege may be lost if abused.  "[W]hether the holder of the privilege lost it due to abuse presents a question of fact." *O'Conner*, 2007 UT 58, ¶ 38 (citations omitted).

The Utah Supreme Court has stated "that in addition to other common law means, such as excessive publication or common law malice, a plaintiff can show abuse of a conditional privilege where the defendant (1) made a defamatory statement knowing it to be false or (2) acted in reckless disregard as to its falsity." *Ferguson*, 2009 UT 49, ¶ 28.  Both factors involve "subjective intent or state of mind." *Id.* ¶ 30.  Reckless disregard "exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement." *Id.* (quotations and citations omitted).  Although reckless disregard is subjective, there also is an objective component to it.  A court may look at "the inherent improbability of or obvious doubt created by the facts." *Id.*  "Evidence of 'malice' in this context may include indications that the publisher made the statements with ill will, [or] that the statements were excessively published . . . ."[11] *Wayment*, 2005 UT 25, ¶ 53 (quotations, citations, and alterations omitted).

---

[11]  The Court also said proof of malice may include "that the publisher did not reasonably believe his or her statements." *Wayment*, 2005 UT 25, ¶ 53 (quotations, citations, and alteration omitted). In 2009, however, the Utah Supreme Court declared that provision no longer may be considered in defamation suits. *See Ferguson*, 2009 UT 49, ¶¶ 27–28.

Here, Dudek first raised the issue of research misconduct in May 2013. It was a serious allegation and Keefe told Dudek he needed to speak with the Dean if he had such concerns. Dudek did not do so. He waited until October 2013 to report his concerns to Parks and November 2013 to report them to Botkin. If one were concerned enough to make such serious accusations, objectively, a person would seek to report the information.

After making the accusation in May 2013, Dudek did not take time to determine how much data and analyses Rossi actually had done. He testified in his deposition it would have been a waste of time to look. He did not have to search on his own, though. Rossi offered to provide him the information, but he did not accept the offer.

Notably, the other Committee members at Rossi's dissertation defense read the same documents and heard her same statements. They also participated in post-defense evaluations of her work. Yet none of them accused Rossi of research misconduct at any point. Moreover, Botkin found no basis even to open an investigation of the issue based on the evidence Dudek presented. This is so despite the fact that the University had a heightened awareness of research misconduct due to a research scandal that had made the news three months earlier. And yet, allegedly Dudek continued to make the same types of statements about Rossi after Botkin told him not to do so.

Additionally, Dudek made some of the accusations allegedly at the same time he had put a plan in motion to obtain the research Rossi had been working on to preserve the data and analysis for his own use. A reasonable factfinder may conclude the above facts show ill will or a reckless disregard of the truth. Accordingly, the court concludes sufficient facts exist to submit the issue to the jury about whether Dudek lost the conditional privileges and defamed Rossi.

### F.      Requisite Degree of Fault

As stated above, defamation exists within the shadows of the First Amendment.  Mistakes occur in reporting information.  When a private individual is involved, however, the standard to prove fault is lower in Utah.  *Seegmiller v. KSL, Inc.*, 626 P.2d 968, 972–73 (Utah 1981) (citation omitted).  Actual malice is not required.  Instead, Utah follows a negligence standard.  *Id.* at 973.  Because Rossi has provided evidence to support intentional conduct by Dudek, she has exceeded the standard necessary to show fault at this stage.

### G.      Damages

Rossi asserts Dudek's statements constituted defamation per se.  Defamation per se derives from words, that "on their face, and without the aid of intrinsic proof, [are] unmistakably recognized as injurious."  *Jacob*, 2009 UT 37, ¶ 26 (quotations and citation omitted).  A false statement asserting "'conduct which is incongruous with the exercise of a lawful business, trade, profession, or office'" constitutes defamation per se.  *Eagle Air Med Corp. v. Sentinel Air Med. Alliance, LLC*, No. 2:16-cv-176, 2018 WL 566835, at *3 (D. Utah Jan. 25, 2018) (quoting *Jacob*, 2009 UT 37, ¶ 26).

> Under this category, courts focus on whether the disparaging words "affect the plaintiff in some way that is peculiarly harmful to one engaged in the plaintiff's trade or profession.  Disparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality disparaged is of such a character that it is peculiarly valuable in the plaintiff's business or profession."

*Id.* (quoting Restatement (Second) of Torts § 573 cmt. (e)) (alteration omitted).

The heart of Rossi's work was research.  To assert she falsified her research and reported results without having analyzed the data, is among one of the most serious accusations one can make in the profession.  It is incongruous with the exercise of a lawful profession and requires no

independent evidence to prove its seriousness.  Rossi has come forward with sufficient evidence

to show Dudek's statements constituted defamation per se.  Moreover, Dudek has not attempted

to show his statements do not fall within that category.

When false statements are defamatory per se, a plaintiff "does not need to plead special

damages . . . because damages are presumed so long as the 'injurious character' of the challenged

word is obvious." *Westmont Residential LLC v. Buttars*, 2014 UT App 291, ¶ 22, <u>340 P.3d 183</u>

(citation omitted).  Rossi has therefore satisfied the final element—damages—for purposes of

defeating Dudek's summary judgment motion on her defamation claim for Statements One

through Six and for Statement Seven as it applies to Amanda Dudek.  The court grants summary

judgment in favor of Dudek for the remainder of Statement Seven and for Statements Eight and

Nine.

### H.    Governmental Immunity

Dudek is an employee of the University, a governmental entity.  Accordingly, he asserts

qualified immunity under Utah's Governmental Immunity Act (the "Act").  The Utah Supreme

Court has stated, "[g]enerally, it is appropriate to address liability issues . . . prior to addressing

the affirmative defense of the defendant's immunity from suit."  *Lyon v. Burton*, 2000 UT 55, ¶

12, 5 P.3d 616 (citation omitted).  Having found Dudek made statements susceptible to being

defamatory, the court now addresses his immunity defense.  The Act states:

> Except as permitted in Subsection (3)(c), no employee may be
> joined or held personally liable for acts or omissions occurring: (a)
> during the performance of the employee's duties; (b) within the
> scope of employment; or (c) under color of authority.

Utah Code Ann. § 63G-7-202(4).  This is a broad immunity afforded to government employees.

Its purpose "is to avoid making public officials unduly fearful in their exercise of discretionary

authority and discouraging them from taking prompt and decisive action." *Lyon*, 2000 UT 55, ¶ 44 (quotations, citation, and alterations omitted).

Like qualified immunity, however, the Act is not an absolute bar on all liability.  It provides the following exception to immunity:

> A plaintiff may not bring or pursue any civil action or proceeding based upon the same subject matter against the employee or the estate of the employee whose act or omission gave rise to the claim, *unless*: (i) the employee acted or failed to act through fraud or willful misconduct . . . .

Utah Code Ann. § 63G-7-202(3)(c)(i) (emphasis added).  The Act defines "willful misconduct" as "the intentional doing of a wrongful act, or the wrongful failure to act, without just cause or excuse, where the actor is aware that the actor's conduct will probably result in injury."  *Id.* § 63G-7-102(10).  This means statutory "willfulness requires a showing (1) that the government actor intentionally performed a wrongful act [or wrongfully failed to act] (2) with an awareness that injury will likely result."  *Salo v. Tyler*, 2018 UT 7, ¶ 41, 417 P.3d 581.

Allegations of research misconduct and falsification of data and analyses are among the most serious allegations one can make.  It is potentially career ending for the person against whom the allegations are made.  Rossi has come forward with sufficient evidence to show Dudek made such accusations with ill will.  Even after he knew Rossi's lab computer contained significant data and analyses, he continued to assert she had engaged in research misconduct.  Moreover, the evidence supports he may have used her research for his benefit.  This is sufficient to support that Dudek acted intentionally when he reported allegedly false statements against Rossi and that he did so knowing injury would likely result.  The court therefore concludes governmental immunity does not bar this claim against Dudek.

## VII.   BOTKIN'S SUMMARY JUDGMENT MOTION

Rossi asserts in her Amended Complaint that Botkin denied her procedural and substantive due process.  Botkin moves for summary judgment on the claims based on qualified immunity. "To rebut qualified immunity, [Rossi] must show that 'defendant's actions violated a federal constitutional or statutory right,'" and that the asserted right "'was clearly established at the time of the alleged unlawful conduct.'"  Mem. in Supp., at 8–9 (ECF No. 79) (quoting *Medina v. Cram*, 252 F.3d 1124, 1128–30 (10th Cir. 2001)) (alteration omitted).  Violation of a University policy, alone, is not enough.  *Trotter v. Regents of Univ. of N. Mex.*, 219 F.3d 1179, 1185 (10th Cir. 2000) (citations omitted).

### A.  Procedural Due Process

Rossi asserts Botkin deprived her of procedural due process because Dudek tainted the Committee with his research misconduct allegations and Botkin did nothing to correct the damage. Botkin met with Dudek and University counsel to review Dudek's concerns.  Botkin knew that Dudek had informed members of his lab and the dissertation Committee about his allegations against Rossi.  Botkin did not notify the Committee members or lab members that Dudek's allegations were not supported by evidence.  Nor did he inform Rossi about Dudek's allegations so she could clear her name.  Rossi contends Botkin's failure to notify her and the Committee of Dudek's unfounded accusations deprived her of pre-dismissal notice.  And because research misconduct is disciplinary in nature, Rossi asserts she was entitled to a hearing on the allegations, which she did not receive.

Rossi correctly states that dismissal for research misconduct is disciplinary in nature and warrants a name clearing hearing.  Rossi, however, was not dismissed for research misconduct, as

explained above.  Rossi also has failed to show the constitutional obligation Botkin had to report accusations when he concluded the accusations lacked merit and opened no investigation to consider them further.  Allowance must be made for employees to discuss possible research misconduct with the University's Research Integrity Office.  The Office serves a gatekeeping function.  To require the Research Integrity Officer to tell a person any time an accusation is made against the person has the potential to chill or defeat reporting of possible misconduct.

This situation, however, is unique in that Botkin knew Dudek had informed Committee and lab members about his accusations.  He knew Rossi's reputation likely had been harmed due to the serious nature of the allegations.  And yet, he did not require Dudek to tell the lab members or the dissertation Committee about Botkin's conclusions.  While Botkin could (and arguably should) have required Dudek to take affirmative steps to report to the Committee and lab members that his accusations were unfounded, Rossi has proffered no case to show Botkin was required to do so.  Overcoming qualified immunity is a heavy burden.  Rossi has failed to show that Botkin's conduct was a constitutional violation or that any such law was well-established.  This does not mean Rossi has no recourse for the harm she alleges.  It means it must be pursued against Dudek for defamation and not Botkin for failing to rehabilitate Dudek's accusations.  For these reasons, the court grants Botkin's summary judgment motion and dismisses the procedural due process claim against him.

### B.     Substantive Due Process

Although Rossi asserts a substantive due process claim in her Amended Complaint against Botkin, she did not address the claim in her opposition memorandum.  The court notes Rossi had to show Botkin's conduct was arbitrary and capricious or "such a substantial departure from

accepted academic norms as to demonstrate" failure to "exercise professional judgment." *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985).  Rossi has failed to come forward with such evidence about Botkin's decision.  Thus, the court also grants summary judgment in favor of Botkin on Rossi's substantive due process claim.

## VIII.   OFFICIAL CAPACITY AND INJUNCTIVE RELIEF

Rossi seeks injunctive relief requiring reinstatement into the Neuroscience Program at the University.  The remaining Committee members move to dismiss this request for relief on the ground that Rossi "cannot meet the elements of her underlying claims."  Mem. in Supp., at 36 (ECF No. 81).  The court denies the defendants' request for the reasons stated in the court's analysis above.

The remaining Committee members also move to dismiss claims against them in their official capacities.  Rossi asserted claims against the Committee members in their official capacity to enforce any injunctive relief.  Presently, Dudek, Keefe, White, and Ekstrand remain in their official capacity for this purpose.  White and Ekstrand have left the University and cannot carry out an injunctive order.   Neither Dudek nor Keefe hold administrative positions in the Neuroscience Program any longer, and similarly cannot carry out a prospective injunctive order.  Consequently, these defendants move for dismissal of the official capacity claims against them.

Rossi did not address their motion in her opposition brief.  Because no opposition was presented, the court hereby dismisses Dudek, Keefe, White, and Ekstrand in their official capacities.

Now that all Committee members have been dismissed in their official capacities, it is unclear how Rossi may seek enforcement of any injunctive relief.  The court directs Rossi to

inform the court on or before June 1, 2020 whether she intends to seek injunctive relief, and if so, how such relief may be enforced.  To the extent an opposition brief is appropriate, the defendants shall file a brief on or before June 22, 2020, and any reply brief shall be filed on or before July 6, 2020.

## CONCLUSION AND SCHEDULING ORDER

For the reasons stated above:

1. The court GRANTS Botkin's Motion for Summary Judgment (ECF No. 79), and dismisses him from the case in his individual and official capacities;

2. The court DENIES Dudek's Motion for Summary Judgment on Rossi's defamation claim (ECF No. 80), but limits the defamatory statements to those stated herein;

3. The court DENIES Rossi's Motion to Reconsider (ECF No. 87);

4. The court GRANTS IN PART and DENIES IN PART the Committee Members' Motion for Summary Judgment (ECF No. 81);

   A. The court grants summary judgment on the First Cause of Action as it applies to Rossi's stigmatizing and liberty interest claims;

   B. The court denies summary judgment on the First Cause of Action as it applies to deprivation of a property interest without procedural due process;

   C. The court grants summary judgment on the Second Cause of Action as it applies to Rossi's liberty interest claim;

   D. The court denies summary judgment on the Second Cause of Action for deprivation of property interest without substantive due process;

5. The court dismisses Dudek, Keefe, White, and Ekstrand in their official capacities; and

6.  The court directs Rossi to inform the court on or before **June 1, 2020** whether she intends to seek injunctive relief, and if so, how such relief may be enforced.  Any opposition brief shall be filed on or before **June 22, 2020**, and any reply brief shall be filed on or before **July 6, 2020**.

7.  When the court denies a motion for summary judgment, typically it holds a Scheduling Conference to set a trial date.  In light of COVID-19, it is unclear when jury trials will resume.  Once the court has that information, it will hold a Scheduling Conference to set a trial date.

SO ORDERED this 5th day of May, 2020.

BY THE COURT:

Clark Waddoups
United States District Court

111